*SOLICITATION VERSION*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTHWEST BANCORPORATION OF ILLINOIS, INC.,[1] | ) Case No. 15-15245 (CAD) |
| | ) |
| Debtor. | ) |
| | ) |

**DISCLOSURE STATEMENT FOR DEBTOR'S PREPACKAGED**
**CHAPTER 11 PLAN OF REORGANIZATION**

Prepared By:

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
Brad Weiland
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel to the Debtor and Debtor in Possession*

Dated: April 29, 2015

---

[1]     The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number is:  Northwest Bancorporation of Illinois, Inc. (0422).  The location of the Debtor's corporate headquarters and the service address for the Debtor is:  300 East Northwest Highway, Palatine, Illinois  60067.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTOR AND THE PARTIES TO THE PLAN SUPPORT AGREEMENT AND ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTOR URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN AND CERTAIN STATUTORY PROVISIONS.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT AND/OR CONSULTANTS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS.  WHILE THE DEBTOR BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTOR MAY SEEK TO

INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIMS ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS DISTRIBUTED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................1

II.  OVERVIEW OF THE PLAN ............................................................................................1

III.  IMPORTANT INFORMATION ABOUT TH IS DISCLOSURE STATEMENT ..................................3

    A.  Key Terms Used in this Disclosure Statement ...................................................3
    B.  Additional Important Information .......................................................................4

IV.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
    THE PLAN .....................................................................................................................5

    A.  What is chapter 11? ............................................................................................5
    B.  Why is the Debtor sending me this Disclosure Statement? .................................5
    C.  Am I entitled to vote on the Plan? ......................................................................5
    D.  What will I receive from the Debtor if the Plan is consummated? ......................6
    E.  What will I receive from the Debtor if I hold an Allowed Administrative Claim or a
       Priority Tax Claim? ............................................................................................8
    F.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
       Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
       "Consummation?" ..............................................................................................8
    G.  What are the sources of cash required to fund the Plan? ....................................8
    H.  Will the final amount of Electing TruPS Holders affect my recovery under the Plan? .......8
    I.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ...8
    J.  What is the deadline to vote on the Plan? ...........................................................8
    K.  How do I vote for or against the Plan? ................................................................9
    L.  What is a Confirmation Hearing and when is the Confirmation Hearing set to occur? ..........9
    M.  What is the purpose of the Confirmation Hearing? .............................................9
    N.  What is the effect of the Plan on the Debtor's ongoing business? .......................9
    O.  Who do I contact if I have additional questions with respect to this Disclosure Statement
       or the Plan? ......................................................................................................10
    P.  Who Supports the Plan? ...................................................................................10

V.  Background to THIS chapter 11 Case ..........................................................................10

    A.  The Debtor's Business .....................................................................................10
    B.  The Debtor's Capital Structure and Prepetition Indebtedness ..........................11

VI.  EVENTS LEADING TO THE CHAPTER 11 FILING ..........................................................11

VII.  ADMINISTRATION OF THE CHAPTER 11 CASE ............................................................12

    A.  First Day Motions and Certain Related Relief .................................................12
    B.  Exclusivity .......................................................................................................13

VIII.  RISK FACTORS ...........................................................................................................13

    A.  Certain Bankruptcy Law Considerations .........................................................13
    B.  Risk Factors that May Affect the Value of Securities to be Issued Under the Plan ........15
    C.  Disclosure Statement Disclaimer .....................................................................16

i

IX.     **BEST INTERESTS OF CREDITORS AND PLAN ALTERNATIVES** .................................................18

     A.     Liquidation Under Chapter 7 .............................................................................18
     B.     Alternative Plans .............................................................................................18

X.     **SOLICITATION AND VOTING PROCEDURES** ....................................................................19

     A.     Holders of Claims Entitled to Vote on the Plan ..............................................19
     B.     Solicitation Package .........................................................................................19
     C.     Distribution of the Solicitation Package ...........................................................19
     D.     Solicitation of Certain Class 3 - TruPS Claims ................................................20
     E.     Voting Record Date ..........................................................................................20
     F.     Voting on the Plan ............................................................................................20
     G.     Ballots Not Counted .........................................................................................21
     H.     TruPS Election ..................................................................................................21

XI.     **CONFIRMATION OF THE PLAN** .........................................................................................22

     A.     Requirements for Confirmation of the Plan ......................................................22
     B.     Feasibility .........................................................................................................22
     C.     Acceptance by Impaired Classes ......................................................................22
     D.     Confirmation without Acceptance by All Impaired Classes .............................23

XII.     **CERTAIN SECURITIES LAW MATTERS** ..........................................................................24

     A.     Amended TruPS .................................................................................................24
     B.     Issuance and Resale of Amended TruPS Under the Plan ..................................24
     C.     No Listing of Amended TruPS .........................................................................25

XIII.     **CERTAIN UNITED STATES INCOME TAX CONSEQUENCES OF THE PLAN** ...........................25

     A.     Certain United States Income Tax Consequences to the Debtor .......................26
     B.     Certain United States Income Tax Consequences to Holders of Class 3 Claims ...........................27

## EXHIBITS

EXHIBIT A          Plan of Reorganization

EXHIBIT B          Form of Stock Purchase Agreement

EXHIBIT C          Financial Statements

EXHIBIT D          Form of Plan Support Agreement

## I.    INTRODUCTION

Northwest Bancorporation of Illinois, Inc. ("Northwest") as a debtor and debtor in possession (the "Debtor"), submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtor in connection with the solicitation of acceptances with respect to the *Debtor's Prepackaged Chapter 11 Plan of Reorganization* (the "Plan"), dated April 29, 2015.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTOR BELIEVES THAT THE REORGANIZATION TRANSACTION CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTOR'S ESTATE, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  THE DEBTOR STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    OVERVIEW OF THE PLAN

In an effort to effect the financial restructuring contemplated by the Plan, the Debtor plans to commence a chapter 11 case in a United States Bankruptcy Court having jurisdiction (the "Bankruptcy Court") following the completion of the solicitation process.  The Debtor, upon commencement of the Chapter 11 Case, intends to file the Plan, this Disclosure Statement, and a motion seeking to approve the Disclosure Statement and solicitation process and confirm the Plan.

The Plan provides for a comprehensive restructuring of the Debtor's pre-bankruptcy obligations and maximizes recoveries available to all constituents.  Specifically, the Plan contemplates that the Debtor, with the support of a majority of its principal creditor constituency (e.g., the Electing TruPS Holders), will seek to confirm a chapter 11 plan of reorganization contemplating a comprehensive balance-sheet restructuring (the "Reorganization Transaction").

Further, the Plan facilitates the Sale Transaction and recapitalization of First Bank which should take place, or is expected to take place, pursuant to the Stock Purchase Agreement at some date after the Effective Date.  River Branch Capital LLC, the Debtor's investment banker and financial advisor, has performed and continues to perform a marketing process to obtain a buyer to purchase the Debtor or its assets.  As a sale of the Debtor will result in an ownership change in First Bank, the prospective buyer will also need to make a capital contribution to the Debtor in an amount sufficient to receive regulatory approval for First Bank's recapitalization and ownership change.  Both the Debtor and the Debtor's investment banker, River Branch Capital LLC, are optimistic that the Restructuring Transaction will right-size the Debtor's balance sheet, resulting in a substantially more attractive business to investors to close on the Sale Transaction and recapitalize First Bank.

The general terms of the Reorganization Transaction are set forth below.

- Plan Financing.  The Electing TruPS Holders will fund $700,000.00 (the "Plan Funding TruPS Contribution") into an escrow no later than April 28, 2015, with such amount to be used to fund the Reorganization Transaction.  In exchange for funding the Plan Funding TruPS Contribution, the Electing TruPS Holders will receive, upon effectiveness of the Plan, their Pro Rata portion of the Junior Amended TruPS.  In addition, the Management Plan Support Parties will fund $300,000.00 (a portion of which in an amount of $180,000.00 is financed by the Electing TruPS Holders through loans by the Electing TruPS Holders to the Management Plan Support Parties) (the "Plan Funding

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan, the exhibits and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement, the Restructuring Support Agreement, the Term Sheet, and/or the Plan, the Plan shall govern.**

<u>Management Contribution</u>") into an escrow no later than April 28, 2015, with such amount to be used to fund the Reorganization Transaction.  In exchange for the Plan Funding Management Contribution, the Management Plan Support Parties will receive their Pro Rata portion of $300,000.00 of the Junior Amended TruPS.

- <u>Treatment of TruPS Claims (Class 3)</u>.

  - o Non-Electing TruPS Claims Treatment:  Holders of Allowed TruPS Claims who do not make the TruPS Election shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim in Class 3, receive a Pro Rata share (based on the amount of their Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that does not make the TruPS Election) of Senior Amended TruPS in the amount of $800,000.00 and any accrued and unpaid interest under the applicable TruPS indentures and the applicable Trust Junior Subordinated Debentures will be irrevocably waived and excused; <u>provided</u> that, if all Holders of TruPS Election make the TruPS Election, there shall be no Non-Electing TruPS Distribution, and the principal face amount of all Junior Amended TruPS shall be $11,500,000.00 in the aggregate.

  - o Electing TruPS Holders Treatment:  Holders of Allowed TruPS Claims who do make the TruPS Election shall (a) forego any rights to a portion of the Non-Electing TruPS Distribution and agree that any distributions to the Electing TruPS Holders under the Plan will be expressly subordinated to the distributions to Non-Electing TruPS Holders; (b) receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for all but not less than all of such Holder's Allowed TruPS Claims, such Holder's Pro Rata share (based on the amount of such Holder's TruPS Claim relative to the Allowed TruPS Claim of any other Holder that makes the TruPS Election) of the Electing TruPS Distribution; and (c) fund in Cash such Holder's Pro Rata share (based on the amount of such Holder's Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes the TruPS Election) of the Plan Funding TruPS Contribution.[3]

- <u>Treatment of Other Claims and Interests (Classes 1, 2, 4, and 5)</u>

  - o Allowed Claims in Class 1 - Other Priority Claims.  The Debtor does not believe that any Other Priority Claims exist and will dispute any such Claims, if any, that are asserted.  In the event that the Bankruptcy Court enters a Final Order finding that a Holder has an Allowed Other Priority Claim, that Holder shall receive payment in full in Cash on account of such Other Priority Claim.

  - o Allowed Claims in Class 2 - Secured Claims.  The Debtor does not believe than any Secured Claims exist and will dispute any such Claims, if any, that are asserted.  In the event that the Bankruptcy Court enters a Final Order finding that a Holder has an Allowed Secured Claim, that Holder shall receive: (a) payment in full, in Cash; (b) receive the collateral securing any such Allowed Secured Claim; or (c) such other treatment such that the Holder shall be rendered Unimpaired.

  - o Allowed Claims in Class 4 - General Unsecured Claims.  Holders of Allowed General Unsecured Claims shall receive payment in full in Cash.

---

[3]   Each Electing TruPS Holder shall be required to place its Pro Rata portion of the Plan Funding TruPS Contribution in the Plan Funding Escrow on or before April 28, 2015.  Failure to make the payment on or before April 28, 2015 will invalidate any TruPS Election.  Any Holder of TruPS Claims that makes the TruPS Election by checking the box above but fails to make the payment into the Plan Funding Escrow by April 28, 2015 shall irrevocably result in such Holder of TruPS Claim to be deemed to have elected to not make the TruPS Election.

    o   Allowed Claims in Class 5 - Section 510(b) Claims.  All Section 510(b) Claims shall be cancelled without any distribution.

- Treatment of Interests (Classes 6 and 7).  Holders of Interests will receive no distribution on account of such Interests.  Minority Interests will be a terminated upon effectiveness of the Plan.  Majority Interests will be reinstated as of the Effective Date subject in all respects to the Recapitalization Right to Purchase and solely to comply with applicable regulations pending the exercise of the Recapitalization Right to Purchase.  Once certain conditions (the "Sale Conditions") identified in the Stock Purchase Agreement have been satisfied, Holders of Majority Interests will sell their Majority Interests to the Plan Sponsor for a nominal amount as specified in the Stock Purchase Agreement.  The Sale Conditions include the following:

    o   Full recapitalization of First Bank led by the Plan Sponsor, including the injection of cash into First Bank in an amount sufficient to receive regulatory approval for First Bank's recapitalization and ownership change.

    o   Receipt of all required regulatory approvals.

As provided by Article IV.C of the Plan, the Debtor may undertake certain Restructuring Transactions to implement the Plan.  Nevertheless, the Debtor does not intend to transfer substantial operating assets prior to the Effective Date.  For the avoidance of doubt, nothing herein shall limit the respective rights and authority of the Reorganized Debtor to sell, transfer, or otherwise convey assets to any third party, in any case subject to applicable law.

It is important to note that the Debtor has virtually no cash on hand with which to pay Claims of any priority, and standing alone the Debtor could not fund a reorganization. Indeed, the money necessary to fund the Plan is being provided solely by (i) the Electing TruPS Holders, who, by making the TruPS Election, will be agreeing to fund a maximum of $880,000 (including a $180,000 to the Management Plan Support Parties) and (ii) the Management Plan Support Parties, who are agreeing to fund $120,000, plus take a $180,000 loan from the Electing TruPS Holders. Moreover, under the Plan Support Agreement certain Holders of TruPS Claims and the Management Plan Support Parties have already agreed and committed to fund this $1 million aggregate Plan funding amount, subject to the terms and conditions of the Plan and the Plan Support Agreement. Without the funding provided by these parties, and in particular the $880,000 funded by the Electing TruPS Holders, the Debtor would likely be forced into a "free fall" bankruptcy with no plan, no stalking horse bidder for its primary asset (First Bank), and no clear source of funding for even Administrative Claims. As such, the funding provided by the Electing TruPS Holders and the Management Plan Support Parties is critical to the Debtor's ability to reorganize and preserve value for its creditors.

## III.   IMPORTANT INFORMATION ABOUT TH IS DISCLOSURE STATEMENT

### A.      Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement.  This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only.  Please refer to the Plan for additional defined terms.

References to the "Bankruptcy Court" are to the United States Bankruptcy Court having jurisdiction over the Chapter 11 Case or any other court having jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the applicable United States District Court.

References to the "Bankruptcy Rules" mean the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

References to the "Chapter 11 Case" means the chapter 11 case to be initiated by the Debtor in the Bankruptcy Court.

References to a "<u>Claim</u>" are to any claim against the Debtor as defined in section 101(5) of the Bankruptcy Code.

References to the "<u>Confirmation Hearing</u>" are to the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

References to the "<u>Confirmation Date</u>" are to the date upon which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

References to "<u>Interests</u>" means any equity security in the Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtor together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

References to "<u>Person</u>" means to a person, as the term is defined in section 101(41) of the Bankruptcy Code.

References to the "<u>Plan</u>" are to the *Debtor's Chapter 11 Plan of Reorganization* dated April 29, 2015, a copy of which is attached as **<u>Exhibit A</u>** hereto and incorporated herein by reference.

References to the "<u>Plan Supplement</u>" are to the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed seven (7) days prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms of the Plan, the Purchase Agreement, the Plan Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules.Except as specifically provided otherwise in the Plan, each document, schedule, and exhibit included in the Plan Supplement shall be reasonably acceptable to the Plan Sponsor.

**B.      Additional Important Information**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, the Plan and the section entitled "Risk Factors" before submitting your ballot to vote on the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtor is under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

IV.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN**

A.       **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.       **Why is the Debtor sending me this Disclosure Statement?**

You are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Plan.  Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety.  As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtor's actual performance or achievements to be materially different from those it may project, and the Debtor undertakes no obligation to update any such statement.  Certain of these risks, uncertainties, and factors are described in Section IX of this Disclosure Statement, entitled "Risk Factors."

C.       **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective classification and voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | TruPS Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Majority Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Minority Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

D.        **What will I receive from the Debtor if the Plan is consummated?**

1.        *Summary of Treatment*

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Name of Class Under the Plan | Description of Class | Percentage Recovery Under the Plan | Plan Treatment and Voting Rights |
|---|---|---|---|---|
| N/A | Administrative Claims | Holders of Allowed Administrative Claims against the Debtor | 100% | Each Holder shall receive payment in full in cash. |
| N/A | Priority Tax Claims | Holders of any Priority Tax Claim against the Debtor | 100% | Each Holder shall receive payment in cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. |
| Class 1 | Other Priority Claims | Holders of all Other Priority Claims against the Debtor | 100% | Each Holder shall receive payment in full in cash.  Unimpaired; deemed to accept. |
| Class 2 | Secured Claims | Holders of all Secured Claims against the Debtor | 100% | Each Holder shall receive, at the option of the Debtor:  (a) payment in full in Cash; (b) receipt of the collateral securing any such Claim; or (c) other treatment rendering such Claim Unimpaired.  Unimpaired; deemed to accept. |
| Class 3 | TruPS Claims | Holders of all TruPS Claims against the Debtor | 5.4–28.7%[4] | <u>Non-Electing TruPS Claims Treatment</u>:  Each Holder of an Allowed TruPS Claim that does not make the TruPS Election shall receive its Pro Rata share (based on the amount of its Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that does not make the TruPS Election) of the Non-Electing TruPS Distribution; <u>provided</u> that, if all Holders of TruPS Claims make the TruPS Election, there shall be no Non-Electing TruPS Distribution, and the principal face amount of all Junior Amended TruPS shall be $11,500,000.00 in the aggregate.  <u>Electing TruPS Holders Treatment</u>: |

---

[4]        Based on principal face amount of Amended TruPS, not taking into account (a) the Plan Funding TruPS Contribution, (b) the relative risk of Amended TruPS instruments, or (c) the subordination of the Junior Amended TruPS.

| Class | Name of Class Under the Plan | Description of Class | Percentage Recovery Under the Plan | Plan Treatment and Voting Rights |
|---|---|---|---|---|
| | | | | Each Holder of Allowed TruPS Claims who makes the TruPS Election shall (a) forego any rights to a portion of the Non-Electing TruPS Distribution and agree that any distributions to the Electing TruPS Holders under the Plan will be expressly subordinated to the distributions to Non-Electing TruPS Holders; (b) receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for all but not less than all of such Holder's Allowed TruPS Claims, such Holder's Pro Rata share (based on the amount of such Holder's TruPS Claim relative to the Allowed TruPS Claim of any other Holder that makes the TruPS Election) of the Electing TruPS Distribution; and (c) fund in Cash such Holder's Pro Rata share (based on the amount of such Holder's Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes the TruPS Election) of the Plan Funding TruPS Contribution. <br><br> Impaired, entitled to vote. |
| Class 4 | General Unsecured Claims | Holders of all General Unsecured Claims against the Debtor | 100% | Each Holder shall receive payment in full in cash. <br><br> Unimpaired; deemed to accept. |
| Class 5 | Section 510(b) Claims | Holders of all Section 510(b) Claims against the Debtor | 0% | Section 510(b) Claims shall be cancelled and released without any distribution on account of such Claims. <br><br> Impaired; deemed to reject. |
| Class 6 | Majority Interests | Majority Interests in the Debtor | 0% | Majority Interests in the Debtor will be reinstated as of the Effective Date subject in all respects to the Recapitalization Right to Purchase and solely to comply with applicable regulations pending the exercise of the Recapitalization Right to Purchase without any distribution on account of such Majority Interest. <br><br> Impaired; deemed to reject |

| Class | Name of Class Under the Plan | Description of Class | Percentage Recovery Under the Plan | Plan Treatment and Voting Rights |
|---|---|---|---|---|
| Class 7 | Minority Interests | Minority Interests in the Debtor | 0% | Minority Interests in the Debtor will be discharged, cancelled, released, and extinguished without any distribution on account of such Minority Interest.<br><br>Impaired; deemed to reject |

**E.      What will I receive from the Debtor if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article II of the Plan. Administrative Claims will be satisfied as set forth in Article II of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

**F.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.

**G.      What are the sources of cash required to fund the Plan?**

The Plan will be funded by the Plan Funding TruPS Contribution and the Plan Funding Management Contribution, as described in Article II above.

**H.      Will the final amount of Electing TruPS Holders affect my recovery under the Plan?**

Electing TruPS Holders will share Pro Rata their recovery in the Junior Amended TruPS with a principal face amount of $10,700,000.00 in the aggregate unless all Holders of TruPS Claims make the TruPS Election, in which case all Electing TruPS Holders will share Pro Rata their recovery in the Junior Amended TruPS with a principal face amount of $11,500,000.00 in the aggregate.

Holders of TruPS Claims that do *not* make the TruPS Election or fail to make the TruPS Election will share Pro Rata their recovery in the Senior Amended TruPS with a principal face amount of $800,000.00 in the aggregate.

**I.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan provides for releases and exculpation of the Debtor, the Plan Sponsor, and other parties in interest as set forth in Article VIII of the Plan.

**J.      What is the deadline to vote on the Plan?**

The Voting Deadline is April 28, 2015, at 5:00 p.m. (prevailing Central Time).

### K.      How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  If your vote was solicited by your broker, dealer, commercial bank, trust company, a trustee, or other nominee ("Master Ballot Agent"), you must complete a ballot (the "Beneficial Owner Ballot") and transmit your vote to the Master Ballot Agent in accordance with the instructions contained in the Solicitation Package sent to you – including by the deadline set forth therein.  For additional detail regarding the solicitation and tabulation procedures for holders of Class 3 - TruPS Claims, see Article X of the Disclosure Statement.

The Master Ballot Agent will complete a Ballot summarizing votes cast by beneficial owners (the "Master Ballot") and submit such Master Ballot by the Voting Deadline.  All Master Ballots must be completed and signed so that they are *actually received* by April 28, 2015, at 5:00 p.m. (prevailing Central Time) using the following delivery methods: (a) if by mail to: Northwest Bancorporation of Illinois, Inc., c/o Kirkland & Ellis LLP, Attn: Brad Weiland, 300 North LaSalle Street, Chicago, IL 60654; if by E-mail to: brad.weiland@kirkland.com; or (c) if by fax: (312) 862-2200.  *See* Article X of this Disclosure Statement.

### L.      What is a Confirmation Hearing and when is the Confirmation Hearing set to occur?

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.  At the Confirmation Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Plan should be Confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed.  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

Upon commencement of the Chapter 11 Case and scheduling of the Confirmation Hearing, the Debtor will provide notice of the Confirmation Hearing, which notice will provide that objections to the Disclosure Statement and Confirmation of the Plan must be filed and served at or before 4:00 p.m., prevailing Central Time, on the date that is seven days prior to the initial date of the Confirmation Hearing.  Unless objections to the Disclosure Statement or Confirmation are timely served and filed, they may not be considered by the Bankruptcy Court.

The Debtor will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The Chicago Tribune* to provide notification to those persons who may not receive notice by mail.  The Debtor may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtor may choose.

### M.      What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### N.      What is the effect of the Plan on the Debtor's ongoing business?

Because the Reorganization Transaction contemplated by the Plan is purely a balance sheet restructuring, there are no material changes expected to occur to the Debtor's ongoing operations on account of the Plan.

**O.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtor's legal counsel, Kirkland & Ellis LLP:

> *By mail at:*
> Kirkland & Ellis LLP
> 300 North LaSalle Street
> Chicago, Illinois 60564
> Attention:  Edwin S. del Hierro, P.C.;
>                     David R. Seligman, P.C.; and
>                     Brad Weiland
>
> *By telephone at:*
> (312) 862-2000
>
> *By fax at:*
> (312) 862-2200

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in this Chapter 11 Case are available upon written request to the Debtor's proposed counsel at the address above or the Bankruptcy Court's website at www.ilnb.uscourts.gov (for a fee).

**P.     Who Supports the Plan?**

The Plan is supported by the Debtor, the Electing TruPS Holders, the Management Plan Support Parties, and Holders the Majority Interests.

**V.     Background to THIS chapter 11 Case**

**A.     The Debtor's Business**

The Debtor is a one-bank holding company headquartered in Palatine, Illinois.  Through its wholly-owned subsidiary, First Bank, the Debtor operates one full service banking branch.  First Bank is a state charted institution and is regulated by the Federal Deposit Insurance Corporation (the "<u>FDIC</u>") and the State of Illinois Department of Financial and Professional Regulation, Division of Banking (the "<u>Division</u>").  The Debtor has no employees.

The Debtor's historic and identifiable headquarters location is at 300 East Northwest Highway, Palatine, Illinois where it is the fourth largest bank ranked by deposit market share.  As of December 31, 2014 First Bank had assets of $243.5 million, with regulatory Leverage and Total Risk Based capital ratios of 8.10 percent and 11.96 percent, respectively.

First Bank opened its doors 40 years ago in Palatine, Illinois.  By 1981, as Palatine's commercial district expanded, First Bank decided to open its third facility at 300 East Northwest Highway to accommodate Palatine's increasing geographic area.  In 1985, First Bank changed its name to the current First Bank and Trust Company of Illinois to reflect First Bank's ultimate intention to expand its reach into the greater metropolitan Chicago area.  Beginning in 1985, First Bank experienced rapid expansion, outgrowing its existing headquarters in less than 10 years.  In 1993, First Bank broke ground on a new three-story addition to its Northwest Highway location - quadrupling its physical size.

B.      **The Debtor's Capital Structure and Prepetition Indebtedness**

1.      *Corporate Structure*

The Debtor is a bank holding company incorporated under the laws of the state of Delaware. First Bank is the Debtor's wholly-owned operating subsidiary, which carries on the business of operating a commercial bank headquartered in Palatine, Illinois. Approximately 90 percent of the Debtor's equity is owned by Robert Hershenhorn and his family. The Debtor also owns all of the issued and outstanding common securities of Capital Trust I, Capital Trust II and Statutory Trust I (described in more detail below).

2.      *Prepetition Indebtedness: the TruPS*

In July 2001, the Debtor issued $35.0 million in fixed and floating rate trust preferred securities ("TruPS") through three separate trusts (Capital Trust I, Capital Trust II and Statutory Trust I). In addition, and in the normal course of business, the trusts issued common equity securities to the Debtor in the aggregate amount of $1.1 million. Obligations under the TruPS are unsecured.

TruPS are a hybrid form of security that has characteristics of both debt and equity. Regulatory changes in the late 1990s allowed for banks to include 25 percent of their outstanding TruPS in their calculation of Tier 1 capital. To qualify as Tier 1 capital, a TruPS had to provide for a five-year deferral of interest period which, once triggered, would temporarily suspend the obligation of the TruPS issuer to make interest payments due on the TruPS. During the deferral period, interest on the TruPS accrues and becomes due once the deferral period ends.

Beginning in April of 2010, the Debtor elected to begin deferral of interest payments on the TruPS issued through Statutory Trust I followed by an election in July of 2010 to begin deferral on the remaining outstanding TruPS issued through Capital Trust I & Capital Trust II. The deferral periods for all three of these issuances will soon come to an end.

The table below summarizes the Debtor's issued and outstanding trust preferred securities.

| Projected Amounts Outstanding Under Trust Preferred Securities as of March 23, 2015 | | | | |
|---|---|---|---|---|
| Trust Preferred Security | Principal | Accrued and Unpaid Distributions | Total | End of Deferral Period | Percent of Total Claim Amount |
| Hershenhorn Capital Trust | $17,000,000.00 | $11,764,653.63 | $28,764,653.63 | 7/25/2015 | 56.38% |
| Hershenhorn Capital Trust II | $6,000,000.00 | $1,505,004.79 | $7,505,004.79 | 7/25/2015 | 14.71% |
| Hershenhorn Statutory Trust I | $12,000,000.00 | $2,745,538.27 | $14,745,538.27 | 4/30/2015 | 28.90% |
| Total | $35,000,000.00 | $16,015,196.69 | $51,015,196.69 | | 100.00% |

VI.    **EVENTS LEADING TO THE CHAPTER 11 FILING**

The global economic downturn that began in 2007 adversely impacted the Debtor's sole operating asset, First Bank. As a community banking institution, First Bank's loan portfolio was primarily made up of real estate lending, with a majority consisting of construction and development, commercial real estate, and multifamily loans. Given First Bank's lending footprint, primarily located in areas that saw rapid growth over the past two decades, real estate construction and development loans were a significant part First Bank's business prior to the onset of the financial crisis in 2007. Since first incurring losses, management has acted to solve problem credits and proactively manage First Bank for a return to profitability. These efforts have focused on achieving improved loan quality, returning to a state of positive net earnings, and stabilizing its loan portfolio.

On January 5, 2011, the FDIC, together with the Division, and First Bank entered into a Stipulation to the Issuance of a Consent Order (the "Consent Order") regarding First Bank's overall condition and the implementation or revision of policies and procedures to cure certain deficiencies noted by the FDIC and the Division during their joint safety and soundness examination of First Bank conducted as of March 31, 2010. Under the terms of the Consent Order, First Bank is, among other things, required to maintain a Tier 1 Leverage Ratio of at least 9.5 percent and a Total Risk Based Capital Ratio of at least 13.5 percent. At December 31, 2014, First Bank's Tier 1 Leverage Ratio and Total Risk Based Capital Ratio were 8.10 percent and 10.90 percent, respectively. In addition,

11

First Bank is restricted from declaring or paying any dividend to the Debtor, or any other party, without prior written consent from the FDIC and the Division.

On May 31, 2011, the Federal Reserve Bank of Chicago (the "Fed") and the Debtor mutually agreed to enter into, with reference made to the Consent Order, a Written Agreement. Under the terms of the Written Agreement, the Debtor and its Board of Directors agreed to, among other things, take appropriate steps, including the utilization of Debtor resources, to ensure First Bank complies with the Consent Order, to not directly or indirectly incur or increase any debt, and to not declare or pay any dividends without prior written approval from the Fed.

First Bank's Board and Management have made strides to improve the overall condition of the institution, increase capital ratios and reduce adversely classified assets from peak levels. In addition, First Bank has changed select members of its management team, many of its loan employees, and completely revamped its credit policies and procedures. In the summer of 2014, the Debtor retained professionals to provide guidance and advice, including advice regarding the Debtor's obligations to creditors and other stakeholders. The Debtor prepared tax, financial, and other information intended to facilitate discussions and development of a restructuring solution that would optimize value and recoveries to all constituents. Throughout the latter half of 2014, the Debtor's management and advisors made numerous contacts with potential investors in or purchasers of the Debtor and/or First Bank.

In an effort to forge a consensual resolution, the Debtor, its shareholders, various creditors, and the Plan Sponsor engaged in discussions regarding potential reorganization or sale alternatives. These extensive, arm's-length discussions, which occurred over several months and resulted in the parties exchanging multiple proposals, were productive and ultimately concluded in the Plan Support Agreement. The Plan Support Agreement serves as the foundation for the Debtor's proposed restructuring. Specifically, the Plan Support Agreement enables the Reorganization Transaction, which is described in more detail herein and in the Plan.

Following the execution of the Plan Support Agreement, the Debtors commenced a prepackaged solicitation of the Plan on March 31, 2015, by delivering a copy of the Plan and this Disclosure Statement (including Ballots) to Holders of Claims entitled to vote to accept or reject the Plan. The Debtors have established April 28, 2015, at 5:00 p.m., prevailing Central Time, as the deadline for the receipt of votes to accept or reject the Plan (the "Voting Deadline"). The Debtors will seek Bankruptcy Court approval of the Voting Deadline at the Confirmation Hearing. On the Petition Date, the Debtor will file a voting report (the "Voting Report") setting forth the voting results for Class 3 Claims. The Debtors believe that the Voting Report will show that Holders of Claims entitled to vote have overwhelmingly (or unanimously) voted to accept the Plan. Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement and schedule the Confirmation Hearing to consider approval of this Disclosure Statement and confirmation of the Plan.

## VII.   ADMINISTRATION OF THE CHAPTER 11 CASE

### A.   First Day Motions and Certain Related Relief

#### 1.   *First Day Relief*

To minimize disruption to the Debtor's operations and effectuate the terms of the Plan, upon the commencement of the Chapter 11 Case, the Debtor intends to file motions seeking various relief, including authority to: (1) continue utilizing the Debtor's prepetition cash management system; (2) set a bar date for 180 days after the Petition Date for all Claims held by governmental entities and for 30 days after the Petition date for all other Claims; (3) extending, and, upon prompt confirmation of the Plan, waiving the requirement to file schedules of assets and liabilities and statements of financial affairs; and (4) establishing notification and hearing procedures for the transfers of equity interests.

#### 2.   *Confirmation Motion*

Additionally, the Debtor intends to file a motion seeking entry of an order: (1) scheduling the Confirmation Hearing; (2) establishing the deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan and related procedures; (3) approving the procedures used in the Debtor's prepetition

solicitation; and (4) directing the U.S. Trustee not to schedule a meeting of creditors under section 341 of the Bankruptcy Code.

### 3. Administrative Motions

The Debtor intends to file a motion seeking a procedural order approving the notice, case management and administrative procedures to govern this Chapter 11 Case. The Debtor also intends to file motions and/or applications seeking certain customary relief, including orders approving the retention of the Debtor's bankruptcy advisors, including Kirkland & Ellis LLP as legal counsel and River Branch Capital, LLC ("River Branch") as financial advisor.

### B. Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (which may be extended by the Bankruptcy Court for a period of up to 18 months from the petition date) (the "Exclusive Filing Period"). If a debtor files a plan within this initial exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan (which may be extended by the Bankruptcy Court for a period of up to 20 months from the petition date) (the "Exclusive Solicitation Period"). During these exclusive periods, no other party in interest may file a competing plan of reorganization, however, a court may extend these periods upon request of a party in interest and "for cause."

## VIII. RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor's business or the Plan and its implementation.

### A. Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of the Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.   *The Debtor May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtor, subject to the terms and conditions of the Plan and the Plan Support Agreement, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.   *Nonconsensual Confirmation*

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Accrued Professional Compensation Claims.

### 5.   *The Debtor May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.   *Risk of Non-Occurrence of the Effective Date*

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 8. Necessary Governmental Approvals May Not Be Granted

Pursuant to the terms of the Stock Purchase Agreement, consummation of the Reorganization Transaction depends upon approval of Federal Deposit Insurance Corporation, and all other approvals required by governmental authorities.  Failure by any governmental authority to grant a necessary approval could prevent consummation of the Reorganization Transaction.

### 9. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations.  However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

**B.**   Risk Factors that May Affect the Value of Securities to be Issued Under the Plan

### 1. Debtor Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes

The Debtor cannot know with certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed.  Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtor cannot state with certainty what recoveries will be available to Holders of Allowed Claims in Voting Classes.

### 2. Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims

The Claims estimates set forth in Article IV.D above, "What will I receive from the Debtor if the Plan is consummated?," are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect.  Such differences may adversely affect the percentage of recovery.

### 3. Plan Support Agreement May Terminate

The Electing TruPS Holders, Management Plan Support Parties, and the Majority Interests have agreed to support the Plan; *provided*, that certain conditions must be met, including, without limitation, that: (a) the filing and approval of this Disclosure Statement within the time periods specified in the Plan Support Agreement; (b) the Confirmation of the Plan within the time periods specified in the Plan Support Agreement; (c) the closing of the Reorganization Transaction within the time periods specified in the Plan Support Agreement; and (d) an event

giving rise to termination of the Plan Support Agreement has not occurred (which events are set forth in the Plan Support Agreement).

To the extent that the terms or conditions of the Plan Support Agreement are not satisfied, or to the extent events giving rise to termination of the Plan Support Agreement occur, the Plan Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents. Any such loss of support could adversely affect the Debtor's ability to confirm and consummate the Plan.

### 4.      *Sale Transaction May Not Consummate*

The Debtor expects to close on the Sale Transaction following the Effective Date.  There is no guaranty that any Entity will express interest in the Sale Transaction.  Even assuming the Debtor was to execute the Stock Purchase Agreement with a Plan Sponsor, the Sale Transaction may not be consummated. For example, the Plan Sponsor could breach the Stock Purchase Agreement, or other conditions to consummation of the Stock Purchase Agreement could fail to be satisfied, including failing to raise the capital necessary to recapitalize First Bank.  In addition, the consummation of the Sale Transaction may be subject to prior consent of or approval by certain governmental Entities that may delay or withhold such consent or approval.

### 5.      *A Liquid Trading Market for the Reinstated Majority Interests in the Reorganized Debtor May Terminate or May Not Develop*

There can be no assurances that liquid trading markets for the Reinstated Majority Interests will develop or be maintained, respectively.  The liquidity of any market for the Reinstated Majority Interests will depend, among other things, upon the number of holders of Reinstated Majority Interests, and the Reorganized Debtor's financial performance, and the market for similar securities, none of which can be determined or predicted.  Therefore, the Debtor cannot provide assurances that an active trading market will develop or continue, or if a market exists, what the liquidity or pricing characteristics of that market will be.

### 6.      *Small Number of Holders or Voting Blocks May Control the Reorganized Debtor*

Consummation of the Plan may result in a small number of holders owning a significant percentage of the shares of the Reinstated Majority Interests.  These holders may, among other things, exercise a controlling influence over the Reorganized Debtor and have the power to elect directors and approve significant transactions.

### 7.      *Impact of Interest Rates*

Changes in interest rates may affect the fair market value of the Debtor's assets and/or the distributions to Holders of Claims under the Plan.

### C.      **Disclosure Statement Disclaimer**

### 1.      *Information Contained Herein Is for Soliciting Votes*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 2.      *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the United States Securities Act of 1933, as amended (the "Securities Act") or applicable state securities laws ("Blue Sky Laws").  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.       Reliance on Exemptions from Registration

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws.

### 4.       No Legal or Tax Advice Is Provided to You by this Disclosure Statement

***This Disclosure Statement is not legal advice to you.***  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 5.       No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor and the Plan Sponsor, nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Plan Sponsor, Holders of Allowed Claims, or any other parties in interest, nor (c) be deemed or construed as a finding of fact or conclusion of law with respect to any matter or controversy.

### 6.       Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtor, the Plan Sponsor, or the Reorganized Debtor, as the case may be, may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 7.       No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code, or rights of the Debtor or the Plan Sponsor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code, of the Debtor or its respective Estates are specifically or generally identified herein.

### 8.       Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 9.       Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this

Disclosure Statement.  Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**10.      *No Representations Outside This Disclosure Statement Are Authorized***

No representations concerning or relating to the Debtor, this Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the proposed counsel to the Debtor.

## IX.    BEST INTERESTS OF CREDITORS AND PLAN ALTERNATIVES

### A.      Liquidation Under Chapter 7

Notwithstanding acceptance of the Plan by a voting Impaired Class, in order to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Impaired Class which has not voted to accept the Plan, meaning that the Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Accordingly, if an Impaired Class does not vote unanimously to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtor were liquidated under chapter 7.

The Debtor believes that the Plan satisfies the best interest test because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors/ claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors, like the Holders of TruPS Claims, are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

The Debtor believes that liquidation under chapter 7 of the Debtor's business would result in significantly lower recoveries to all Holders of TruPS Claims and Holders of other Claims as compared to distributions contemplated under the Plan.  River Branch Capital LLC has performed a marketing process to sell the assets and/or the equity interests in the Debtor.  This process has failed to yield a buyer that would purchase the Debtor, or its assets, in a sale that would yield any recoveries to creditors.

Accordingly, the Debtor believes the Plan is in the best interests of creditors.

### B.      Alternative Plans

If no plan can be Confirmed or become effective, the Debtor may determine it is necessary or appropriate either to pursue a sale of substantially all of its assets under section 363 of the Bankruptcy Code or the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code and discussed in section IX.A above.  The Debtor believes that the Plan, as described

herein, enables the Holders of TruPS Claims to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth herein.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan.  The table in section IV.C of this Disclosure Statement, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.  As shown in the table, the Debtor is soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 - TruPS Claims.

The Holders of Claims in Class 3 - TruPS Claims are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in Class 3 - TruPS Claims have the right to vote to accept or reject the Plan.  The Debtor believes that each and every Holder of a Claim in Class 3 - TruPS Claims is an "accredited investor," as that term is defined by the Securities and Exchange Commission ("SEC") for the purposes of rule 506 of Regulation D promulgated under the Securities Act ("Accredited Investor").  As such, the Debtor believes it is only soliciting Accredited Investors.  However, in any event, only Accredited Investors are eligible to vote on the Plan.

The Debtor is *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 4, 5, 6, or 7.

### B.    Solicitation Package

The votes of the Holders of Class 3 - TruPS Claims on the Plan are being solicited on an out-of-court basis using a package of solicitation materials (the "Solicitation Package").  The following materials constitute the Solicitation Package, which the Debtor will cause to be distributed to Holders of Claims and Interests entitled to vote to accept or reject the Plan:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope and directions for electronically transmitting such Ballot(s) to the Debtor's Counsel; and

- this Disclosure Statement, including the Plan and all other exhibits.

### C.    Distribution of the Solicitation Package

The Debtor distributed or caused to be distributed the Solicitation Packages to Holders of Claims and Interests on April 1, 2015.

The Solicitation Package (except the Ballots) may also be obtained by:  (a) calling the Debtor's counsel at (312) 862-2200; (b) writing to Northwest Bancorporation of Illinois, Inc., Claims Processing c/o Kirkland & Ellis LLP, Attn: Brad Weiland, 300 North LaSalle Street, Chicago, IL 60654; or (c) emailing bweiland@kirkland.com.  When the Debtor files the Chapter 11 Case, you may also obtain copies of any pleadings filed with the Bankruptcy Court for a fee via PACER at http://www.ecf.ilnb.uscourts.gov.

No later than five days prior to the Confirmation Hearing, the Debtors intend to file the Plan Supplement.  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Debtor's counsel by:  (a) calling

the Debtor's counsel at the telephone number set forth above; (b) emailing the Debtor's counsel at the email address listed above; or (c) writing to the Debtor's counsel at the address set forth above.

### D.    Solicitation of Certain Class 3 - TruPS Claims

Where the beneficial owner of a Class 3 - TruPS Claim cannot be solicited directly, the Debtor will solicit votes through the Master Ballot Agent for such beneficial owners. The following procedures will be used to solicit and tabulate votes from such Holders of Allowed Class 3 - TruPS Claims:

- The Debtor will cause the Solicitation Package to be mailed by first class mail, postage prepaid, to each Master Ballot Agent for distribution to the Holders of Allowed Class 3 - TruPS Claims as of the Voting Record Date.

- The Debtor will (i) contact each Master Ballot Agent to determine the number of Solicitation Packages needed by the Master Ballot Agent for distribution to the Holders of Allowed Class 3 - TruPS Claims for whom the Master Ballot Agent performs services and (ii) deliver to each Master Ballot Agent a Master Ballot and the requisite number of Solicitation Packages and Beneficial Owner Ballots.

- The Master Ballot Agents will distribute Solicitation Packages and notices –including any additional instructions required by the Master Ballot Agent – to the Holders for whom they provide services within seven (7) days of receiving the Solicitation Packages. Each Master Ballot Agent will include a Beneficial Owner Ballot as part of each Solicitation Package sent to a beneficial owner of an Allowed Class 3 - TruPS Claim together with a return envelope provided by and addressed to the Master Ballot Agent. The beneficial owners of the Class 3 - TruPS Claims must return the Beneficial Owner Ballots to the Master Ballot Agents in the manner and by the deadline in the instructions accompanying the Beneficial Owner Ballots provided by the Master Ballot Agent.

- Upon receipt of the completed Beneficial Owner Ballots from the beneficial owners of the Class 3 - TruPS Claims, the Master Ballot Agent will separate and summarize the votes of its respective beneficial owners of Class 3 - TruPS Claims on a Master Ballot in accordance with the instructions attached to the Master Ballot.

- After tallying on the Master Ballot the votes of the applicable beneficial owners of the Class 3 - TruPS Claims that return the Beneficial Owner Ballots, the Master Ballot Agents will return the completed Master Ballot to the Debtor's counsel by no later than the Voting Deadline. The Master Ballot Agent will be required to retain the Beneficial Owner Ballots cast by the beneficial owners of Class 3 - TruPS Claims for inspection for a period of one year following the Effective Date.

### E.    Voting Record Date

**The Voting Record Date is March 30, 2015**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim.

### F.    Voting on the Plan

**The Voting Deadline is April 28, 2015, at 5:00 p.m. (prevailing Central Time)**.  Beneficial owners of Class 3 - TruPS Claims must complete the Ballot for beneficial owners (the "Beneficial Owner Ballot"). If your vote was solicited by a Master Ballot Agent, you must complete the Beneficial Owner Ballot and transmit your vote to the Master Ballot Agent in accordance with the instructions contained in the Solicitation Package sent to you – including by the deadline set forth therein. The Master Ballot Agent will complete a Master Ballot and submit such Master Ballot by the Voting Deadline.  In order to be counted as votes to accept or reject the Plan, all Ballots and Master Ballots, as applicable, must be properly executed, completed and delivered (either by using the return

envelope provided, by first class mail, overnight courier, or personal delivery) so that they are **actually received** on or before the Voting Deadline by the Debtor's counsel at:

---

### DELIVERY OF BALLOTS

**If by Mail to:**

**Northwest Bancorporation of Illinois, Inc., Claims Processing**
**c/o Kirkland & Ellis LLP**
**Attn: Brad Weiland**
**300 North LaSalle Street**
**Chicago, IL 60654**

**If by E-Mail to:**

**bweiland@kirkland.com**

**If by Fax:**

**(312) 862-2200**

---

**IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT OR MASTER BALLOT.**

G.      **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was cast by an entity that is not entitled to vote on the Plan; (iii) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (iv) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date; (v) it was returned to the Debtor, the Debtor's agents/representatives (other than the Debtor's counsel), an indenture trustee or the Debtor's financial advisors instead of the Debtor's counsel; (vi) it is unsigned; (vii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan; or (viii) the Holder of the Claim is not an Accredited Investor or does not fully and accurately provide sufficient information on the applicable Ballot to indicate such Holder's Accredited Investor status.

H.      **TruPS Election**

All Holders of Class 3 TruPS Claims will have the option to make the TruPS Election, subject to the terms and conditions of the Plan.  By default, Holders of Class 3 TruPS Claims will receive, on account of such claims, a Pro Rata share of the Non-Electing TruPS Distribution.

By making the TruPS Election, Holders of Class 3 TruPS Claims will instead *irrevocably choose to*:

*forego any rights to a portion of the Non-Electing TruPS Distribution* and agree that any distribution to such Holder under the Plan will be expressly subordinated to the distributions to Holders of TruPS Claims that do *not* make the TruPS Election; *and*

*receive, in full and final satisfaction, settlement, release, and discharge* of and in exchange for all but not less than all of such Holder's Allowed TruPS Claims, such Holder's Pro Rata share (based on the amount of such Holder's Allowed TruPS Claim relative to the Allowed TruPS Claim of any other Holder that makes the above TruPS Election) of the Electing TruPS Distribution; *and*

*fund in Cash* such Holder's Pro Rata share (based on the amount of such Holder's Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes the above TruPS Election) of the Plan Funding TruPS Contribution.[5]

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT BRAD WEILAND AT (312) 862-2000 OR BRAD.WEILAND@KIRKLAND.COM ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (i) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtor has complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtor has analyzed their ability to meet their respective obligations under the Plan.

Pursuant to the Plan, the Debtor's operating business will continue to operate in the ordinary course.  As such, the Debtor believes that the confirmation of the Plan is not likely to be followed by a further financial reorganization and, therefore, is feasible.

### C.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[6]

---

[5]     Each Electing TruPS Holder shall be required to place its Pro Rata portion of the Plan Funding TruPS Contribution in the Plan Funding Escrow on or before April 28, 2015.  Failure to make the payment on or before April 28, 2015 will invalidate any TruPS Election.  Any Holder of TruPS Claims that makes the TruPS Election by checking the box above but fails to make the payment into the Plan Funding Escrow by April 28, 2015 shall irrevocably result in such Holder of TruPS Claim to be deemed to have elected to not make the TruPS Election.

[6]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal,

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have **_actually_** voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### D.     Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; _provided, however_, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtor reserves the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtor will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

### 1.     _No Unfair Discrimination_

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The Debtor believes that the different treatment between those TruPS Holders that make the TruPS Election and those TruPS Holders that do not make the TruPS Election is fair. Recoveries to Holders of TruPS Claims has been structured to (a) minimize risk to TruPS Holders that do not make the TruPS Election by providing recoveries in Senior Amended TruPS and (b) recognize the significant funding contributions that Electing TruPS Holders are making through the Plan Funding TruPS Contribution, a substantial majority of the cash used to fund the Plan, by offering the Electing TruPS Holders higher recoveries in the Junior Amended TruPS, a riskier instrument that is subordinate and junior in right of payment to the Senior Amended TruPS.

### 2.     _Fair and Equitable Test_

The "fair and equitable" test applies to classes of different priority and status (_e.g._, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtor submits that if the Debtor "cramsdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtor believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

---

equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

XII.   **CERTAIN SECURITIES LAW MATTERS**

A.   **Amended TruPS.**

The Plan provides that Holders of certain Allowed Class 3 TruPS Claims will receive their Pro Rata share of the Amended TruPS.

The Debtors believe that the Amended TruPS constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Law. The Debtors further believe that the offer and sale of the Amended TruPS pursuant to the Plan are, and subsequent transfers of the Amended TruPS by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and state securities laws.

B.   **Issuance and Resale of Amended TruPS Under the Plan.**

1.   *Exemption from Registration.*

Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering. Transactions meeting the requirements of rule 506 promulgated thereunder by the SEC are deemed to qualify for the exemption provided for in section 4(a)(2) without any need to examine any factors other than the requirements of rule 506. By virtue of section 18 of the Securities Act, section 4(a)(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale conducted in compliance with SEC rules or regulations issued under section 4(a)(2), such as Regulation D promulgated under the Securities Act.

Each Holder of a Claim that is entitled to vote (e.g., only Holders of TruPS Claims that are Accredited Investors) will be requested to make representations that are set forth in the Ballot regarding such Holder's qualifications to be an offeree in a private offering exempt from registration from the Securities Act by virtue of Section 4(a)(2) and that such Holder is an Accredited Investor. The Debtors are relying on section 4(a)(2) of the Securities Act, rule 506 of Regulation D promulgated under the Securities Act, and similar Blue Sky Law provisions, to exempt from registration under the Securities Act and Blue Sky Law the offer to the Holders of Senior Secured Notes Claims of Amended TruPS prior to the filing of the Chapter 11 Cases, including without limitation in connection with the Solicitation.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. After the filing of the Chapter 11 Cases, the Debtors are relying on the exemption from the Securities Act, and equivalent state law registration requirements, provided by section 1145(a) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of the Amended TruPS under the Plan.

In reliance upon these exemptions, the offer and sale of the Amended TruPS will not be registered under the Securities Act or any state Blue Sky Law.

Because the issuance of the Amended TruPS under the Plan are covered by section 1145 of the Bankruptcy Code, the Amended TruPS may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Amended TruPS generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Amended TruPS are

advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

### 2.   *Resales of Amended TruPS; Definition of Underwriter.*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the Holders of such securities; or (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Amended TruPS by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, Holders of Amended TruPS who are deemed to be "underwriters" may be entitled to resell their Amended TruPS pursuant to the limited safe harbor resale provisions of Rule 144.  However, the Debtors do not presently intend to make publicly available the requisite current information regarding the Debtors, and as a result, Rule 144 may not be available for resales of Amended TruPS by persons deemed to be underwriters.  Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Amended TruPS would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Amended TruPS. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell Amended TruPS.  **Accordingly, the Debtors recommend that potential recipients of Amended TruPS consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws**.

### C.   No Listing of Amended TruPS.

The Debtor will not be required to file periodic reports with the SEC following emergence.  Moreover, the Debtors will not seek to list the Amended TruPS on a national securities exchange.

## XIII.   CERTAIN UNITED STATES INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtor and certain Holders of Allowed Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"), Treasury Regulations thereunder ("<u>Treasury Regulations</u>") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to

change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtor does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Allowed Claims that are not United States persons (as such term is defined in the IRC) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees of the Debtor, persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtor, the reorganized Debtor, or Holders of Allowed Claims or Interests based upon their particular circumstances.  Additionally, except as otherwise specified, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

If a partnership (or other entity treated as a partnership or other pass-through entity for United States federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the United States federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.    **Certain United States Income Tax Consequences to the Debtor**

1.    *Cancellation of Debt Income*

As of the date hereof, the Debtor's shareholders have elected to treat the Debtor as an "S Corporation" for U.S. federal income tax purposes.  As a general matter, income (including COD Income, defined below) and losses incurred by an S Corporation are treated as income and losses of an S Corporation's shareholders (subject to a variety of complex rules that are beyond the scope of this Disclosure Statement).  However, the Bankruptcy Exception (defined below) does apply to COD Income incurred by S Corporations.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the sum of (a) the issue price of any new indebtedness of the taxpayer issued and (b) the fair market value of any new consideration (including any new equity or cash) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs") (which, in the case of S Corporations, are based on current taxable year losses and losses that the S corporation's shareholders were unable to utilize in prior years); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject (the "Liability Floor Rule")); (e) passive activity loss

and credit carryovers; and (f) foreign tax credits; however, several of these categories do not apply to S corporations. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.Because the Plan provides that Holders of certain Allowed Claims will receive their pro rata share of new debt, the amount of COD Income will depend on, among other things, the adjusted issue price of the new indebtedness.  Certain of these figures cannot be known with certainty until after the Effective Date.  Accordingly, the amount of COD Income the Debtor may incur, and resulting attribute reduction (including to the basis of the Debtor's assets), is uncertain, but in no event will the basis of the Debtor's assets be reduced below the amount determined in accordance with the Liability Floor Rule.

On the Effective Date or as soon as reasonably practicable thereafter (the "Issuance Date"), the Reorganized Debtor may issue one or more shares of preferred stock in the Debtor to render the Debtor ineligible to be an S Corporation; provided that such issuance shall not materially affect the recoveries to and treatment of Claims and Interests under the Plan.  As a result, the Debtor's taxable year will be bifurcated into two short taxable years.  The first short taxable year will be treated as if the Debtor is an S Corporation (the "S Corp Taxable Year").  The Debtor expects that S Corp Taxable Year will be treated as beginning on January 1, 2015, and ending on the day immediately before the Issuance Date.  The second short taxable year will be treated as if the Debtor is a standard "C Corporation" (the "C Corp Taxable Year").  The Debtor expects that the C Corp Taxable Year will be treated as beginning on the Issuance Date and ending on December 31, 2015.

Accordingly, the Debtor expects, but cannot guarantee, that (1) any COD Income resulting from the Plan will be treated as having been realized during the S Corp Taxable Year, and (2) income or loss following the Effective Date will be treated as having been realized during the C Corp Taxable Year.

### 2.  Limitation of Tax Attributes

In general, the acquirer of an S corporation does not acquire any suspended losses that existed at the time of an acquisition.  Additionally, to the extent any NOLs exist as of the Effective Date, the Debtor expects that such NOLs will be subject to reduction under section 108 of the IRC.  Accordingly, the Debtor does not expect that it will have any net operating losses or similar attributes (other than tax basis, as discussed above) that can be applied to income, if any, generated in the C Corp Taxable Year (or to any period thereafter).

### B.  Certain United States Income Tax Consequences to Holders of Class 3 Claims.

As an initial matter, the treatment of any such U.S. Holder will depend, in part, on whether the TruPS and the Amended TruPS are determined to be stock or "securities".  Whether a Claim that is surrendered and debt instruments received pursuant to the Plan constitute "securities" is determined based on all the facts and circumstances.  Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for United States federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest in the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

The character of any recognized gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands (including whether the Claim constitutes a capital asset), whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim, and whether any part of the Holder's recovery is treated as being on account of accrued but unpaid interest.  Accrued interest and market discount are discussed below.

1.        *Consequences for U.S. Holders Receiving Amended TruPS.*

a.        **Treatment if the TruPS and the Amended TruPS are Determined to be "Securities."**

If a Class 3 Claim and the TruPS and Amended TruPS are both determined to be "securities," then the exchange of such Claim for Amended TruPS should be treated as a reorganization under the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), a U.S. Holder of such Claim should not recognize gain or loss with respect to such exchange.

U.S. Holders should obtain a tax basis in the Amended TruPS, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to the tax basis of the surrendered Claim. The holding period for the Amended TruPS should include the holding period for the surrendered Claims.

The tax basis of any Amended TruPS determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the Amended TruPS received in satisfaction of accrued but untaxed interest (or original issue discount). The holding period for any such Amended TruPS should begin on the day following the Effective Date.

b.        **Treatment if the TruPS or the Amended TruPS Are Determined Not to Be "Securities."**

Some of the Class 3 Claims may not be "securities." In such case, a U.S. Holder of such Claims will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between the issue price of the Amended TruPS and such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in the Amended TruPS received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to the fair market value of the Amended TruPS as of the date such property is distributed to the U.S. Holder. The holding period for the Amended TruPS should begin on the day following the Effective Date.

The tax basis of any Amended TruPS determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the Amended TruPS received in satisfaction of accrued but untaxed interest (or original issue discount). The holding period for any such Amended TruPS should begin on the day following the Effective Date.

2.        *Accrued but Untaxed Interest*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest (or original issue discount) and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest (or original issue discount) on the debt instruments constituting such Claim was previously included in the Holder's gross income, but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest (or original issue discount) on the debts constituting the surrendered Allowed Claim is unclear. Holders of Claims with accrued interest (or original issue discount) should consult with their tax advisors regarding the allocation of the consideration.

### 3.    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument. These rules are complex, their application is uncertain, and Holders of Allowed Claims should consult their own tax advisors regarding their application.

### 4.    Information Reporting and Backup Withholding

The Debtor will withhold all amounts required by law to be withheld from payments of interest (or original issue discount).  The Debtor will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding, currently at a rate of 28 percent, will generally apply to such payments unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 or, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  Any amounts withheld under the backup withholding rules will be allowed as a credit against such Holder's federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### Recommendation

In the opinion of the Debtor, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtor's creditors than would otherwise result in any other scenario.  Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 29, 2015

Respectfully submitted,

Northwest Bancorporation of Illinois, Inc.

By:

Name:  Alan Reasoner
Title:   President

## EXHIBIT A

**Plan of Reorganization**

*SOLICITATION VERSION*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTHWEST BANCORPORATION OF ILLINOIS, INC.,[1] | ) Case No. 15-[_____] (___) |
| | ) |
| Debtor. | ) |
| | ) |

## DEBTOR'S PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
Brad Weiland
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtor and Debtor in Possession*

Dated: April 29, 2015

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number is:   Northwest Bancorporation of Illinois, Inc. (0422).   The location of the Debtor's corporate headquarters and the service address for the Debtor is:  300 East Northwest Highway, Palatine, Illinois  60067.

**TABLE OF CONTENTS**

DEBTOR'S PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION ..................................................... I

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
                 GOVERNING LAW ...............................................................................................................1
    A.      Defined Terms. ...........................................................................................................1
    B.      Rules of Interpretation. ............................................................................................12
    C.      Computation of Time. ..............................................................................................12
    D.      Governing Law. ........................................................................................................13
    E.      Reference to Monetary Figures. ...............................................................................13

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ......................................13
    A.      General Administrative Claims. ...............................................................................13
    B.      Professional Compensation. .....................................................................................14
    C.      Post-Confirmation Date Fees and Expenses. ...........................................................14
    D.      Priority Tax Claims. .................................................................................................14
    E.      Statutory Fees. ..........................................................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................15
    A.      Classification of Claims and Interests. .....................................................................15
    B.      Treatment of Claims and Interests. ..........................................................................15
    C.      Special Provision Governing Unimpaired Claims. ...................................................18
    D.      Acceptance or Rejection of the Plan. .......................................................................18
    E.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ...18
    F.      Controversy Concerning Impairment. ......................................................................18
    G.      Elimination of Vacant Classes. ................................................................................19
    H.      Subordinated Claims. ...............................................................................................19

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................................19
    A.      General Settlement of Claims and Interests. ............................................................19
    B.      Sources of Consideration for Plan Distributions. .....................................................19
    C.      Restructuring Transactions. ......................................................................................20
    D.      Sale Transaction. ......................................................................................................21
    E.      TruPS Amendments. .................................................................................................22
    F.      TruPS Election. .........................................................................................................22
    G.      Corporate Existence. .................................................................................................22
    H.      Vesting of Assets in the Reorganized Debtor. ..........................................................22
    I.      Cancellation of Securities and Agreements. .............................................................23
    J.      Corporate Action. .....................................................................................................23
    K.      Directors, Managers, and Officers of the Reorganized Debtor. ...............................23
    L.      Effectuating Documents; Further Transactions. .......................................................24
    M.      Cooperation Regarding Regulatory Matters. ...........................................................24
    N.      Non-Payment of Certain Fees and Expenses. ..........................................................24
    O.      Section 1146 Exemption. .........................................................................................24
    P.      Employee and Retiree Benefits. ...............................................................................25
    Q.      Preservation of Causes of Action. ............................................................................25

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............25
    A.      Assumption of Executory Contracts and Unexpired Leases. ...................................25
    B.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. ...........26
    C.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ....26
    D.      Reservation of Rights. ..............................................................................................26
    E.      Nonoccurrence of Effective Date. ............................................................................26

i

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ....................................................27
    A.    Timing and Calculation of Amounts to Be Distributed.................................27
    B.    Distributions on Account of Claims Allowed After the Effective Date...........27
    C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.......27
    D.    Manner of Payment.............................................................................28
    E.    Compliance with Tax Requirements. ......................................................28
    F.    Allocations. ......................................................................................28
    G.    No Postpetition Interest on Claims.........................................................28
    H.    Setoffs and Recoupment by Debtor. .......................................................28
    I.    Claims Paid or Payable by Third Parties..................................................28

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
    DISPUTED CLAIMS ................................................................................29
    A.    Resolution of Disputed Claims. .............................................................29
    B.    Disallowance of Claims. ......................................................................30
    C.    Amendments to Claims. .......................................................................31

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS............31
    A.    Discharge of Claims and Termination of Interests; Compromise and Settlement of
        Claims, Interests, and Controversies. .....................................................31
    B.    Subordinated Claims. ..........................................................................31
    **C.**    **Releases by the Debtor.**......................................................................31
    **D.**    **Releases by Holders of Claims and Interests.** .......................................32
    **E.**    **Exculpation.** ...................................................................................33
    **F.**    **Injunction.**.....................................................................................33
    **G.**    **Waiver of Statutory Limitations on Releases.** ......................................33
    H.    Setoffs. ............................................................................................34
    I.    Special Provision Governing Accrued Professional Compensation Claims and Final Fee
        Applications. ....................................................................................34
    J.    Protections Against Discriminatory Treatment. ........................................34
    K.    Document Retention. ..........................................................................34

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
    THE PLAN ..............................................................................................34
    A.    Conditions Precedent to the Effective Date. .............................................34
    B.    Waiver of Conditions. .........................................................................35
    C.    Effect of Failure of Conditions. .............................................................35

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................35
    A.    Modification and Amendments. .............................................................35
    B.    Effect of Confirmation on Modifications. .................................................36
    C.    Revocation or Withdrawal of Plan. .........................................................36

ARTICLE XI. RETENTION OF JURISDICTION ...........................................................36

ARTICLE XII. MISCELLANEOUS PROVISIONS ..........................................................38
    A.    Immediate Binding Effect. ...................................................................38
    B.    Additional Documents. ........................................................................38
    C.    Dissolution of Creditors' Committee and Cessation of Fee and Expense Payment.......38
    D.    Reservation of Rights. .........................................................................38
    E.    Successors and Assigns........................................................................38
    F.    Notices. ............................................................................................39
    G.    Term of Injunctions or Stays. ...............................................................39
    H.    Entire Agreement. ..............................................................................39
    I.    Exhibits. ..........................................................................................39
    J.    Nonseverability of Plan Provisions. ........................................................39

K.      Votes Solicited in Good Faith. ...................................................................................40
L.      Closing of Chapter 11 Case.......................................................................................40
M.     Conflicts. ...................................................................................................................40

KE 35583166

**INTRODUCTION**

Northwest Bancorporation of Illinois, Inc. as debtor and debtor in possession (the "Debtor") proposes this Plan for the resolution of the outstanding Claims against and Interests in the Debtor pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtor's history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan and certain related matters.  The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

All Holders of Claims entitled to vote to accept or reject the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Accrued Professional Compensation Claims*" means, at any given time, all Claims for accrued, contingent, and/or unpaid fees and expenses rendered allowable before the Effective Date by any retained Professional in the Chapter 11 Case that the Bankruptcy Court has not denied by Final Order; provided that any such fees and expenses (a) have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) have not been applied against any retainer that has been provided to such Professional.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation Claims.

2.      "*Administrative Claim*" means any Claim for costs and expenses of administration pursuant to sections 328, 330, 364(c)(1), 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtor (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises); (b) Allowed Accrued Professional Compensation Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code.

3.      "*Adverse Action*" has the meaning set forth in Article IV.D.

4.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim for which the applicable deadline for parties in interest to object to such Claim has passed with no such objection having been filed; (b) a Claim that is allowed (i) pursuant to the terms of the Plan or (ii) in any stipulation that is approved by the Bankruptcy Court by a Final Order; (c) a Claim that has been allowed by a Final Order.

6.      "*Amended TruPS*" means the Junior Amended TruPS and/or the Senior Amended TruPS, as applicable.

7.      "*Amended TruPS Indentures*" means those TruPS Indentures (if any) as amended by the Electing TruPS Amendments and Non-Electing TruPS Amendments, as applicable, on and after the Effective Date.

2

8.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

9.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Illinois or any other court having jurisdiction over the Chapter 11 Case.

10.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

11.     "*BONY*" means The Bank of New York.

12.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

13.     "*Capital Securities*" means, collectively:  (a) the 17,000 capital securities of Capital Trust I; (b) the 6,000 capital securities of Capital Trust II; and (c) the 12,000 capital securities of Statutory Trust I, issued by the Trusts pursuant to the applicable Trust Declaration.

14.     "*Capital Trust I*" means Hershenhorn Capital Trust I, a statutory business trust, formed under Delaware law pursuant to the Capital Trust I Declaration, established for the sole purpose of issuing securities representing undivided beneficial interests in Capital Trust I's assets.

15.     "*Capital Trust I Declaration*" means that certain Amended and Restated Declaration of Trust (as amended, modified, or supplemented from time to time), dated as of July 16, 2001, among C. Richard Schuler, Alexis Hershenhorn and Robert Hershenhorn, as Administrators, The ·Bank of New York (Delaware), as Delaware Trustee, BONY, as Institutional Trustee, Hershenhorn Bancorporation, Inc., as Sponsor, and the holders from time to time of undivided beneficial interests in the assets of the Trust, including the designation of the terms of the Capital Securities as set forth in Annex I thereto.

16.     "*Capital Trust I Junior Subordinated Debentures*" means the $17,000,000 of the Debtor's 10.25% Junior Subordinated Deferrable Interest Debentures due July 25, 2031.

17.     "*Capital Trust II*" means Hershenhorn Capital Trust II, a statutory business trust, formed under Delaware law pursuant to the Capital Trust II Declaration, established for the sole purpose of issuing securities representing undivided beneficial interests in Capital Trust I's assets.

18.     "*Capital Trust II Declaration*" that certain Amended and Restated Declaration of Trust (as amended, modified, or supplemented from time to time), dated as of July 16, 2001, among C. Richard Schuler, Alexis Hershenhorn and Robert Hershenhorn, as Administrators, BONY (Delaware), as Delaware Trustee, BONY, as Institutional Trustee, Hershenhorn Bancorporation, Inc., as Sponsor, and the holders from time to time of undivided beneficial interests in the assets of the Trust, including the designation of the terms of the Capital Securities as set forth in Annex I thereto.

19.     "*Capital Trust II Junior Subordinated Debentures*" means the $6,000,000 in principal face amount of the Floating Rate Junior Subordinated Deferrable Interest Debentures due July 25, 2031.

20.     "*Cash*" means cash and cash equivalents.

21.     "*Causes of Action*" means any:  (a) Claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises; (b) all rights of setoff, counterclaim, or recoupment and Claims on contracts or for breaches of duties imposed by law; (c) rights to object to Claims or Interests; (d) Claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code; and (e) Claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, whether arising before, on, or after

2

the Petition Date including through the Effective Date, in contract, in tort, in law, or in equity, or pursuant to any other theory of law.

22.    "*Certificate*" means any instrument evidencing a Claim or an Interest.

23.    "*Chapter 11 Case*" means the case commenced when the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date, which is administered in the Bankruptcy Court under case number 15-_____.

24.    "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

25.    "*Claims Bar Date*" means the deadline for filing Proofs of Claim, as set forth in a separate Final Order of the Bankruptcy Court.

26.    "*Claims Objection Deadline*" means the date that is six (6) months after the Effective Date.

27.    "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

28.    "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

29.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified in Article IX.A hereof having been (a) satisfied or (b) waived pursuant to Article IX.B hereof.

30.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

31.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

32.    "*Confirmation Order*" means an order of the Bankruptcy Court in form and substance acceptable to the Debtor and the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33.    "*Consummation*" means the occurrence of the Effective Date.

34.    "*Creditors' Committee*" means an official committee of unsecured creditors, if any, appointed in the Chapter 11 Case by the U.S. Trustee.

35.    "*Cure*" means the payment of Cash by the Debtor or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtor that permits the Debtor to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

36.    "*Cure Claim*" means a Claim based upon the Debtor's defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

37.    "*Debtor Release*" means the release given by the Debtor to the Released Parties as set forth in Article VIII.C.

38.    "*Disclosure Statement*" means the *Disclosure Statement for the Debtor's Prepackaged Chapter 11 Plan of Reorganization* (as may be altered, amended, modified, or supplemented from time to time), including all

exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

39. "*Disputed*" means any Claim or Interest that is not yet Allowed.

40. "*Effective Date*" means the date selected by the Debtor that is at least one (1) Business Day after the Confirmation Date on which: (a) the conditions to the occurrence of the Effective Date have been met or waived pursuant to Article IX.A and Article IX.B hereof and (b) no stay of the Confirmation Order is in effect.

41. "*Effective Date Excess Amount*" has the meaning set forth in Article IV.B.2.

42. "*Effective Date Funding Amount*" has the meaning set forth in Article IV.B.1.

43. "*Electing TruPS Amendments*" means those certain amendments to the Trust Junior Subordinated Debentures held by Electing TruPS Holders and the related TruPS Indentures, pursuant to which, on the Effective Date:

  a.    the principal face amount of all Junior Amended TruPS shall be reduced (on a Pro Rata basis based on the amounts of the respective Allowed TruPS Claims of Electing TruPS Holders) to $10,700,000.00 in the aggregate unless all Holders of TruPS Claims make the TruPS Election, in which case the principal face amount of all Junior Amended TruPS shall be reduced (on a Pro Rata basis based on the amounts of the respective Allowed TruPS Claims of Electing TruPS Holders) to $11,500,000.00 in the aggregate;

  b.    the Reorganized Debtor shall have the right to extend the deferral of all interest payments under the Junior Amended TruPS until the earlier of (i) four (4) years after the Effective Date (which is approximately nine (9) years after the last deferral period began) or (ii) one (1) year after that certain written agreement, dated as of May 31, 2011, between the Federal Reserve Bank of Chicago and the Debtor has been terminated or lifted.

  c.    if the Holders of TruPS Claims under the Capital Trust I Junior Subordinated Debentures become Electing TruPS Holders, the interest rate under the Capital Trust I Junior Subordinated Debentures and the related TruPS Indenture shall be reduced to approximately 9.39% or such other rate necessary to cause the effective rate of interest on all Amended TruPS, in the aggregate, held by any such Electing TruPS Holder on and after the Effective Date to be equal to eight percent (8%) after giving effect to the Electing TruPS Swap; provided that, if all Holders of TruPS Claims make the TruPS Election, than the interest rate under the Capital Trust I Junior Subordinated Debentures and the related TruPS Indenture shall remain 10.25%.

  d.    any accrued and unpaid interest under the applicable TruPS Indentures and the Trust Junior Subordinated Debentures shall be irrevocably waived and excused; and

  e.    all amounts (including all principal, interest, and other payments) payable by the Debtor under or with respect to any and all Junior Amended TruPS are and shall be subordinate and junior in right of payment to the prior payment in full in cash of the Senior Amended TruPS.

44. "*Electing TruPS Holders*" means those Holders of TruPS Claims that make the TruPS Election on their respective ballots.

45. "*Electing TruPS Distribution*" means the distribution to the Electing TruPS Holders (if any) of the Junior Amended TruPS, subject to the Electing TruPS Management Contribution, and the Electing TruPS Swap.

<div align="center">4</div>

46.     "*Electing TruPS Management Contribution*" means the contribution and full assignment by each Electing TruPS Holder to the Management Plan Support Parties of Junior Amended TruPS in an amount of such Electing TruPS Holder's respective Pro Rata share (based on such Electing TruPS Holder's respective Allowed TruPS Claims relative to the Allowed TruPS Claims of all Electing TruPS Holders) of the Management TruPS Amount after giving effect to the Electing TruPS Swap.  Following the Electing TruPS Management Contribution, the Management TruPS Amount shall be held directly by the Management Plan Support Parties or their designee.

47.     "*Electing TruPS Swap*" means the swap, pooling, and/or exchange, pursuant to which a portion of the Amended TruPS held by each Electing TruPS Holder on the Effective Date shall be swapped, pooled, and/or exchanged with portions of the Junior Amended TruPS held by all other Electing TruPS Holders such that the effective rate of interest on all Junior Amended TruPS, in the aggregate, held by any Electing TruPS Holder shall be equal to the effective rate of interest on all Junior Amended TruPS, in the aggregate, held by all other Electing TruPS Holders (and, after giving effect to the Electing TruPS Management Contribution, the Management Plan Support Parties), at a rate of eight percent (8%).

48.     "*Enjoined Actions*" has the meaning set forth in Article VIII.F.

49.     "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

50.     "*Equity Security*" means any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

51.     "*Estate*" means the estate created for the Debtor in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

52.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*

53.     "*Exculpated Claim*" means any Claim related to any post-petition act taken or omitted to be taken in connection with, relating to, or arising out of the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the preparation or filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, and the administration and implementation of the Plan, including the distribution of property under the Plan or any other agreement.

54.     "*Exculpated Party*" means each of:  (a) the Debtor; (b) the Reorganized Debtor; (c) the Creditors' Committee (if any) and each member thereof; (d) the Holders of TruPS Claims; (e) the Management Plan Support Parties; and (f) with respect to each of the foregoing entities in clauses (a) through (e), each such party's current and former affiliates, and such party's and its current and former affiliates' subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

55.     "*Executory Contract*" means a contract to which one or more of the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

56.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

57.     "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

58.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial,

5

re-argument, or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

59.    "*First Bank*" means First Bank and Trust Company of Illinois, a wholly owned subsidiary of the Debtor.

60.    "*General Unsecured Claims*" means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code and all claims that are not (a) Administrative Claims, (b) Priority Tax Claims, (c) Other Priority Claims, (d) Secured Claims, (e) TruPS Claims, or (f) Section 510(b) Claims.  For the avoidance of doubt, the General Unsecured Claims shall include any deficiency Claims arising from Holders of Secured Claims.

61.    "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

62.    "*Holder*" means an Entity holding a Claim or an Interest.

63.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

64.    "*Indenture Trustee*" means BONY and State Street, as trustees under the TruPS Indentures.

65.    "*Indenture Trustee Fees*" means the reasonable compensation, fees and expenses, disbursements and indemnity claims, including, without limitation, attorneys' fees and agents' fees, expenses, costs and disbursements, incurred by or owed to the Indenture Trustee under the TruPS Documents and related and ancillary documents, whether incurred prior to or after the Petition Date and whether incurred prior to or after consummation of the Plan.

66.    "*Interests*" means the common stock and any other equity, ownership, or profits interests in and of the Debtor and options, rights, warrants, or other agreements or securities to acquire the common stock and/or any other equity, ownership, or profits interests in and of the Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

67.    "*Internal Revenue Code*" means title 26 of the United States Code, 26 U.S.C. §§ 1–9834, as may be amended from time to time.

68.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as may be amended from time to time.

69.    "*Junior Amended TruPS*" means those Trust Junior Subordinated Debentures (if any), Reinstated as amended by the Electing TruPS Amendments on and after the Effective Date.

70.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

71.    "*Majority Interests*" means all Interests held or controlled by Holders that are parties to the Plan Support Agreement.

72.    "*Management Loans*" mean those loans in an aggregate amount of approximately $180,000.00 by the Electing TruPS Holders to the Management Plan Support Parties, secured by a first-priority security interest on the Management TruPS Amount, to be used to finance a portion of the Plan Funding Management Contribution, which loans shall be governed by loan agreements or other applicable documents among the parties included in the Plan Supplement (which shall provide, among other things, that such loans are contingent upon the Management

Plan Support Parties funding $120,000.00 of the Plan Funding Management Contribution in accordance with the Plan Support Agreement).

73.     "*Management Plan Support Parties*" means those members of management of the Debtor who are party to the Plan Support Agreement.

74.     "*Management TruPS Amount*" means a portion of the Junior Amended in an aggregate principal face amount of $300,000.00 (an amount equal to the Plan Funding Management Contribution), which will be contributed and assigned in full by the Electing TruPS Holders to the Management Plan Support Parties (or to their designee, which in any case shall be controlled by the Management Plan Support Parties) pursuant to the Electing TruPS Management Contribution.

75.     "*Minority Interests*" means all Interests held or controlled by any Entity not party to the Plan Support Agreement.

76.     "*Non-Electing TruPS Distribution*" means the distribution to the Holders of TruPS Claims (if any) that are not Electing TruPS Holders of Senior Amended TruPS in the aggregate principal amount of $800,000.00; provided that, if all Holders of TruPS Claims make the TruPS Election, there shall be no Non-Electing TruPS Distribution, and the principal face amount of all Junior Amended TruPS shall be $11,500,000.00 in the aggregate.

77.     "*Non-Electing TruPS Amendments*" means those certain amendments to the Trust Junior Subordinated Debentures held by Holders of TruPS Claims that are not Electing TruPS Holders and the related TruPS Indentures, pursuant to which, on the Effective Date:

      a.      the principal face amount of all Senior Amended TruPS shall be reduced (on a Pro Rata basis based on the amounts of the respective Allowed TruPS Claims of Holders of TruPS Claims that are not Electing TruPS Holders) to $800,000.00;

      b.      the Reorganized Debtor shall have the right to extend the deferral of all interest payments under the Senior Amended TruPS until the earlier of (i) four (4) years after the Effective Date (which is approximately nine (9) years after the last deferral period began) or (ii) one (1) year after that certain written agreement, dated as of May 31, 2011, between the Federal Reserve Bank of Chicago and the Debtor has been terminated or lifted; and

      c.      any accrued and unpaid interest under the applicable TruPS indentures and the applicable Trust Junior Subordinated Debentures shall be irrevocably waived and excused.

78.     "*Other Priority Claims*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

79.     "*Petition Date*" means April 29, 2015, the date on which the Debtor commenced the Chapter 11 Case.

80.     "*Plan*" means this *Debtor's Prepackaged Chapter 11 Plan of Reorganization*, including the Plan Supplement and all exhibits, supplements, appendices, and schedules, which are incorporated herein by reference, as amended, modified, or supplemented from time to time in accordance with the terms of the Plan, the Bankruptcy Code, and the Bankruptcy Rules.

81.     "*Plan Funding Contributions*" means, collectively, the Plan Funding Management Contribution and the Plan Funding TruPS Contribution.

82.     "*Plan Funding Escrow*" means an escrow account maintained with a third-party escrow agent into which the Electing TruPS Holders must have placed the entirety of the Plan Funding TruPS Contribution (including the Management Loans), and into which the Management Plan Support Parties must have placed the Plan Funding Management Contribution, in each case on or before April 28, 2015 (or such earlier date as may have been agreed).

7

The amounts held in the Plan Funding Escrow shall not be or be deemed property of the Debtor's Estate under section 541 of the Bankruptcy Code and shall not be released to the Debtor or any other Entity unless and until the Effective Date occurs.

83.     "*Plan Funding Management Contribution*" means a contribution by the Management Plan Support Parties of $300,000.00 (a portion of which in an amount of $180,000.00 shall be financed by the Electing TruPS Holders pursuant to the Management Loans), all of which was placed by the Management Plan Support Parties and the Electing TruPS Holders into the Plan Funding Escrow on or before April 28, 2015; provided that the amounts held in the Plan Funding Escrow shall not be released to the Debtor or any other Entity unless and until the Effective Date occurs.

84.     "*Plan Funding TruPS Contribution*" means a contribution by Electing TruPS Holders (on a Pro Rata basis based on the amount of the respective Allowed TruPS Claims relative to the Allowed TruPS Claims of all Electing TruPS Holders) of Cash in an amount of $1,000,000.00 (a) less the amount of the Plan Funding Management Contribution and (b) plus the loans made by the Electing TruPS Holders to the Management Plan Support Parties under the Management Loans in an aggregate amount of $180,000.00 to partially fund the Plan Funding Management Contribution, which amount was placed by the Electing TruPS Holders into the Plan Funding Escrow on or before April 28, 2015; provided that the amounts held in the Plan Funding Escrow shall not be released to the Debtor or any other Entity unless and until the Effective Date occurs.

85.     "*Plan Sponsor*" means a non-Debtor Entity that agrees, (a) pursuant to an assignment of the Stock Purchase Agreement or (b) pursuant to other or additional definitive documentation reasonably acceptable to the Debtor, the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders, Holders of a majority of the Majority Interests, and during the Exclusivity Period (as defined in the Stock Purchase Agreement) the Management Plan Support Parties, to purchase all interests in the Debtor outstanding on and after the Effective Date.

86.     "*Plan Supplement*" means the documents and forms of documents, schedules, and exhibits to the Plan to be Filed by the Debtor no later than seven (7) days before the Confirmation Hearing and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement, as amended, modified, or supplemented from time to time in accordance with the terms of the Plan, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) the Plan Support Agreement; (b) the Stock Purchase Agreement; (c) the Electing TruPS Amendments; (d) a list of retained Causes of Action; (e) the loan agreements or other applicable documents governing the Management Loans; and (f) to the extent known, the identity of the members of the board of directors of the Reorganized Debtor and the nature and compensation for any member of the board of directors who is an "insider" under section 101(31) of the Bankruptcy Code.  Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (f).

87.     "*Plan Support Agreement*" means that certain Plan Support Agreement dated as of March 31, 2015 by and among the Debtor, the Holders of Majority Interests, certain Holders of TruPS Claims, and the Management Plan Support Parties, including all exhibits and schedules attached thereto and as may be amended from time to time according to its terms.

88.     "*Priority Tax Claim*" means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

89.     "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

90.     "*Professional*" means an Entity:   (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

91.     "*Professional Fee Escrow Account*" means a non-interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtor after the Confirmation Date but at least one (1) day prior to the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.  Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.

92.     "*Professional Fee Escrow Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3.

93.     "*Proof of Claim*" means the proof of Claim Filed by a holder on account of such Claim.

94.     "*Recapitalization Right to Purchase*" means the right under the Stock Purchase Agreement to purchase all (but not less than all) of the Majority Interests for $10.00 on or after the Effective Date, subject to the terms and conditions of the Stock Purchase Agreement, including that any Entity seeking so to purchase the Majority Interests make (immediately upon such purchase) a capital contribution to the Debtor for the purpose of recapitalizing First Bank in an amount sufficient to receive regulatory approval for First Bank's recapitalization and ownership change.  For so long at the Plan Support Agreement remains effective and has not been validly terminated, the Debtor will use commercially reasonable efforts to cooperate in good faith with the Plan Sponsor and the Electing TruPS Holders to take actions necessary or appropriate to address regulatory matters related to First Bank's recapitalization and ownership change.

95.     "*Regulators*" means the Federal Deposit Insurance Corporation, the Illinois Department of Financial and Professional Regulation, the Federal Reserve Bank of Chicago or the Board of Governors of the Federal Reserve System.

96.     "*Reinstated*" means:  (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest (except the Majority Interests) Unimpaired; or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

97.     "*Released Party*" means each of: (a) Holders of the TruPS Claims; (b) the Indenture Trustees; (c) the Debtor and the Reorganized Debtor, (d) the Management Plan Support Parties, and (e) with respect to each of the foregoing entities in clauses (a) through (d), such person's current and former Affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such.  No Holder of a Claim or Interest who votes to reject the Plan shall be a Released Party.

98.     "*Releasing Party*" means each of: (a) the Holders of TruPS Claims, and for each such Holder, such person's current and former Affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; (b) the Indenture Trustees; (c) the Holders of Interests; (d) the Creditors' Committee; (e) the Management Plan Support Parties; and (f) without limiting the foregoing clauses (a), (b), (c), and (d), each Holder of a Claim against or an Interest in the Debtors that (1) votes to accept the Plan and (2) does not opt out of the Plan's release provisions with respect to the Released Parties pursuant to an election contained on the relevant Ballot.

9

99.    "*Reorganized Debtor*" means the Debtor, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

100.    "*Restructuring Transactions*" means one or more arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Sale Transaction, including (a) the Electing TruPS Management Contribution, (b) the Electing TruPS Swap, (c) the Management Loans, (d) the Plan Funding Management Contribution; (e) the Plan Funding TruPS Contribution; (f) the TruPS Amendments; (g) the execution and delivery of appropriate agreements or other documents of merger, sale, consolidation, equity issuance, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (h) the execution and delivery of appropriate instruments of sale, equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (i) all other actions that the Debtor determines are necessary or appropriate.

101.    "*Sale Transaction*" means that certain transaction between the Holders of the Majority Interests and the Plan Sponsor (a) as set forth in the Stock Purchase Agreement or (b) pursuant to other or additional definitive documentation reasonably acceptable to the Debtor, the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders, Holders of a majority of the Majority Interests, and during the Exclusivity Period (as defined in the Stock Purchase Agreement) the Management Plan Support Parties, to purchase all interests in the Debtor outstanding on and after the Effective Date.

102.    "*Section 510(b) Claim*" means any Claim against the Debtor arising from rescission of a purchase or sale of a Security of the Debtor or any Affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

103.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

104.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

105.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

106.    "*Senior Amended TruPS*" means those Trust Junior Subordinated Debentures (if any), Reinstated as amended by the Non-Electing TruPS Amendments on and after the Effective Date.

107.    "*State Street*" means State Street Bank and Trust Company of Connecticut, National Association.

108.    "*Statutory Trust I*" means Hershenhorn Statutory Trust I, a statutory business trust, formed under Connecticut law pursuant to the Statutory Trust I Declaration, established for the sole purpose of issuing securities representing undivided beneficial interests in Statutory Trust I's assets.

109.    "*Statutory Trust I Declaration*" means that certain Amended and Restated Declaration of Trust dated as of July 31, 2001 (as amended, modified, or supplemented from time to time) by and among Robert Hershenhorn, Alexis Hershenhorn, and C. Richard Schuler, as Administrators, State Street, as institutional trustee, Hershenhorn Bancorporation, Inc., as sponsor, and the holders from time to time of undivided beneficial interests in the assets of the Trust, including the designation of the terms of the Capital Securities as set forth in Annex I thereto.

10

110.     "*Statutory Trust I Junior Subordinated Debentures*" means the $12,000,000 of the Debtor's Floating Rate Junior Subordinated Deferrable Interest Debentures due 2031.

111.     "*Stock Purchase Agreement*" means that certain Stock Purchase Agreement, dated as of March 31, 2015, by and among the purchasers and sellers thereto.

112.     "*Third Party Release*" means the release provision set forth in Article VIII.D hereof.

113.     "*Third Party Releasees*" means the Debtor, the Reorganized Debtor, and the Released Parties.

114.     "*TruPS Amendments*" means the Electing TruPS Amendments and/or the Non-Electing TruPS Amendments, as applicable.

115.     "*TruPS Claims*" means all Claims under the TruPS Documents, and including any Claims related to or arising out of the Trust Junior Subordinated Debentures, the TruPS Indentures, the Trust Declarations, and any related and ancillary documents and instruments, which Claims include, but are not limited to, principal and accrued and unpaid interest as of the Petition Date and, to the extent applicable, postpetition interest.  For the avoidance of doubt, TruPS Claims shall include all of the Claims set forth in the preceding sentence that could be asserted by one or more of the several parties to such agreement and documents without duplication.

116.     "*TruPS Documents*" means collectively the TruPS Indentures, Trust Declarations, and any related and ancillary documents and instruments.

117.     "*TruPS Election*" means the election by any Holder of TruPS Claims on such Holder's ballot (a) to receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for all (but not less than all) of such Holder's Allowed TruPS Claims, its Pro Rata share (based on the amount of its Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes such election) of the Electing TruPS Distribution and to forgo any share of the Senior Amended TruPS, if any; and (b) to contribute its Pro Rata share (based on the amount of its Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes such election) of the Plan Funding TruPS Contribution.  Upon making such election, each Electing TruPS Holder shall be required to place its Pro Rata portion (based on the amount of its Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes the TruPS Election) of the Plan Funding TruPS Contribution in the Plan Funding Escrow on or before April 28, 2015, and failure to do so on or before April 28, 2015 shall irrevocably result in such Holder of TruPS Claim to be deemed to have elected not to make the TruPS Election.  The TruPS Election or failure to make the TruPS Election shall be irrevocable by any Entity, including the Debtor and the Holder of the TruPS Claim making or failing to make such election.

118.     "*TruPS Indentures*" means, collectively:  (a) the indenture dated as of July 16, 2001, between the Debtor, as issuer, and BONY, as trustee, pursuant to which the Debtor issued the 10.25% Junior Subordinated Deferrable Interest Debentures due July 25, 2031; (b) the indenture dated as of July 16, 2001, between the Debtor, as issuer, and BONY, as trustee, pursuant to which the Debtor issued the Floating Rate Junior Subordinated Deferrable Interest Debentures due July 25, 2031; and (c) the indenture dated as of July 31, 2001, between the Debtor, as issuer, and State Street, as trustee, pursuant to which the Debtor issued the Floating Rate Junior Subordinated Deferrable Interest Debentures due 2031, in each case as may have been amended, modified, or supplemented.

119.     "*Trust Declarations*" means, collectively, the Capital Trust I Declaration, the Capital Trust II Declaration, and the Statutory Trust I Declaration.

120.     "*Trust Junior Subordinated Debentures*" means, collectively, the Capital Trust I Junior Subordinated Debentures, the Capital Trust II Junior Subordinated Debentures, and the Statutory Trust I Junior Subordinated Debentures.

121.     "*Trusts*" means, collectively Capital Trust I, Capital Trust II, and Statutory Trust I.

11

122.   "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

123.   "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

124.   "*U.S. Trustee*" means the United States Trustee for the Northern District of Illinois.

125.   "*U.S. Trustee Fees*" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

126.   "*Voting Deadline*" means April 28, 2015, the date by which all Holders of Claims entitled to vote on the Plan must have submitted their ballots in accordance with the Disclosure Statement and related solicitation procedures.

B.   *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (14) all references to events occurring on a specified date shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (15) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (16) any effectuating provisions may be interpreted by the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control.  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or to the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

C.   *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided that corporate governance matters relating to the Debtor or the Reorganized Debtor, as applicable, shall be governed by the laws of the State of Delaware or any other state of incorporation of the Reorganized Debtor, as applicable.

E.     *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.     *General Administrative Claims.*

1.     <u>Treatment</u>.

Except as otherwise specified in this Article II or agreed to by the Holder of an Administrative Claim, each Holder of an Allowed Administrative Claim will receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim (a) on the Effective Date or as soon as reasonably practicable thereafter, (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Administrative Claim becomes a Allowed Administrative Claims or as soon as reasonably practicable thereafter, or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holder of such Allowed Administrative Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

2.     <u>Administrative Claims Bar Date</u>.

Except as provided in Article II.B with respect to Professionals seeking payment of Accrued Professional Compensation Claims and in Article II.E with respect to U.S. Trustee Fees for the Chapter 11 Case and all other fees payable pursuant to section 1930(a) of the Judicial Code, any Entity seeking payment of an Administrative Claim shall File with the Bankruptcy Court and serve on the Debtor an application for approval and allowance of such Claim no later than the date that is 30 days after the Effective Date.  Holders of Administrative Claims that do not File and serve such application by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

3.     <u>Administrative Claims Objection Deadline</u>.

Any objection to an application for approval or allowance of any Administrative Claim shall be Filed no later than the later of (a) the date that is 120 days after the Effective Date and (b) the date that is 120 days after such application is or was Filed.

KE 35583166

B.      *Professional Compensation.*

     1.      <u>Professional Fee Escrow Account</u>.

     As soon as reasonably practicable after the Confirmation Date and no later than one (1) day prior to the Effective Date, the Debtor shall establish the Professional Fee Escrow Account.  On the Effective Date, the Debtor, the Electing TruPS Holders, and the Management Plan Support Parties shall cause to be funded from the Plan Funding Escrow the Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals and shall not be considered property of the Debtor's Estate.

     2.      <u>Final Fee Applications and Payment of Accrued Professional Compensation Claims</u>.

     All final requests for payment of Claims of a Professional shall be Filed no later than 30 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.  The amount of Accrued Professional Compensation Claims owing to the Professionals, after taking into account any prior payments and after applying any retainers, shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order.  To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A.  After all Allowed Accrued Professional Compensation Claims have been paid in full, the escrow agent shall return any excess amounts to the Plan Funding Escrow.

     3.      <u>Professional Fee Escrow Amount</u>.

     To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims before and as of the Effective Date and shall deliver such estimate to the Debtor no later than five (5) days prior to the anticipated Effective Date; <u>provided</u> that no such estimate shall be considered an admission with respect to the fees and expenses of any such Professional, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtor may estimate a reasonable amount of unbilled fees and expenses of such Professional; <u>provided</u> that no such estimate shall be binding or considered an admission with respect to the fees and expenses of any such Professional. The total amount so estimated shall comprise the Professional Fee Escrow Amount.

C.      *Post-Confirmation Date Fees and Expenses.*

     Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses billed by any Professional.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

     Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

KE 35583166

E.      *Statutory Fees.*

The Debtor shall pay all U.S. Trustee Fees for the Chapter 11 Case and all other fees payable pursuant to section 1930(a) of the Judicial Code for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.      <u>Class Identification</u>.

The classification of Claims and Interests against the Debtor pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | TruPS Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Majority Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Minority Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

1.      <u>Class 1 – Other Priority Claims</u>.

a.      *Classification*:  Class 1 consists of all Other Priority Claims against the Debtor.

b.      *Allowance*:  Notwithstanding anything in the Plan to the contrary, a Class 1 Claim, if existing, may only become Allowed by Final Order of the Bankruptcy Court.   The Debtors are not aware of any asserted Class 1 Claim and believe that no Class 1 Claim exists.

c.      *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 1, each such Holder shall be paid in full in Cash by the Reorganized Debtor on the later of the Effective Date and the date such Class 1 Claim becomes an Allowed Class 1 Claim or as soon as reasonably practicable thereafter.

15

    d.    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Secured Claims</u>.

    a.    *Classification*:  Class 2 consists of all Secured Claims against the Debtor.

    b.    *Allowance*:  Notwithstanding anything in the Plan to the contrary, a Class 2 Claim, if existing, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any asserted Class 2 Claim and believe that no Class 2 Claim exists.

    c.    *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 2 agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 2, each such Holder shall, at the sole option of the Debtor:

        i.    be paid in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as reasonably practicable or, if payment is not then due, in accordance with the payment terms of any applicable agreement;

        ii.    receive the collateral securing any such Allowed Secured Claim and be paid any interest required to be paid under section 506(b) of the Bankruptcy Code on the Effective Date or as soon thereafter as reasonably practicable; or

        iii.    otherwise be treated in any other manner such that the Allowed Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim or as soon as reasonably practicable thereafter.

    d.    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – TruPS Claims</u>.

    a.    *Classification*:  Class 3 consists of all TruPS Claims against the Debtor.

    b.    *Allowance*:

        i.    TruPS Claims under the Capital Trust I Junior Subordinated Debentures shall be Allowed in an amount of $28,764,653.63 or such other amount agreed to in writing by the Debtor and BONY.

        ii.    TruPS Claims under the Capital Trust II Junior Subordinated Debentures shall be Allowed in an amount of $7,505,004.79 or such other amount agreed to in writing by the Debtor and BONY.

        iii.    TruPS Claims under the Statutory Trust I Junior Subordinated Debentures shall be Allowed in an amount of $14,745,538.27 or such other amount agreed to in writing by the Debtor and State Street.

c.    *Default TruPS Claims Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment or makes the TruPS Election, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim in Class 3, such Holder shall receive its Pro Rata share (based on the amount of its Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that does not make the TruPS Election) of the Non-Electing TruPS Distribution; <u>provided</u> that, if all Holders of TruPS Claims make the TruPS Election, there shall be no Non-Electing TruPS Distribution, and the principal face amount of all Junior Amended TruPS shall be $11,500,000.00 in the aggregate.

d.    *Electing TruPS Holders Treatment*:  If a Holder of an Allowed Claim in Class 3 makes the TruPS Election, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim in Class 3, such Holder shall receive its Pro Rata share (based on the amount of its Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes the TruPS Election) of the Electing TruPS Distribution.

e.    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – General Unsecured Claims</u>.

a.    *Classification*:  Class 4 consists of all General Unsecured Claims against the Debtor.

b.    *Treatment*:  Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment of its Allowed General Unsecured Claim or has been paid prior to the Effective Date, each such Holder shall receive on the latest of the Effective Date, the date such Class 4 Claim becomes an Allowed Class 4 Claim, and the date or dates on which such Allowed Class 4 Claim becomes due and payable in the ordinary course in accordance with contractual terms without regard to acceleration, or as soon as reasonably practicable thereafter, payment in full in Cash from the Reorganized Debtor.

c.    *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Section 510(b) Claims</u>.

a.    *Classification*:  Class 5 consists of all Section 510(b) Claims.

b.    *Treatment*:  On the Effective Date, all Claims in Class 5 shall be cancelled without any distribution.

c.    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Majority Interests</u>.

a.    *Classification*:  Class 6 consists of all Majority Interests.

b.    *Treatment*:  Majority Interests shall be deemed Reinstated as of the Effective Date subject in all respects to the Recapitalization Right to Purchase and solely to comply with applicable regulations pending the exercise of the Recapitalization Right to Purchase.

KE 35583166

There shall be no distribution to any Holder of Majority Interests on account of such Majority Interests.

c.    *Voting:*  Class 6 is Impaired under the Plan.  Holders of Interests in Class 6 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Minority Interests</u>.

a.    *Classification:*  Class 7 consists of all Minority Interests.

b.    *Treatment:*  Minority Interests shall be discharged, canceled, released, and extinguished as of the Effective Date and will be of no further force or effect.  There shall be no distribution to any Holder of Minority Interests on account of such Minority Interests.

c.    *Voting:*  Class 6 is Impaired under the Plan.  Holders of Interests in Class 6 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's rights in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

D.    *Acceptance or Rejection of the Plan.*

1.    <u>Voting Classes</u>.

Class 3 is Impaired under the Plan.  Each Holder of a Claim in Class 3 is entitled to vote to accept or reject the Plan.

2.    <u>Presumed Acceptance of the Plan</u>.

Classes 1, 2, and 4 are Unimpaired under the Plan.  Each Holder of a Claim in such Classes is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

3.    <u>Presumed Rejection of Plan</u>.

Classes 5, 6, and 7 are Impaired and shall receive no distribution under the Plan.  Each Holder of a Claim or Interest in such Classes is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

E.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

F.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the

18

Confirmation Date.  In the absence of any such specific determination, the applicable Plan designation or designations shall control.

G.      *Elimination of Vacant Classes*.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero (0) as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.      *Subordinated Claims*.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests*.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Holders of Allowed Interests in any Class are intended to be and shall be final.

B.      *Sources of Consideration for Plan Distributions*.

The Reorganized Debtor shall fund distributions under the Plan with Cash on hand, including Cash from operations and the Plan Funding Contributions, and the Amended TruPS.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, the Debtor, the Electing TruPS Holders, and the Management Plan Support Parties shall cause to be funded from the Plan Funding Escrow the Professional Fee Escrow Account with Cash in the aggregate amount of the Professional Fee Escrow Amount.

On the Effective Date or as soon as practicable thereafter:

1.      the Debtor or the Reorganized Debtor, as the case may be, the Electing TruPS Holders, and the Management Plan Support Parties shall cause to be funded from the Plan Funding Escrow to the Debtor or the Reorganized Debtor, as the case may be, the aggregate amount of any:  (a) Allowed Administrative Claims (less amount of the Professional Fee Escrow Amount funded into the Professional Fee Escrow Account); (b) Allowed Cure Claims; (c) Allowed Priority Tax Claims; (d) Allowed Other Priority Claims; (e) Allowed Secured Claims; and (f) Allowed General Unsecured Claims (including any Claims of up to $250,000 in the aggregate held by or payable to First Bank) less the amount of any such Claim to the extent that such Claim is (x) held by and

payable to First Bank (except for such Claims of up to $250,000 in the aggregate) or otherwise incurred in the ordinary course of the Debtor's business and operations, (y) payable by any Affiliate of the Debtor; and/or (z) not payable in Cash (as provided by any documents giving rise to or governing such Claim or otherwise agreed by the Debtor and the Holder(s) of such Claim) (such aggregate amount the "Effective Date Funding Amount"); and

2. the Debtor or the Reorganized Debtor, as the case may be, the Electing TruPS Holders, and the Management Plan Support Parties shall cause to be returned from the Plan Funding Escrow to the Electing TruPS Holders and/or paid to the Debtor or the Reorganized Debtor pursuant to this paragraph the aggregate amount maintained therein in excess of the total aggregate amount of any asserted or assertable Claims that are: (a) Administrative Claims; (b) Cure Claims; (c) Priority Tax Claims; (d) Other Priority Claims; (e) Secured Claims; and (f) General Unsecured Claims, in each case as estimated by the Debtor (and agreed to by the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders (such aggregate amount the "Effective Date Excess Amount"). The Effective Date Excess Amount shall be returned or paid as follows: (x) first, all amounts up to $300,000 shall be returned to the Electing TruPS Holders on a Pro Rata basis (based on such Electing TruPS Holders' respective portion of the Plan Funding Contributions); and (y) second, any amount in excess of $300,000 shall be paid to the Debtor or the Reorganized Debtor, as the case may be.

On and after the Effective Date, there shall be maintained in the Plan Funding Escrow the balance of the Plan Funding Contributions after taking into account (a) the disbursement of the Effective Date Funding Amount to the Debtor or the Reorganized Debtor, as the case may be, and (b) the disbursement of the Effective Date Excess Amount to the Electing TruPS Holders or the Debtor or the Reorganized Debtor (less subsequent disbursement from the Plan Funding Escrow as described in this paragraph). After the Effective Date, as and when any (a) Administrative Claim (except for any Accrued Professional Compensation Claim unless such Claim is not satisfied from the Professional Fee Escrow Account), (b) Cure Claim; (c) Priority Tax Claim, (d) Other Priority Claim, (e) Secured Claim, and (f) General Unsecured Claim becomes an Allowed Claim (except to the extent that such Claim is (x) held by and payable to First Bank (except to the extent such Claims of up to $250,000 in the aggregate are payable as a portion of the Effective Date Funding Amount) or otherwise incurred in the ordinary course of the Debtor's business and operations, (y) payable by any Affiliate of the Debtor; and/or (z) not payable in Cash), the Reorganized Debtor, the Electing TruPS Holders, and the Management Plan Support Parties shall cause to be funded from the Plan Funding Escrow to the Reorganized Debtor the amount of any such Allowed Claim, and the Reorganized Debtor shall make a distribution on account of such Allowed Claim according to the Plan.

After the disallowance or payment of all Claims (as determined by the Debtor in consultation with the Electing TruPS Holders), the Reorganized Debtor, the Electing TruPS Holders, and the Management Plan Support Parties shall cause the Plan Funding Escrow to be closed, and any amounts that remain in the Plan Funding Escrow shall be returned to the Electing TruPS Holders on a Pro Rata basis (based on such Electing TruPS Holders' respective portion of the Plan Funding TruPS Contribution).

Notwithstanding anything in the Plan to the contrary, under no circumstances shall the amounts held in the Plan Funding Escrow ever be used directly to fund the Claims of any officers or directors of the Debtor, the Reorganized Debtor, or First Bank.

C. *Restructuring Transactions.*

On the Effective Date and thereafter, the Debtor or the Reorganized Debtor, as applicable, shall facilitate the grant of the Recapitalization Right to Purchase and ultimate consummation of the Sale Transaction pursuant to the Stock Purchase Agreement.

On or before the Effective Date and thereafter, the Debtor or Reorganized Debtor, as applicable, are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan or the Stock Purchase Agreement, including: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion,

20

disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

The Debtor or the Reorganized Debtor, as applicable, will use commercially reasonable efforts in good faith to pursue the Restructuring Transactions (including the Sale Transaction) and will not propose, file, support any transaction, recapitalization, restructuring, workout, plan of arrangement, plan of reorganization, or sale process other than the Restructuring Transactions (including the Sale Transaction); provided that the Debtor may pursue a transaction, recapitalization, restructuring, workout, plan of arrangement, plan of reorganization, or sale process other than as contemplated by the Plan if the board of directors of the Debtor reasonably determines in good faith that the continued performance in furtherance of the Restructuring Transactions (including the Sale Transaction) would be inconsistent with the exercise of the Debtor's fiduciary duties under applicable law.

Until any valid termination of the Plan Support Agreement, (a) the Debtor or the Reorganized Debtor, as applicable, shall not sell, assign, transfer, hypothecation, encumber, dilute, or otherwise impair of any shares of the Debtor or Reorganized Debtor (as applicable) that are the subject of the Stock Purchase Agreement, issue any shares, stock, or other right, title, or interest in or to the Debtor that is not subject to the Stock Purchase Agreement (and in furtherance thereof, the Debtor shall cause all shares, stock, and other ownership interests in or to the Debtor to bear a legend that same are fully subject to the terms and conditions of the Stock Purchase Agreement), or take any other action that is inconsistent with the intent and purposes contemplated in the Plan; and (b) the Debtor or Reorganized Debtor, as applicable, shall not issue or assume (whether as a principal, guarantor, or otherwise) any additional indebtedness for borrowed money outside the ordinary course of business.

All of the obligations of the Debtor, the Reorganized Debtor, and each member of the board of directors of the Reorganized Debtor or First Bank shall be subject to, and limited by, any instruction or direction made by any Regulator after the date hereof, including any written instruction or directive that is issued after the Effective Date and pursuant to an examination, visitation or other regulatory review. If the financial condition of First Bank deteriorates significantly, including if the regulatory capital ratios of First Bank decrease significantly, the Debtor or the Reorganized Debtor, as applicable, may need to take actions that result in the recapitalization of First Bank, which actions may include a sale or bankruptcy.

D.     *Sale Transaction.*

On the Effective Date, the Debtor, the Holders of the Majority Interests, the Plan Sponsor, and any assignee or transferee of the Recapitalization Right to Purchase shall be authorized to issue the Recapitalization Right to Purchase and to consummate the Sale Transaction subject to the terms and conditions of the Stock Purchase Agreement. In no event shall any Management Plan Support Party directly or indirectly amend or terminate the Stock Purchase Agreement, cause the Stock Purchase Agreement to be amended or terminated, or take any action that will materially and adversely affect the rights of First Bank or the parties in interest in this Chapter 11 Case (each, an "Adverse Action") unless, after the Effective Date, (a) such Management Plan Support Party Files and serves on the Reorganized Debtor, First Bank, and all parties in interest in this Chapter 11 Case a notice of such intent to take an Adverse Action in the future and (b) no party in interest (other than the following parties in interest, an objection by whom will not impact the Management Plan Support Parties' ability to take an Adverse Action as set forth in this Article VI.D: the Debtor, any affiliate of the Debtor, the Plan Sponsor, the Holders of the Majority Interests, creditors that are treated as unimpaired under the Plan, creditors whose Claims or Interests are cancelled under the Plan, or other current or prior owners of Interests in the Debtor) files an objection to such Adverse Action within 10 business days of the Filing and service of such notice. First Bank or any party in interest in the Chapter 11 Case may waive its rights under this Article IV.D.

KE 35583166

On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor and (after consummation of the Sale Transaction) the Plan Sponsor may operate the Debtor's businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Retained Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided* that any Claims against the Debtor as of the Effective Date shall be settled, compromised, withdrawn, or litigated to judgment as set forth in Article VII of the Plan.

Notwithstanding anything to the contrary in the organizational documents of the Debtor, the issuance of the Recapitalization Right to Purchase by the Holders of the Majority Interests is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. The Recapitalization Right to Purchase issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

E.      *TruPS Amendments.*

On the Effective Date, the Trust Junior Subordinated Debentures and TruPS Indentures shall be Reinstated as amended by the applicable TruPS Amendments, and any applicable Trust Declaration shall remain in full force and effect (and any Trust created thereby shall continue to exist after the Effective Date as set forth in such Trust Declaration as it was in effect immediately prior to the Effective Date).

F.      *TruPS Election.*

All Holders of TruPS Claims shall have made (or not made) the TruPS Election on their respective ballots on or before the Voting Deadline, and the making (or not making) of the TruPS Election shall be irrevocable. If any Holder of TruPS Claims does not validly submit a ballot in accordance with the Disclosure Statement and related solicitation procedures, then such Holder shall be deemed irrevocably not to have made the TruPS Election. If any Holder of TruPS Claims purports to make the TruPS Election on its respective ballot and does not pay its Pro Rata Portion of the Plan Funding TruPS Contribution into the Plan Funding Escrow within two (2) business days of the Debtor's demand, then it will not under any circumstance be or be deemed an Electing TruPS Holder under the Plan and will be forever barred from seeking to make or reinstate the TruPS Election (including by seeking any relief of the Bankruptcy Court or any other court to permit it to be or be deemed an Electing TruPS Holder). The TruPS Election and any failure to make the TruPS Election shall be irrevocable by any Entity, including the Debtor and the applicable Holder of any TruPS Claim that makes or fails to make the TruPS Election.

G.      *Corporate Existence.*

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a corporation with all the powers of a corporation pursuant to the law of the State of Delaware and pursuant to the Debtor's certificate of incorporation and bylaws in effect prior to the Effective Date.

On the Effective Date (but not before the Effective Date), the Holders of the Majority Interests shall terminate the election for the Debtor to be taxed an "S Corporation" in accordance with section 1362(d) of the Internal Revenue Code, and, on and after the Effective Date, the Reorganized Debtor shall maintain its tax status as a "C Corporation" under Chapter 1, Subchapter C of the Internal Revenue Code. Notwithstanding the immediately preceding sentence, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may issue one or more shares of preferred stock in the Debtor to render the Debtor ineligible to be a "S Corporation"; *provided* that such issuance shall not materially affect the recoveries to and treatment of Claims and Interests under the Plan, and all such shares and stock shall bear a legend that same are fully subject to the terms and conditions of the Stock Purchase Agreement.

H.      *Vesting of Assets in the Reorganized Debtor.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized

Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.     *Cancellation of Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtor under any Certificate, Trust Junior Subordinated Debenture, TruPS Indenture, Equity Security, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such Certificates, Trust Junior Subordinated Debentures, TruPS Indentures, Equity Securities, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtor, if any, that are Reinstated pursuant to the Plan), shall be cancelled (solely as to the Debtor), and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Certificates, Trust Junior Subordinated Debentures, TruPS Indentures, Equity Securities, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtor that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided that notwithstanding Confirmation or Consummation, any such instrument that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan from the Reorganized Debtor, as provided herein; provided further that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtor.  Notwithstanding the foregoing, no executory contract or unexpired lease that has been, or will be, assumed pursuant to Section 365 of the Bankruptcy Code, shall be terminated or cancelled on the Effective Date.

J.     *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) selection of the directors and officers for the Reorganized Debtor; (2) the issuances of the Recapitalization Right to Purchase; (3) implementation of the Restructuring Transactions, including the Sale Transaction (subject to the terms and conditions of the Stock Purchase Agreement), the Electing TruPS Management Contribution, and the Electing TruPS Swap; and (4) any other actions necessary or appropriate to effect the transactions and contemplated under the Plan and other provisions of the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtor or the Reorganized Debtor.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtor, including any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of any shares of stock and any other securities shall be exempt from the requirements of section 16(b) of the Exchange Act (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

K.     *Directors, Managers, and Officers of the Reorganized Debtor.*

On and immediately after the Effective Date, the members of the board of directors of the Debtor shall be the same board of directors that existed as of the Effective Date.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the board of directors or be an officer of the Reorganized Debtor.  To the extent any such director or officer of the Reorganized Debtor is an "insider" under the Bankruptcy Code, the Debtor also will

23

disclose the nature of any compensation to be paid to such director or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the organizational documents of the Reorganized Debtor (which shall be consistent in all material respects with the organizational documents of the Debtor).

L.       *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtor and the officers and members of the board of directors thereof are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

M.       *Cooperation Regarding Regulatory Matters.*

For so long at the Plan Support Agreement remains effective and has not been validly terminated, the Debtor will use commercially reasonable efforts to cooperate in good faith with the Plan Sponsor and the Electing TruPS Holders to take actions necessary or appropriate to address regulatory matters related to First Bank's recapitalization and ownership change.

N.       *Non-Payment of Certain Fees and Expenses.*

Notwithstanding anything to the contrary in the Plan, neither the Debtor nor the Reorganized Debtor shall pay any Indenture Trustee Fees incurred through the Effective Date, and no Indenture Trustee Fees incurred through the Effective Date shall be afforded treatment as a Claim against the Debtor of any kind or priority.  Nothing herein shall limit the right (if any) of any Indenture Trustee to seek payment of its respective Indenture Trustee Fees through the exercise of a charging lien, setoff, recoupment, or other charge under the terms and subject to the conditions of the applicable TruPS Documents.

Notwithstanding anything to the contrary in the Plan, no fees or expenses payable to River Branch Capital LLC (pursuant to that certain engagement letter dated as of June 26, 2014, as may have been amended, modified, or supplemented, or otherwise) shall be paid as Accrued Professional Compensation Claims under the Plan, and, instead, any fees and expenses payable to River Branch Capital LLC (pursuant to that certain engagement letter dated as of June 26, 2014, as may have been amended, modified, or supplemented, or otherwise) shall be earned and payable only upon the recapitalization of First Bank in connection with the Sale Transaction or as otherwise agreed between the Reorganized Debtor and River Branch Capital LLC.

O.       *Section 1146 Exemption.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the issuance of the Recapitalization Right to Purchase shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies to (1) the creation of any mortgage, deed of trust, Lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution, and/or sale of any of the Recapitalization Right to Purchase and any other securities of the Debtor or the Reorganized Debtor; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any bills of sale or assignments executed in connection with any Restructuring Transaction occurring under the Plan.

24

P.      *Employee and Retiree Benefits.*

There are no employment, retirement, indemnification, or other arrangements in effect on the Effective Date with the Debtor's non-insider officers or employees, or retirement income plans and welfare benefit plans for such Persons, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, and accordingly, no such agreements or arrangements will be assumed by the Reorganized Debtor or otherwise remain in effect after the Effective Date. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, any retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IV.N hereof, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against it. The Debtor or Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases.*

On the Effective Date, all Executory Contracts or Unexpired Leases not previously rejected (or the subject of a pending motion to reject) will be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease so assumed shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan. The Debtor will maintain and, to the extent applicable, assume its director's and officer's, general liability, and other insurance policies.

B.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease not previously rejected (or the subject of a pending motion to reject) shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure on the Effective Date or as soon as reasonably practicable thereafter or in the ordinary course of business, subject to the limitation described below.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Subject to the payment of the Cure Claims (and all other undisputed amounts falling due through the Effective Date), any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed or satisfied and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

The Filing of the Plan shall constitute notice by the Debtor that the Cure for each Executory Contract and Unexpired Lease shall be zero unless otherwise noticed in a Plan Supplement or other subsequent notice.  To the extent any Entity party to an Executory Contract or Unexpired Lease disputes the foregoing Cure, such Entity must file an objection to the proposed Cure within 30 days after the Effective Date.  The Debtor shall then have until 120 days after the Effective Date to respond to such objection, and the related Cure Claim shall not become an Allowed, payable obligation of the Debtor until such dispute has been resolved by a Final Order.

C.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Any modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

D.      *Reservation of Rights.*

Nothing contained in the Plan, shall constitute an admission by the Debtor that any Executory Contract or Unexpired Lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or the Reorganized Debtor, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

E.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

KE 35583166

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as practicable thereafter), each Holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VI.B.1 hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be made on a quarterly basis (to the extent that material distributions exist to be made) and deemed to have been made on the Effective Date; provided that, for the avoidance of doubt, a Holder of any Disputed Administrative Claim or Disputed Priority Tax Claim that later becomes an Allowed Claim shall be entitled to interest on such Allowed Claim to the extent provided for by the Bankruptcy Code.

2.      Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision to the contrary in the Plan, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until the Disputed Claim has become an Allowed Claim in its entirety or has otherwise been resolved by settlement or Final Order.

C.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Delivery of Distributions in General.

Except as otherwise provided herein, the Reorganized Debtor shall make distributions to Holders of Allowed Claims and Allowed Interests on the Effective Date at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtor.

2.      Minimum Distributions.

Notwithstanding any other provision of the Plan, the Reorganized Debtor will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claims against the Reorganized Debtor or its property.

3.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtor has determined the then-current address of such Holder, at

27

which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date; provided further that the Debtor shall use commercially reasonable efforts to locate a Holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

D.      *Manner of Payment.*

All distributions under the Plan shall be made by the Reorganized Debtor. At the option of the Debtor, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

E.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

F.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtor, and no Holder of a Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such Claim.

H.      *Setoffs and Recoupment by Debtor.*

The Debtor may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against the Holder of such Claim.

I.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtor or the Reorganized Debtor, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; provided that the Debtor shall provide 21

28

days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the Debtor shall provide 21 days' notice to the Holder of prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Without limiting the foregoing, no distributions under the Plan shall be made on account of an Allowed Claim payable by any Affiliate of the Debtor.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Subject to Article VIII, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Resolution of Disputed Claims.*

1.      Allowance of Claims.

Except as provided herein, on or after the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim Allowed as of the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

2.      Prosecution of Objections to Claims.

Except as provided herein, the Reorganized Debtor after the Effective Date shall have the authority to File, settle, compromise, withdraw, or litigate to judgment objections to any and all Claims.  From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.

29

3.      Claims Estimation.

Except as provided herein, prior to and on the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation, as determined by the Bankruptcy Court, on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtor or the Reorganized Debtor, as applicable, may elect to pursue additional objection to the ultimate distribution on account of such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding anything to the contrary in this paragraph, nothing in this paragraph shall derogate in any way the rights under applicable law, independent of this paragraph, of the Holder of a Disputed Claim with respect to estimation and allowance of, and allocation and holding of any reserves in respect of, the Disputed Claim.

4.      Deadline to File Objections to Claims.

Unless a different time is set by an order of the Bankruptcy Court or otherwise established pursuant to the Plan, all objections to Claims and Interests must be Filed by the Claims Objection Deadline; provided that no such objection may be Filed with respect to any Claim or Interest after a Final Order has been entered Allowing such Claim or Interest.

B.      *Disallowance of Claims*.

Except as otherwise Allowed by the Plan, all Claims of any Entity from which property is sought by the Debtor under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtor allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTOR AND UNLESS OTHERWISE ORDERED BY THE COURT, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE MAY BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

C.      *Amendments to Claims.*

On or after the Effective Date, a Claim may not be amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor.  Any such unauthorized new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, compromise, settlement, discharge, and release, effective as of the Effective Date, of all debt (as such term is defined in section 101 of the Bankruptcy Code) that arose before the Effective Date, any debts of any kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and the rights and Interests of any Holders of Interests whether or not: (1) a Proof of Claim based on such debt or Interest is Filed; (2) a Claim or Interest based upon such debt is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as provided for under section 1141(d)(6) of the Bankruptcy Code.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests that is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Debtor and its Estate and Causes of Action, including solely with respect to the Reorganized Debtor, against other Entities.

B.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights related thereto, whether arising under general principals of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

C.      **Releases by the Debtor.**

**Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, for the good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Debtor and its Estate from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, its Estate, or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other entity, based on or relating to, or in any manner arising from, in**

31

whole or in part, the Debtor, First Bank, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of claims and interests prior to or during the Chapter 11 Case, the Stock Purchase Agreement, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or any related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by this Article VIII.C; (3) in the best interests of the Debtor and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to the Debtor asserting any claim or Cause of Action released pursuant to the Debtor Release.

D.       *Releases by Holders of Claims and Interests.*

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Third Party Releasees from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtor, First Bank, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Stock Purchase Agreement, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Third Party Releasees; (2) a good faith settlement and compromise of the Claims released by this Article VIII.D; (3) in the best interests of the Debtor, its Estate, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity granting a Third Party Release from asserting any claim or Cause of Action released pursuant to the Third Party Release.

KE 35583166

E.      **Exculpation.**

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, none of the Exculpated Parties shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Case, the Stock Purchase Agreement, the negotiation, formulation, or preparation of the Plan or any contract, instrument, document, or other agreement entered into pursuant thereto, or any distributions made pursuant to or in accordance with the Plan; <u>provided</u> that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

F.      **Injunction.**

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, compromised and settled pursuant to the Plan, or are exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, First Bank, the Reorganized Debtor, the Released Parties, or the Exculpated Parties, or their respective property (collectively, the "<u>Enjoined Actions</u>"):  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or exculpated Claim or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated Claims or Interests unless such entity has timely filed a Proof of Claim with the Bankruptcy Court preserving such right of setoff, subrogation, or recoupment; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or exculpated Claims or Interests.  Any Entity receiving a distribution under the Plan on account of any Claim shall be deemed to have waived any right to such Claim as against any third party and shall be enjoined from pursuing such Claim as against any Entity other than the Debtor's Estate; <u>provided</u> that the foregoing injunction does not enjoin any actions against any Released Party to enforce obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

G.      **Waiver of Statutory Limitations on Releases.**

Each Releasing Party in each of the releases contained in the Plan (including under Article VIII of the Plan) expressly acknowledges that although ordinarily a general release may not extend to claims which the Releasing Parties do not know or suspect to exist in his favor, which if known by it may have materially affected its settlement with the party released, each of the Releasing Parties has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each of the Releasing Parties expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party, including the provisions of California Civil Code Section 1542.  The releases contained in Article VIII of the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

33

H.      *Setoffs.*

Except as otherwise provided herein, the Debtor, First Bank, and the Reorganized Debtor, as applicable pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest (which setoff shall be made against the Allowed Claim or Interest, not against any distributions to be made under the Plan with respect to such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that any Debtor may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a Holder is entitled under the Plan shall be made on account of the Claim or Interest, as reduced after application of the setoff described above.  In no event shall any Holder of any Claim or Interest be entitled to set off any Claim or Interest against any Claim, right, or Cause of Action of the Debtor unless such Holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtor, First Bank, or the Reorganized Debtor, as applicable, and a Holder of a Claim or Interest; provided that, where there is no written agreement between the Debtor, First Bank, or the Reorganized Debtor, as applicable and a Holder of a Claim authorizing such setoff nothing herein shall prejudice or be deemed to have prejudiced the rights of the Debtor, First Bank, or the Reorganized Debtor to assert that any Holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

I.      *Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications.*

For the avoidance of doubt, the releases in Article VIII of the Plan shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Accrued Professional Compensation Claim or final fee application filed by any Professional in the Chapter 11 Case.

J.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entities, including Governmental Units, shall discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor, or another Entity with whom the Reorganized Debtor have been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

K.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor.

### ARTICLE IX.
### CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition precedent to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      the Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information in form and substance reasonably acceptable to the Debtor and the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders;

2.      the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtor and the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders, and the Confirmation Order shall have become a Final Order;

3.      the Plan Support Agreement has not been validly terminated pursuant to its terms;

4.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the Debtor and the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders;

5.      the Debtor and the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders shall have agreed in writing that Section 14 of the Plan Support Agreement has been satisfied;

6.      the Professional Fee Escrow Account shall have been established and funded in Cash in accordance with Article II.B of the Plan;

7.      the conditions to the Effective Date set forth in this Article IX.A shall have been satisfied or waived on or before August 13, 2015;

8.      all actions, documents, Certificates, and agreements necessary to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws; provided that each document, instrument, and agreement must be acceptable to the Debtor and the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders; and

9.      any and all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been received.

B.      *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived only by the Debtor, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by the Debtor, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders of Claims or Interests, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtor reserves the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves its right to revoke, withdraw, alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to alter, amend, modify, or supplement the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the

35

Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such alteration, amendment, modification, or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.  Notwithstanding the foregoing, no material modification in the treatment of any Class of Claims shall occur that seeks to treat Holders of Claims in such Class in a manner less favorable than the treatment being accorded to such Holders in the current version of the Plan without providing the Holders of such Claims with the required disclosures and affording such Holders the opportunity to vote on the proposed modification of the Plan.

B.      *Effect of Confirmation on Modifications.*

        Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

        The Debtor reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity, including the Holders of Claims or First Bank; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity, including First Bank.

## ARTICLE XI.
## RETENTION OF JURISDICTION

        Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

        1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Claim, and (b) the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

        2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

        3.      resolve any matters related to:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

        4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

KE 35583166

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1 hereof;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.      enter an order or Final Decree concluding or closing the Chapter 11 Case;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII hereof;

22.    enforce all orders previously entered by the Bankruptcy Court; and

23.    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.B hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

B.    *Additional Documents.*

On or before the Effective Date, the Debtor may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or the Reorganized Debtor, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Dissolution of Creditors' Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Creditors' Committee (if any) shall be dissolved.  As of the Effective Date, the Reorganized Debtor shall no longer be responsible for paying any fees or expenses incurred after the Effective Date by the Creditors' Committee.

D.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur, and none of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

KE 35583166

F.      *Notices.*

All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Northwest Bancorporation of Illinois, Inc.
> 300 East Northwest Highway
> Palatine, Illinois  60067
> Facsimile:  (847) 705-3903
> Attention:  Alan Reasoner
>
> with a copy to:
>
> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> Facsimile:  (312) 862-2200
> Attention:  Edwin S. del Hierro, P.C.;
>            David R. Seligman, P.C.; and
>            Brad Weiland

After the Effective Date, the Debtor has authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's CM/ECF website at www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to

make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtor's consent; and (3) nonseverable and mutually dependent.

K.       *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and its respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.       *Closing of Chapter 11 Case.*

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

M.       *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

Dated:  April 29, 2015

Respectfully submitted,

Northwest Bancorporation of Illinois, Inc.

By:

Name:    Alan Reasoner
Title:      President

KE 35583166

**EXHIBIT B**

**Form of Stock Purchase Agreement**

**<u>EXECUTION VERSION</u>**

**STOCK PURCHASE AGREEMENT**

by and between

**ALAN REASONER AND EMAD MURRAR**

and

**THE SHAREHOLDERS LISTED ON SCHEDULE I**

March 31, 2015

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE ........................................................................ 2
   1.1    Right to Purchase ........................................................................... 2
   1.2    Purchase and Sale .......................................................................... 2
   1.3    Delivery of Stock Interests ............................................................ 2
   1.4    Purchase Price ................................................................................ 2

ARTICLE II CLOSING .......................................................................................... 2

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS ...................... 3
   3.1    Authorization ................................................................................. 3
   3.2    Valid Title; No Encumbrances ....................................................... 3
   3.3    Finders and Investment Bankers .................................................... 3
   3.4    Sellers' Representative .................................................................... 3
   3.5    Disclosure ...................................................................................... 3

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................... 4
   4.1    Authorization ................................................................................. 4
   4.2    Finders and Investment Bankers .................................................... 4
   4.3    Funds ............................................................................................. 4
   4.4    Disclosure ...................................................................................... 4

ARTICLE V COVENANTS OF THE PARTIES ............................................................ 4
   5.1    Actions of Seller ............................................................................ 4
   5.2    Notice ............................................................................................ 5
   5.3    Supplemental Information; Disclosure Supplements ...................... 5
   5.4    Resignations .................................................................................. 5
   5.5    Purchase of All of the Shares ......................................................... 5
   5.6    Covenant of Non-Solicitation ........................................................ 5
   5.7    Release .......................................................................................... 5
   5.8    Purchaser's Representative ............................................................. 6

ARTICLE VI CONDITIONS TO OBLIGATIONS OF ALL PARTIES ................................ 6
   6.1    Regulatory Approvals .................................................................... 6
   6.2    Bankruptcy Court Approval ........................................................... 6
   6.3    Performance of Purchasers under the Plan ..................................... 6
   6.4    Reasonable Efforts ........................................................................ 7

ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASERS ............ 7
   7.1    Representations, Warranties and Covenants ................................... 7
   7.2    Absence of Litigation .................................................................... 7
   7.3    Restructuring Matters ..................................................................... 7
   7.4    No Other Agreements .................................................................... 7
   7.5    Certificates .................................................................................... 7
   7.6    Resignations .................................................................................. 7

i

7.7    Other Documents ................................................................................................ 8

7.8    Sale of All of the Shares ..................................................................................... 8

ARTICLE VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLERS ........... 8

8.1    Representations, Warranties and Covenants ...................................................... 8

8.2    Purchase of All of the Shares .............................................................................. 8

8.3    Restructuring Matters .......................................................................................... 8

8.4    Regulatory Matters ............................................................................................. 8

ARTICLE IX ADDITIONAL AGREEMENTS ...................................................................... 8

9.1    Bankruptcy Court Approval ................................................................................ 8

9.2    Assignment ......................................................................................................... 9

9.3    Adverse Effect .................................................................................................... 9

9.4    Waiver ................................................................................................................. 9

ARTICLE X TERMINATION ................................................................................................ 10

10.1    Termination ......................................................................................................... 10

10.2    Effect of Termination ......................................................................................... 10

10.3    Breach; Specific Performance ............................................................................ 11

ARTICLE XI MISCELLANEOUS ......................................................................................... 11

11.1    Binding Effect .................................................................................................... 11

11.2    Expenses ............................................................................................................. 11

11.3    Notices ................................................................................................................ 11

11.4    Counterparts ....................................................................................................... 13

11.5    Captions .............................................................................................................. 13

11.6    Amendments, Supplements or Modifications .................................................... 13

11.7    Applicable Law; Jurisdiction ............................................................................. 13

11.8    Construction of Agreement ................................................................................ 13

11.9    Waivers ............................................................................................................... 14

11.10    Waiver of Jury Trial ........................................................................................... 14

11.11    Assignment ......................................................................................................... 14

11.12    No Third Party Beneficiaries ............................................................................. 14

11.13    Severability ......................................................................................................... 15

11.14    Remedies Cumulative ........................................................................................ 15

11.15    Entire Agreement ............................................................................................... 15

11.16    Press Releases .................................................................................................... 15

# STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of the 31st day of March, 2015 by and between, on the one hand, ALAN REASONER and EMAD MURRAR, individuals residing in the State of Illinois (collectively, the "**Purchasers**"), and, on the other hand, the STOCKHOLDERS LISTED ON SCHEDULE I hereto (solely in any such stockholder's capacity as a stockholder, collectively, the "**Sellers**").

## R E C I T A L S:

A.      The Sellers are the record owners of certain of the issued and outstanding shares of common stock, no par value per share, of NORTHWEST BANCORPORATION OF ILLINOIS, INC, a Delaware corporation ("**NBI**"), each as set forth in SCHEDULE I hereto (such shares owned by the Sellers being referred to herein as the "**Shares**" and together with all other ownership interests owned by the Sellers, the "**Stock Interests**").

B.      NBI is a bank holding company within the meaning of the Bank Holding Company Act of 1956, as amended, and is the parent of First Bank and Trust Company of Illinois, an Illinois-chartered banking corporation ("**First Bank**").

C.      In connection with, and to facilitate, the transactions contemplated hereby, NBI intends to file a voluntary petition for relief (the "**Bankruptcy Case**") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") with a bankruptcy court having jurisdiction (the "**Bankruptcy Court**"), and to propose and seek confirmation of that certain Debtor's Chapter 11 Plan of Reorganization (the "**Plan**") that is the subject of that certain Plan Support Agreement, dated as of March 31, 2015, by and among NBI, the Sellers, the Purchasers, and certain holders of trust preferred securities sponsored by NBI.

D.      The Purchasers are entering into this Agreement in furtherance of the Plan and understand that certain of their obligations under ARTICLE IX hereof shall be governed by the terms of the Plan and that in connection therewith the Purchasers shall be subject to the jurisdiction of the Bankruptcy Court.

E.      Provided that the Plan is confirmed and becomes effective, the Purchasers desire to purchase the Stock Interests, and the Sellers are willing to sell the Stock Interests to the Purchasers, on the terms and conditions set forth herein.  Accordingly, unless this Agreement is terminated in accordance with Section 10.1 hereof, the rights and obligations of the parties under Article I of this Agreement shall become effective (the "**Effective Date**") on the later of the date that either (i) the Plan is confirmed and effective and a notice of occurrence of the Plan's effective date has been filed in the Bankruptcy Case or (ii) the funds held pursuant to the Plan Funding Contribution Escrow (as defined in the Plan) (the "**Escrowed Funds**") are released to be used in accordance with the terms of the Plan.

## A G R E E M E N T S:

In consideration of the representations, warranties, covenants and agreements contained herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I

## PURCHASE AND SALE

**1.1**     **Right to Purchase**.  Beginning on the Effective Date and prior to the occurrence of a Termination Event (as defined below), in consideration for the purchase price described in Section 1.4 below, the Purchasers shall have the right, but not the obligation to acquire the Stock Interests subject to the terms and conditions hereof.   "**Termination Event**" shall mean the occurrence of any direct or indirect sale, assignment or transfer by any Purchaser of this Agreement, or any of the rights of any Purchaser under this Agreement, other than (i) an assignment of this Agreement pursuant to Section 9.2 hereof or (ii) any sale, assignment or transfer that occurs in connection with a recapitalization of NBI and First Bank that includes the retention of Alan Reasoner as the president and chief executive officer of First Bank in accordance with the employment agreement currently in effect between Alan Reasoner and First Bank and that requires any and all consideration received by any Purchaser in connection with such sale, transfer or assignment to be used by such Purchasers to fund or facilitate the recapitalization of NBI and First Bank.

**1.2**     **Purchase and Sale**.  On the Closing Date (as hereinafter defined), and subject to the terms and conditions of this Agreement, the Sellers shall sell to the Purchasers all of the Stock Interests, free and clear of any and all liens, pledges, charges or encumbrances, and the Purchasers shall purchase all of the Stock Interests.

**1.3**     **Delivery of Stock Interests**.   At the Closing (as hereinafter defined), in consideration for the purchase price described in Section 1.4 below, the Sellers shall deliver to the Purchasers one or more stock certificates representing all of the Shares, duly endorsed in blank or accompanied by duly executed stock powers.

**1.4**     **Purchase Price**.  In consideration for delivery of the Stock Interests, and subject to all of the terms and conditions of this Agreement, one or more of the Purchasers will pay to each Seller at the Closing a cash amount equal to its pro rata share as set forth on SCHEDULE II of an aggregate amount equal to $10.00 (the "**Purchase Price**").

# ARTICLE II

## CLOSING

The closing (the "**Closing**") shall occur on a date that is mutually agreed upon by the Purchasers' Representative and the Sellers' Representative (each as defined below); *provided, that,* in the absence of an agreement, the Closing shall occur on the tenth (10th) Business Day of the calendar month following the calendar month during which the conditions set forth herein have been satisfied or waived (the "**Closing Date**").  The Closing shall take place at the law offices of Kirkland & Ellis LLP, 300 North LaSalle, Suite 2400, Chicago, Illinois 60654, at a time to be mutually agreed upon by the parties or as otherwise agreed to by the Purchasers' Representative and the Sellers' Representative through the electronic exchange of closing documents.  In connection with the Closing, Sellers will assign and transfer to the Purchasers good and valid title in and to the Stock Interests, free and clear of all pledges, liens, security

interests, charges or encumbrances, by delivering to the Purchasers a certificate or certificates representing the Stock Interests, in genuine and unaltered form, duly endorsed in blank or accompanied by duly executed stock powers endorsed in blank.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each Seller severally, and not jointly, hereby represents and warrants to each Purchaser as set forth below as of the date of this Agreement and as of the Closing Date (as if such representations and warranties were made as of the Closing Date):

**3.1** **Authorization**.  Seller has full power and authority to enter into this Agreement, and to consummate the transactions contemplated hereby.  No other actions, consents, approvals or proceedings on the part of Seller or any other person are necessary to authorize this Agreement or the transactions contemplated hereby.  The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, or the fulfillment of and compliance with the terms and provisions hereof will not (i) violate any judicial, administrative or arbitration order, writ, award, judgment, injunction or decree involving Seller or (ii) conflict with any of the terms, conditions or provisions of any agreements to which Seller is a party.  This Agreement constitutes the legal, valid and binding obligations of Seller, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect that affect the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies.

**3.2** **Valid Title; No Encumbrances**.  The Shares owned by the Seller are validly issued, fully paid and nonassessable.  The Stock Interests are delivered to the Purchasers free and clear of all liens, claims, pledges, charges, encumbrances and rights of third parties of every kind and are not subject to any assignment, pledge or participation.  The Seller is not party to any agreement with respect to the transfer of its Stock Interests other than this Agreement.

**3.3** **Finders and Investment Bankers**.  Seller has not retained any broker, finder or other agent or incurred any liability for any brokerage fees, commissions or finders' fees with respect to the transactions contemplated by this Agreement.

**3.4** **Sellers' Representative**.  The Sellers have appointed Robert Hershenhorn to act as the Sellers' exclusive agent and attorney-in-fact with authority to make the decisions on behalf of the Sellers under this Agreement (the "**Sellers' Representative**").

**3.5** **Disclosure**.  No representation or warranty of Seller contained in this Agreement contains any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements made herein or therein, in light of the circumstances in which they were made, not misleading.

3

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Each Purchaser severally, and not jointly, hereby represents and warrants to each Seller as set forth below as of the date of this Agreement and as of the Closing Date (as if such representations and warranties were made as of the Closing Date):

**4.1**   **Authorization**.   Purchaser has full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.   No other actions, consents, approvals or proceedings on the part of Purchaser or any other person are necessary to authorize this Agreement or the transactions contemplated hereby, except for the regulatory approvals contemplated by Section 6.1 hereof.   The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby or the fulfillment of and compliance with the terms and provisions hereof will not (i) violate any judicial, administrative or arbitration order, writ, award, judgment, injunction or decree involving Purchaser or (ii) conflict with any of the terms, conditions or provisions of any agreements to which Purchaser is a party.   This Agreement constitutes the legal, valid and binding obligations of Purchaser, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect that affect the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies.

**4.2**   **Finders and Investment Bankers**.   Purchaser has not retained any broker, finder or other agent or incurred any liability for any brokerage fees, commissions or finders' fees with respect to the transactions contemplated hereby.

**4.3**   **Funds**.   Such Purchaser individually has sufficient funds and the ability to perform his, her or its obligations to pay the Purchase Price to the Sellers in accordance with Article I hereof.

**4.4**   **Disclosure**.   No representation or warranty of Purchaser contained in this Agreement contains any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements made herein or therein, in light of the circumstances in which they were made, not misleading.

## ARTICLE V

## COVENANTS OF THE PARTIES

**5.1**   **Actions of Seller**.   Each Seller agrees that unless permitted or required under this Agreement or following the termination of this Agreement in accordance with the provisions hereof, such Seller (i) will not, whether in whole or in part, hypothecate, pledge or otherwise encumber any of the Shares, (ii) will not, whether in whole or in part, assign, sell or otherwise transfer or offer or enter into any contract to assign, sell or otherwise transfer, any of the Shares to any Person other than the Purchasers or its permitted assigns hereunder, and (iii) will not take

4

any other action which could have the effect of preventing, impeding or disabling the performance by such Seller of his, her or its respective obligations under this Agreement.

**5.2** **Notice**.  A Seller shall give prompt notice to the Purchasers of any notice or other communication from any third party to such Seller alleging that the consent of such third party is or may be required in connection with the transactions contemplated hereby.

**5.3** **Supplemental Information; Disclosure Supplements**.  From time to time prior to the Closing Date, the Sellers' Representative will promptly disclose in writing to the Purchasers any matter hereafter arising which, if existing, occurring or known at the date of this Agreement would have been required to be disclosed or which would render inaccurate any of the representations, warranties or statements set forth in this Agreement.

**5.4** **Resignations**.  At the Closing, the individuals identified on SCHEDULE II shall resign the positions set forth in SCHEDULE II.

**5.5** **Purchase of All of the Shares**.  Each Purchaser hereby agrees that if and when the Purchasers purchase the Shares hereunder, the Purchasers collectively will purchase all of the Shares and will be jointly and severally liable for any failure of a Purchaser to purchase his, her or its pro rata portion of the Shares set forth on SCHEDULE III.

**5.6** **Covenant of Non-Solicitation**.

(a)     Each Seller and Purchaser acknowledge that the restrictions contained in this Section 5.5 are reasonable and necessary to protect the legitimate interests of Purchaser, do not cause such Seller undue hardship, and that any violations of any provision of Section 5.5 will result in irreparable injury to the Purchasers and that, therefore, the Purchasers shall be entitled to preliminary and permanent injunctive relief in any court of competent jurisdiction, which rights shall be cumulative and in addition to any other rights or remedies to which the Purchasers may be entitled.

(b)     Until the fifth anniversary of the Closing Date, each Seller agrees that he/she will not either directly or indirectly:  (i) solicit or induce any person or entity that is a customer of First Bank to do business with any other individual or entity which is engaged in any business of the type conducted by First Bank; (ii) request or advise any such customer of First Bank to withdraw, curtail or cancel such customer's business with First Bank; or (iii) cause, induce, or entice any person who is an employee of First Bank to accept employment with a company that competes with the business of First Bank.

**5.7** **Release**.  In consideration of each Seller agreeing to sell such Seller's Stock Interests to the Purchasers, each of the Purchasers, First Bank, and their respective affiliates, subsidiaries, related organizations, employees, trustees, officers, directors, beneficiaries, successors, and assigns (collectively, the "**Purchaser Releasers**") hereby release, waive, and forever discharge each of the Sellers and their respective agents, affiliates, trustees, beneficiaries, attorneys, successors and assigns (collectively, the "**Seller Releasees**") from, and do fully waive any obligations of the Seller Releasees to the Purchaser Releasers for, any and all liability, actions, charges, causes of action, demands, damages, or claims for relief, remuneration, sums of money, accounts or expenses (including attorneys' fees and costs) of any kind whatsoever,

whether known or unknown or contingent or absolute, which heretofore have been or which hereafter may be suffered or sustained, directly or indirectly, by the Purchaser Releasers in consequence of, arising out of, or relating to (i) the ownership by any of the Seller Releasees of the Stock Interests, (ii) the service by any of the Seller Releasees as an owner, officer or director of any Purchaser Releaser, (iii) the actions by any of the Seller Releasees in support of, or to facilitate, the consummation of the Plan or the transactions contemplated herein or in the Plan or (iv) any action taken by any of the Seller Releasees following a termination of this Agreement in accordance with Section 10.1; *provided, however,* that the Purchaser Releasers do not release any claims or rights under this Agreement and this release shall not limit or otherwise affect any rights exercised by the Federal Deposit Insurance Corporation, as receiver.   The foregoing release and discharge, waiver and covenant not to sue includes, but is not limited to, all claims and any obligations or causes of action arising from such claims, under common law.   The Purchaser Releasers agree never to sue the Seller Releasees in any forum for any claim covered by this Section 5.7 and agree not to cause or encourage another party to sue the Seller Releasees. If the Purchaser Releasers violate this Section 5.7 by suing the Seller Releasees, or causing or encouraging another party to sue the Seller Releasees, then the Purchaser Releasers shall be liable to the Seller Releasees for their reasonable attorneys' fees and other litigation costs incurred in defending against such a suit.   The Purchaser Releasers agree and understand that if any Purchaser Releaser files such a lawsuit or makes such a claim in violation of this Section 5.7, this Agreement shall serve as a full and complete defense.

**5.8** **Purchaser's Representative**.   If this Agreement is assigned, either pursuant to Section 9.2 or otherwise, the assignees shall appoint an individual to act as their exclusive agent and attorney-in-fact with authority to make certain decisions on their behalf under this Agreement (the "Purchasers' Representative").   Prior to an assignment of this Agreement, the Purchasers shall be the Purchasers' Representative.

## ARTICLE VI

## CONDITIONS TO OBLIGATIONS OF ALL PARTIES

The obligations of the Sellers and the Purchasers to complete the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following condition:

**6.1** **Regulatory Approvals**.   In the reasonable judgment of Sellers, the Purchasers shall have received all required regulatory approvals to acquire the Stock Interests and to consummate the transactions contemplated hereby and in connection with the contemplated recapitalization of NBI and First Bank and all required waiting periods relating thereto shall have expired, and the Purchasers shall have provided copies of any such required regulatory approvals to the Sellers, subject to applicable law, rule or regulation.

**6.2** **Bankruptcy Court Approval**.   The Plan shall have been confirmed by the Bankruptcy Court and shall have become effective pursuant to its terms.

**6.3** **Performance of Purchasers under the Plan**.   The Purchasers shall have performed all of their obligations under the Plan, including their obligation to fund the Plan

Funding Management Contribution in an amount equal to $120,000. The right to purchase contemplated in Section 1.1 shall have become effective and shall have been exercised in connection with the transactions contemplated hereby.

**6.4** **Reasonable Efforts**. Subject to the terms and conditions hereof and the parties' respective rights to terminate this Agreement, each party hereto shall use its reasonable efforts to take all action required of it to fulfill its obligations under the terms of this Agreement and to facilitate the satisfaction of the conditions to and the consummation of the transactions contemplated hereby. Each Seller and Purchaser will cooperate with each other in securing all the necessary approvals needed to consummate the transactions contemplated herein.

## ARTICLE VII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASERS

The obligations of the Purchasers hereunder shall be subject to the satisfaction (or written waiver by Purchasers' Representative) on or before the Closing Date of each condition precedent set forth in this Agreement and to all of the following additional conditions:

**7.1** **Representations, Warranties and Covenants**. The representations and warranties of each Seller contained herein shall have been true, accurate and complete in all material respects on and as of the date of this Agreement, and shall also be true, accurate and complete in all material respects on and as of the Closing Date with the same force and effect as though made by the Seller on and as of the Closing Date. Each Seller shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by him or her on or prior to the Closing Date. The Purchasers shall have received a certificate, dated as of the Closing Date and signed by each Seller, to the foregoing effect.

**7.2** **Absence of Litigation**. There shall not be pending or, to the knowledge of any Purchaser, threatened, any action or proceeding seeking to restrain, enjoin, prohibit, or obtain damages in connection with or related to any part of this Agreement. No preliminary or permanent injunction or other order by any federal or state court that prevents the consummation of the transactions contemplated hereby shall have been issued and shall remain in effect.

**7.3** **Restructuring Matters**. NBI shall have satisfied all of its obligations under the Plan; provided that each of the parties hereto agrees to co-operate and use reasonable best efforts to cause such approval and ratification.

**7.4** **No Other Agreements**. There shall not be any other agreement in effect for the sale of any of the Shares.

**7.5** **Certificates**. The certificates representing all of the Shares shall have been properly tendered and delivered to the Purchasers together with stock powers duly executed in blank.

**7.6** **Resignations**. On the Closing Date, the Purchasers shall have received the resignations, effective immediately following the Closing, contemplated in SCHEDULE II.

**7.7    Other Documents**.  The Purchasers shall have received all such documents, certificates or instruments and all other documents, certificates and instruments from the Sellers as may be mutually agreed upon by the parties and their respective counsel.

**7.8    Sale of All of the Shares**.  On the Closing Date, the Sellers shall sell all of the Shares hereunder to the Purchasers.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLERS

The obligations of the Sellers hereunder shall be subject to the satisfaction (or written waiver by the Sellers' Representative) on or before the Closing Date of each condition precedent set forth in this Agreement and to all of the following additional conditions:

**8.1    Representations, Warranties and Covenants**.   The representations and warranties of each Purchaser contained herein shall have been true, accurate and complete in all material respects on and as of the date of this Agreement, and shall also be true, accurate and complete in all material respects on and as of the Closing Date with the same force and effect as though made by the Purchasers on and as of the Closing Date.  Each Purchaser shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by it on or prior to the Closing Date.  The Sellers shall have received a certificate, dated as of the Closing Date and signed by each Purchaser, to the foregoing effect.

**8.2    Purchase of All of the Shares**.   On the Closing Date, the Purchasers shall purchase all of the Shares hereunder.

**8.3    Restructuring Matters**.  Purchasers shall have satisfied all of their obligations under the Plan; provided that each of the parties hereto agrees to co-operate and use reasonable best efforts to cause such approval and ratification.

**8.4    Regulatory Matters**.  No regulatory approval issued in connection with the transactions contemplated hereby shall impose any material obligations on any Seller or create any material risk on any Seller.

## ARTICLE IX

## ADDITIONAL AGREEMENTS

**9.1    Bankruptcy Court Approval**.  The Purchasers understand and acknowledge that: (i) they are entering into this Agreement in connection with the Plan to be filed by NBI in the Bankruptcy Case and (ii) their obligations under ARTICLE IX of this Agreement are expressly subject to and will be governed by the Plan.  The Purchasers further understand and acknowledge that by entering into this Agreement they are subjecting themselves to the jurisdiction of the Bankruptcy Court and consenting to have any disputes regarding their obligations under ARTICLE IX of this Agreement initiated by a party-in-interest to the Bankruptcy Case adjudicated by the Bankruptcy Court.  For the avoidance of doubt, nothing in this Agreement,

including this ARTICLE IX, shall subject to the Sellers to the jurisdiction of the Bankruptcy Court or the terms of the Plan.

**9.2** **Assignment**.  The Purchasers agree that, at any time following the sixth month anniversary of the date of this Agreement, the Purchasers shall assign this Agreement, without charge or consideration, to any party or parties designated, in writing, by First Bank or any party-in-interest in the Bankruptcy Case (except that no assignee pursuant to this Section 9.2 shall be a party-in-interest in the Bankruptcy Case and no party-in-interest in the Bankruptcy Case may receive any fee or other type of compensation on account of such assignment) that have agreed to facilitate the recapitalization of NBI and First Bank and have reasonably demonstrated the financial ability to consummate such recapitalization; *provided, however,* that any party-in-interest requesting assignment pursuant to this Section 9.2 shall provide notice of assignment to all parties-in-interest in the Bankruptcy Case and such assignment shall only become effective if no objection to such assignment has been filed with the Bankruptcy Court by any other party-in-interest in the Bankruptcy Case (other than First Bank and the following parties-in-interest, an objection by whom will not impact the assignment set forth in this Section 9.2: the Debtor, an affiliate of the Debtor, the Purchasers, the Seller, creditors that are treated as unimpaired under the Plan, creditors whose claims or interests are cancelled under the Plan, or other current or prior owners of shares of NBI) within ten business days of such holder's receipt of the notice of assignment.  Any such assignment by Purchasers shall be pursuant to the terms of the assignment agreement attached hereto as APPENDIX A.   Notwithstanding anything to the contrary contained in this Section 9.2, the Purchasers shall not be required to assign this Agreement if at the time that the notice from First Bank or the parties-in-interest in the Bankruptcy is sent to Purchasers (a) the Purchasers have filed all applications, notices, other required requests and other submissions seeking the regulatory approval contemplated in Section 6.1 hereof and such applications are deemed informationally sufficient by the applicable regulatory authority and (b) the Purchasers are using best efforts to cause Section 6.1 to be satisfied.  The period between the date of this Agreement and the end date specified in the first sentence of this Section 9.2, subject to extension as provided in the immediately preceding sentence, is the "**Exclusivity Period**".

**9.3** **Adverse Effect**.  The Purchasers further agree that the Purchasers shall not exercise any right or take any action, including without limitation, causing a Termination Event, the amendment of this Agreement, or the waiver of any rights hereunder, in a manner that will materially and adversely affect the rights of First Bank or the parties-in-interest in the Bankruptcy Case under the Plan or which impairs the rights of such parties-in-interest to direct the assignment of this Agreement pursuant to Section 9.2.   Notwithstanding anything to the contrary in this Agreement, the failure of any Purchaser to comply with its obligations under this Agreement or the Plan, shall not limit the rights of any Sellers.

**9.4** **Waiver**.  In its sole and absolute discretion, First Bank or any party-in-interest in the Bankruptcy Case may waive its rights under this ARTICLE IX.

## ARTICLE X

## TERMINATION

**10.1    Termination**.    This Agreement may be terminated at any time prior to the Closing in accordance with the following: (i) by written agreement of Purchasers' Representative (in compliance with the Plan) and the Sellers' Representative; (ii) by the Sellers if the Effective Date has not occurred on or prior to September 30, 2015, or if the Closing Date has not occurred on or before March 31, 2016 (unless on or prior to March 31, 2016, (a) all applications, notices, other required requests and other submissions seeking the regulatory approval contemplated in Section 6.1 hereof shall have been filed and deemed informationally sufficient by the applicable regulatory authority and (b) the Purchasers shall continue to use best efforts to cause Section 6.1 to be satisfied); (iii) by the Sellers upon the occurrence of a Termination Event; (iv) by the Sellers if the Purchaser has not irrevocably and indefeasibly paid to NBI the funds held pursuant to the Plan Funding Contribution Escrow on or before one business day after the effective date of the Plan; (v) by the Sellers if the Bankruptcy Court denies confirmation of the Plan or confirms an alternative chapter 11 plan of reorganization or sale of all or substantially all of NBI's assets to an entity other than the Purchaser; (vi) by the Sellers if after the date hereof, but prior to the filing of the Bankruptcy Case, any of the Sellers, NBI or any member of the board of directors of NBI or First Bank receives any instruction or direction from the Federal Deposit Insurance Corporation, the Illinois Department of Financial and Professional Regulation, the Federal Reserve Bank of Chicago or the Board of Governors of the Federal Reserve System (collectively, the "**Regulators**") that the Sellers, NBI or the directors of NBI or First Bank should act to cause First Bank to be recapitalized prior to the consummation of the transactions contemplated in this Agreement or in the Plan; or (vii) by the Sellers after the filing of the Bankruptcy Case if both: (x) the financial condition of the Bank deteriorates significantly (including if the regulatory capital ratios of the First Bank decrease significantly); and (y) any of the Sellers, NBI or any member of the board of directors of NBI or First Bank receives any instruction or direction from the Regulators that the Sellers, NBI or the directors of NBI or First Bank should act to cause First Bank to be recapitalized prior to the consummation of the transactions contemplated in this Agreement or in the Plan.  For the avoidance of doubt, (i) the termination right set forth in clause (vi) above may not be exercised after the filing of the Bankruptcy Case and (ii) other than expressly set forth in this Agreement, the Sellers and the Purchasers hereto shall not have the right to terminate this Agreement.  Additionally, the Purchasers, First Bank and all parties-in-interest in the Bankruptcy Case agree and acknowledge that this Agreement does not bind the Sellers in any capacity other than as stockholders of NBI. Accordingly, this Agreement does not limit the ability of any Seller to exercise or comply with any fiduciary duties of such Seller as a director or officer of NBI or First Bank.

**10.2    Effect of Termination**.   If this Agreement is terminated pursuant to Section 10.1, all obligations of the parties hereunder shall terminate, except for the release given pursuant to Section 5.7 and the obligations set forth in Section 11.2, which shall survive the termination of this Agreement, and except that no such termination shall relieve any party from liability for any prior willful breach of this Agreement. Additionally, each Purchaser agrees and acknowledges that following a termination of this Agreement pursuant to Section 10.1, the Sellers and NBI may need to take actions that result in the recapitalization of the Bank, which actions may include a

sale of First Bank, a bankruptcy filing by NBI and any disposition of First Bank following such filing by NBI.

**10.3**   **Breach; Specific Performance**.   If the transactions contemplated by this Agreement have not been consummated as a result of a breach of this Agreement by any party hereto, the parties hereto agree that the non-breaching parties hereto shall be entitled, at their option and in addition to any other available legal and equitable remedies, to specific performance of this Agreement.  The parties hereto agree that the non-breaching parties hereto shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in addition to any other remedy to which it may be entitled, at law or equity.

## ARTICLE XI

## MISCELLANEOUS

**11.1**   **Binding Effect**.  All covenants, agreements, representations and warranties of the parties contained herein shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, and legal representatives.

**11.2**   **Expenses**.  Each party shall pay all of its own expenses, costs and fees incurred or assumed in connection with the transactions contemplated hereby.

**11.3**   **Notices**.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, by email transmission and by registered or certified mail to the parties at the following addresses (or at such other address for a party as shall be specified by like notice) and shall be deemed to be delivered on the date so delivered:

|  |  |
|---|---|
| If to any Purchaser: | Alan Reasoner |
|  | 300 East Northwest Highway |
|  | Palatine, Illinois  60067 |
|  | Telephone:     (847) 654-4420 |
|  | Email:           alan.reasoner@firstbankillinois.com |
|  | Attention:      Alan Reasoner, as Purchasers' Representative |
| With a required copy to: | Emad Murrar |
|  | 300 East Northwest Highway |
|  | Palatine, Illinois  60067 |
|  | Telephone:     (708) 205-7209 |
|  | Email:           emurrar@gmail.com |
|  | and |
|  | Northwest Bancorporation of Illinois, Inc. |
|  | 300 East Northwest Highway |
|  | Palatine, Illinois  60067 |

11

Attn:  Board of Directors

and

Kirkland & Ellis LLP
300 North LaSalle Street
Suite 2400
Chicago, Illinois  60654
Attn:  Edwin S. del Hierro, P.C.
      David R. Seligman, P.C.
      Brad Weiland

If to any Seller:         Robert Hershenhorn
808 East Deerpath
Palatine, Illinois 60047
Telephone:    (847) 358-6262
Email:          rhershenhorn@aol.com
Attention:     Robert Hershenhorn, as Sellers'
             Representative

With a required copy to:    Robert Hershenhorn
980 Spyglass Lane
Naples, Florida  34102

and

Robert Herschenhorn
rhershenhorn@aol.com

and

Northwest Bancorporation of Illinois, Inc.
300 East Northwest Highway
Palatine, Illinois 60067
Attn:  Board of Directors

and

Kirkland & Ellis LLP
300 North LaSalle Street
Suite 2400
Chicago, Illinois 60654
Attn:  Edwin S. del Hierro, P.C.
      David R. Seligman, P.C.
      Brad Weiland

**11.4    Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

**11.5    Captions**.  Captions and paragraph headings used herein are for convenience only and are not a part of this Agreement and shall not be used in construing or interpreting any provision hereof.

**11.6    Amendments, Supplements or Modifications**.  This Agreement may only be amended by a written agreement signed by each of the parties hereto.

**11.7    Applicable Law; Jurisdiction**.

(a)    As between the Purchasers and the Sellers, this Agreement shall be construed and interpreted in all respects, including validity, interpretation and effect, by the laws of the State of Illinois, except to the extent that the federal laws of the United States apply.  In addition, each of the parties hereto (i) consents to submit itself to the personal jurisdiction of any federal or state court located in Cook County, Illinois, in the event any dispute between the Purchasers and Sellers arises out of this Agreement or any of the transactions contemplated hereby, and consents to service of process by notice as provided in Section 11.3 of this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated hereby in any court other than a federal or state court sitting in Cook County, Illinois.

(b)    Solely for the purposes of ARTICLE IX, the Purchasers agree that any dispute arising between the Purchasers and First Bank or any parties-in-interests in the Bankruptcy Case regarding the Purchasers' rights and obligations under ARTICLE IX shall be adjudicated solely in the Bankruptcy Court pursuant to the terms of the Plan.  The Purchasers hereby (i) consent to submit themselves to the personal jurisdiction of the Bankruptcy Court in the event of any dispute arising out of ARTICLE IX of this Agreement and to service of process by notice as provided in the Plan, (ii) agree that they will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court and (iii) agree that they will not bring any action relating to ARTICLE IX of this Agreement in any court other than the Bankruptcy Court.

**11.8    Construction of Agreement**.  When permitted by the context, the singular includes the plural and vice versa.  The use of the masculine, feminine or neuter gender herein shall not limit any provision of this Agreement.  The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation" respectively.  References to Articles, Sections or Subsections shall refer to those portions of this Agreement.  Consummation of the transactions contemplated herein shall not be deemed a waiver of a breach of or an inaccuracy in any representation, warranty or covenant or of any party's rights and remedies with regard thereto.  No specific representation, warranty or covenant contained herein shall limit the generality or applicability of a similar or more general representation, warranty or covenant contained herein.  A breach of or an inaccuracy in any

representation, warranty or covenant shall not be affected by the fact that any similar or more or less specific representation, warranty or covenant was not also breached or inaccurate.

**11.9   Waivers**.   The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.   No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one of more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**11.10   Waiver of Jury Trial**.   **EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY OR DISPUTE THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.   EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS OF THIS SECTION 11.10.**

**11.11   Assignment**.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided, however,* that no assignment of any rights or obligations shall be made by (i) any Seller without the written consent of Purchasers or (ii) any Purchaser if such assignment would result in a Termination Event or in the violation any applicable law, rule or regulation; *provided further, however,* that the Purchasers shall notify all parties-in-interest in the Bankruptcy Case that have filed a renewed request to receive documents pursuant to Bankruptcy Rule 2002 pursuant to the terms of the Plan of any assignment.   Furthermore, notwithstanding anything to the contrary in this Agreement, no direct or indirect assignment, transfer or sale by any Purchaser of this Agreement, or any of the rights of any Purchaser under this Agreement shall limit or otherwise effect the release given pursuant to Section 5.7 by any Purchaser as of the date hereof and any party that becomes a Purchaser pursuant to an assignment, transfer or purchase of this Agreement or any of the rights of any Purchaser under this Agreement, shall become an additional Purchaser Releaser under, and in accordance with, Section 5.7.

**11.12   No Third Party Beneficiaries**.   This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon other third parties any remedy, claim, liability, reimbursement, cause of action or other right; *provided,*

*however,* that First Bank and the parties-in-interest to the Bankruptcy Case shall be and are express third party beneficiaries of ARTICLE IX hereof solely with respect to their right to enforce such Article against the Purchasers and not against the Sellers.

**11.13**   **Severability**.  If any provision of this Agreement shall be held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions hereof shall not be affected thereby.

**11.14**   **Remedies Cumulative**.   The remedies provided in this Agreement shall be cumulative and shall not preclude the assertion or exercise of any other rights or remedies available by law, in equity or otherwise.

**11.15**   **Entire Agreement**.   This Agreement (together with any Schedules and Exhibits hereto and the documents referred to herein) contains, and is intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for herein, and supersedes any previous agreements and understandings between the parties with respect to those matters.

**11.16**   **Press Releases**.  Except as may otherwise be required by law, no publicity release or announcement concerning this Agreement or the transactions contemplated hereby shall be made without advance approval thereof by the Purchasers' Representative and the Sellers' Representative.  The Purchasers' Representative and the Sellers' Representative will cooperate with each other in the development and distribution of all news releases and other public information disclosures with respect to this Agreement, the transactions contemplated hereby or any of the transactions contemplated hereby and will keep confidential, except as otherwise required by law or applicable regulatory authority, the existence of and terms of this Agreement. Nothing in this Section 11.16 or otherwise provided in this Agreement shall place any restriction on NBI's right or power to file information with the Bankruptcy Court as NBI determines necessary or appropriate in its sole discretion, regardless of whether any such information makes reference to this Agreement or the transactions contemplated hereby.

**[Remainder of Page Intentionally Left Blank]**

**SCHEDULE I**

**LIST OF SELLERS**

| **Seller** | **Shares** |
| --- | --- |
| 1.   Robert Hershenhorn | 20,140 |

**SCHEDULE II**

**RESIGNATIONS**

- All directors other than Alan Reasoner shall resign any positions he or she holds as an officer, employee and director of NBI or the Bank.

**SCHEDULE III**

**PRO RATA INTEREST OF PURCHASERS**

| Purchaser | Pro Rata Share |
|-----------|:--------------:|
| 1.   Alan Reasoner | * |
| 2.   Emad Murrar | * |

_____

*  Percentage to be determined by the Purchasers

**APPENDIX A**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Assignment**") is made as of this [__] day of [__], 2015, by and between ALAN REASONER, an individual, and EMAD MURRAR, an individual (collectively, the "**Assignors**"), and [__] ("**Assignee**").

### R E C I T A L S:

**WHEREAS,** the Assignors entered into that certain Stock Purchase Agreement, dated as of March ____, 2015 (the "**Agreement**"), by and between the Assignors and the Stockholders listed on Schedule I thereto (the "**Sellers**"). All terms used but not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

**WHEREAS**, pursuant to Section 9.2 of the Agreement, at any time following the sixth month anniversary of the date of the Agreement and in the absence of certain conditions described therein, the Assignors have agreed to assign the Agreement to any party or parties designated, in writing, by any party-in-interest in the Bankruptcy Case.

**WHEREAS**, no party-in-interest to the Bankruptcy Case has objected to this Assignment pursuant to Section 9.2 of the Agreement.

**WHEREAS**, the Assignors desire to assign to Assignee all of the Assignors' right and interest in and to the Agreement as of the date hereof, and Assignee desires to accept such assignment, and to assume all obligations and responsibilities of the Assignors thereunder as of the date hereof.

**NOW, THEREFORE**, in consideration of the foregoing and for such consideration otherwise provided under the Agreement, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereto agree as follows:

### A G R E E M E N T S:

1.     As of the date hereof (the "**Assignment Date**"), the Assignors hereby grant, convey and assign to Assignee all of the Assignors' right, title and interest in and to the Agreement.

2.     As of the Assignment Date, Assignee hereby accepts the assignment of all of the Assignors' right and interest in and to the Agreement and assumes the responsibilities of the Assignors under the Agreement and the Plan and agrees to keep, perform and observe each and every obligation, term, covenant, condition and provision to be kept, performed and observed by the Assignors under the Agreement, including, for the avoidance of doubt, the submission to the jurisdiction of the Bankruptcy Court for the resolution of any disputes that may arise hereunder or under the Agreement and the Plan, as set forth therein, and the assumption of the obligations under Article IX of the Agreement.

3.      This Assignment is being delivered pursuant to the Agreement and shall be construed consistently therewith. This instrument is not intended to, and does not, in any manner increase, modify or alter the rights and obligations of the Sellers pursuant to the Agreement.

4.      The Assignors represent that:

      a.      the Assignors have not assigned, transferred, conveyed, or otherwise encumbered the Agreement;

      b.      the Assignors have full right, power and authority to assign the Agreement, subject to the provisions thereof; and

      c.      the Agreement is in full force and effect as of the Assignment Date and constitutes the legal, valid and binding obligations of the Assignors and the Sellers, enforceable in accordance with its terms under the laws of the State of Illinois, except to the extent that the federal laws of the United States apply.

5.      Except as otherwise provided herein, all representations, covenants and warranties shall survive the consummation of the transactions contemplated by this Assignment.

6.      For the avoidance of doubt, the Assignees affirm the release set forth in Section 5.7 of the Agreement and agree to release the Sellers pursuant thereto as if the Assignees were an original party to the Agreement.

7.      This Assignment shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and assigns.

8.      In the event of conflict between the provisions of this Assignment and the provisions of the Agreement, the provisions of the Agreement shall govern, supersede and prevail.

9.      This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

10.     This Assignment embodies and constitutes the entire agreement between the parties with respect to the matters set forth herein and therein.  There have been no additional oral or written representations or agreements.

11.     This Assignment shall be governed and construed in accordance with the laws of the State of Illinois, except to the extent that the federal laws of the United States apply.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

**IN WITNESS WHEREOF**, the Assignors and Assignee have executed this Assignment as of the day and year first above written.

**<u>ASSIGNORS</u>**:

_____

Alan Reasoner

_____

Emad Murrar

**<u>ASSIGNEE</u>**:

_____

Name:

By:

Its:

**<u>EXHIBIT C</u>**

**Financial Statements**

# Northwest Bancorporation of Illinois, Inc.
## Balance Sheet

**(Dollars in Thousands)**

| | For the twelve months ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| **Assets** | | | | | |
| Cash & Equivalents | $ 320 | $ 238 | $ 220 | $ 201 | $ 83 |
| Total Securities | - | - | - | - | - |
| Reverse Repurch Agrmnts | - | - | - | - | - |
| Total Loans | - | - | - | - | - |
| Loan Loss Reserve | - | - | - | - | - |
| Net Loans | - | - | - | - | - |
| Total Investment in Subsidiaries | 46,666 | 34,708 | 29,132 | 24,776 | 20,136 |
| Premises & Fixed Assets | - | - | - | - | - |
| Total Intangibles | - | - | - | - | - |
| Other Assets | 379 | 379 | - | - | - |
| **Total Assets** | $ 47,365 | $ 35,325 | $ 29,352 | $ 24,977 | $ 20,219 |
| | | | | | |
| **Liabilities** | | | | | |
| Total Deposits | $ - | $ - | $ - | $ - | $ - |
| Borrowings | - | - | - | - | - |
| Other Liabilities | 2,374 | 5,126 | 8,150 | 11,352 | 14,869 |
| Due to Nonbanks Subsidiaries | 36,084 | 36,084 | 36,084 | 36,084 | 36,084 |
| **Total Liabilities** | 38,458 | 41,210 | 44,234 | 47,436 | 50,953 |
| | | | | | |
| **Equity** | | | | | |
| Common Stock Par Value | 1 | 1 | 1 | 1 | 1 |
| Retained Earnings | 8,835 | (6,023) | (15,031) | (22,486) | (30,811) |
| Other Comprehensive Income | 71 | 137 | 148 | 26 | 76 |
| **Total Equity** | 8,907 | (5,885) | (14,882) | (22,459) | (30,734) |
| | | | | | |
| **Total Liabilities and Equity** | $ 47,365 | $ 35,325 | $ 29,352 | $ 24,977 | $ 20,219 |

**Northwest Bancorporation of Illinois, Inc.**
Cash Flow Statement

(Dollars in Thousands)

| | For the twelve months ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| **Cash Flow from Operating Activities** | | | | | |
| Net Income of Parent Company | $ (6,871) $ | (14,860) $ | (9,008) $ | (7,454) $ | (8,324) |
| **Adjustments from Operating Activities** | | | | | |
| Undisributed (Earnings) / Loss of Subsidiaries | 5,435 | 11,958 | 5,548 | 2,426 | 3,615 |
| Net Change in Other Liabilities | 1,400 | 2,752 | 3,023 | 3,202 | - |
| Net Change in Other Assets | 261 | - | 407 | 1,807 | 4,641 |
| Other Changes, Net | 20 | 67 | 11 | - | (49) |
| Total Adjustments from Operating Activities | 7,116 | 14,777 | 8,989 | 7,435 | 8,207 |
| **Net Cash Flow from Operating Activities** | 245 | (83) | (19) | (19) | (117) |
| **Cash Flow from Investing Activities** | | | | | |
| Purchases of Secs | - | - | - | - | - |
| Sales of Secs | - | - | - | - | - |
| Outlays for Business Acquisitions | - | - | - | - | - |
| Proceeds from Business Divestitures | - | - | - | - | - |
| Other Changes, Net | - | - | - | - | - |
| Net Cash Flow from Investing Activities | - | - | - | - | - |
| **Cash Flow from Financing Activities** | | | | | |
| Proceeds / (repayments) of Short-Term Borrowings | - | - | - | - | - |
| Proceeds from Issuance of Long-Term Debt | - | - | - | - | - |
| Repurchase of Long-Term Debt | - | - | - | - | - |
| Proceeds from Issuance of Common Stock | - | - | - | - | - |
| Repurchase of Common Stock | - | - | - | - | - |
| Proceeds from Issuance of Preferred Stck | - | - | - | - | - |
| Repurchase of Preferred Stock | - | - | - | - | - |
| Dividends Paid | - | - | - | - | - |
| Other, Net | - | - | - | - | - |
| Net Cash Flow from Financing Activities | - | - | - | - | - |
| **Cash and Cash Equivalents** | | | | | |
| Net Increase in Cash and Cash Equivalents | 245 | (83) | (19) | (19) | (117) |
| Cash and Cash Equivalents at Beginning of Period | 75 | 320 | 237 | 219 | 200 |
| Cash and Cash Equivalents at End of Period | $ 320 $ | 237 $ | 218 $ | 200 $ | 83 |

## Northwest Bancorporation of Illinois, Inc.
**Income Statement**

**(Dollars in Thousands)**

| | For the twelve months ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| **Operating Income** | | | | | |
| Income from Bank Subsidiaries | | | | | |
| Dividend Income | $   1,140 | $        - | $        - | $        - | $        - |
| Interest Income | - | 1 | 1 | 1 | 1 |
| Other Income | - | - | - | - | - |
| Total Income from Bank Subsidiaries | 1,140 | 1 | 1 | 1 | 1 |
| | | | | | |
| Income from NonBank Subsidiaries | | | | | |
| Dividend Income | 4 | - | - | - | - |
| Interest Income | - | - | - | - | - |
| Other Income | - | - | - | - | - |
| Total Income from NonBank Subsidiaries | 4 | - | - | - | - |
| | | | | | |
| Total Operating Income | 1,144 | 1 | 1 | 1 | 1 |
| | | | | | |
| **Operating Expenses** | | | | | |
| Salary Expense | - | - | - | - | - |
| Interest Expense | - | - | - | - | - |
| Prov for Loan Losses | - | - | - | - | - |
| All Other Expense | 2,600 | 2,877 | 3,460 | 5,030 | 3,635 |
| Total Operating Expense | 2,600 | 2,877 | 3,460 | 5,030 | 3,635 |
| | | | | | |
| Income Before Taxes & Undistruted Income | (1,456) | (2,876) | (3,459) | (5,029) | (3,634) |
| Income Taxes | - | - | - | - | - |
| Income Before Undistruted Income | (1,456) | (2,876) | (3,459) | (5,029) | (3,634) |
| | | | | | |
| Equity in Undistributed Income of Bank Subs | (5,415) | (11,984) | (5,549) | (2,425) | (4,690) |
| Net Income of Parent Company | $   (6,871) | $   (14,860) | $   (9,008) | $   (7,454) | $   (8,324) |

**<u>EXHIBIT D</u>**

**Form of Plan Support Agreement**

*EXECUTION VERSION*

---

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

---

**PLAN SUPPORT AGREEMENT**

by and among

**NORTHWEST BANCORPORATION OF ILLINOIS, INC.,**

**THE UNDERSIGNED SUPPORTING SHAREHOLDERS,**

**THE UNDERSIGNED SUPPORTING TRUPS HOLDERS,**

and

**THE UNDERSIGNED MANAGEMENT PARTIES**

March 31, 2015

KE 35583175

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (including all exhibits annexed hereto which are incorporated by reference herein, this "Agreement") is made and entered into as of March __, 2015, by and among Northwest Bancorporation of Illinois, Inc. (the "Debtor"), the undersigned supporting holders (the "Supporting Shareholders") of the Majority Interests (as defined in the Plan (as defined herein)), each of the undersigned supporting holders (each a "Supporting TruPS Holder," and, collectively, the "Supporting TruPS Holders") of TruPS Claims (as defined in the Plan (as defined herein)), and each of the undersigned supporting members of management of the Debtor (each a "Management Party" and, collectively, the "Management Parties," all of whom are also parties to the Stock Purchase Agreement (as defined in the Plan)), the form of which is attached hereto as **Exhibit A**. Each of the parties hereto is referred to as a "Party" and all parties hereto are collectively referred to as the "Parties."

**WHEREAS**, the Debtor, the Supporting TruPS Holders, and the Management Parties have negotiated certain restructuring and recapitalization transactions with respect to the Debtor's capital structure (such transactions, as set forth in and pursuant to the Plan (as defined herein), the "Restructuring Transactions");

**WHEREAS**, to implement or facilitate such transactions, the Debtor intends to commence a voluntary case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in a United States Bankruptcy Court having jurisdiction (the "Bankruptcy Court") and intends to seek confirmation of the prepackaged chapter 11 plan attached hereto as **Exhibit B** (as may be amended, supplemented or revised from time to time in accordance with its terms and this Agreement, the "Plan") and to solicit votes on the Plan with the disclosure statement attached hereto as **Exhibit C** (as may be amended, supplemented or revised from time to time in accordance with its terms and this Agreement, the "Disclosure Statement"); and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the Restructuring Transactions and the Plan on the terms and conditions contained in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1. **Definitions and Interpretation.** Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan. This Agreement shall be interpreted according to the rules of interpretation set forth in the Plan.

2. **Effectiveness; Entire Agreement.**

   a. This Agreement shall become effective and binding on all Parties as of the date this Agreement is executed by each of the Parties; provided that Supporting TruPS Holders holding or controlling at least two thirds (2/3) of the TruPS Claims execute this Agreement.

1

b. Without limiting the rights and remedies of any Party arising from a breach of this Agreement prior to its valid termination, except as specifically provided to the contrary herein, if this Agreement is validly terminated pursuant to its terms, then this Agreement shall be null and void and have no further legal effect, and none of the Parties shall have any liability or obligation arising under or in connection with this Agreement. Notwithstanding the immediately preceding sentence, if this Agreement is validly terminated pursuant to its terms, the entire amount of the Plan Funding TruPS Contribution shall be paid or returned to the applicable Supporting TruPS Holders in their respective portions , and the entire amount of the Plan Funding Management Contribution shall be paid or returned to the applicable Management Parties (and the amounts of the Management Loans paid shall be returned to the Supporting TruPS Holders) in their respective portions, in each case as soon as reasonably practicable following such valid termination of this Agreement.

c. The Plan Funding Escrow shall be held in trust by a non-Debtor escrow agent on behalf of the Electing TruPS Holders and the Management Plan Support Parties and is not and shall not be considered property of the Estate under section 541 of the Bankruptcy Code. The Plan Funding Escrow shall be governed by that certain Escrow Agreement by and between certain Holders of TruPS Claims, the Management Plan Support Parties, and the Debtor, a copy of which is attached hereto as **Exhibit D**. The amounts held in the Plan Funding Escrow shall be treated and disbursed in accordance with the Plan.

d. This Agreement (including the Plan and any other exhibits to this Agreement or to the Plan) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations. Upon the execution of this Agreement, no Party will enter into any agreement related to the transactions contemplated by this Agreement or the Plan unless agreed by all the Parties or provided for under the Plan.

3. **Covenants of the Debtor.** For so long as this Agreement has not been validly terminated in accordance with its terms, the Debtor hereby agrees and covenants to:

a. use commercially reasonable efforts to complete solicitation of the Plan and thereafter to commence the Chapter 11 Case on or before April 28, 2015;

b. use reasonable best efforts in good faith to take all actions necessary or appropriate to propose and support the Plan and obtain entry of the Confirmation Order by the Bankruptcy Court (including, without limitation, filing with the Bankruptcy Court documents to propose and support the Plan and Confirmation and appearing in the Bankruptcy Court in support of the Plan and Confirmation);

c. operate its business in the ordinary course, taking into account the Restructuring Transactions, and use commercially reasonable efforts to avoid causing the financial condition of First Bank and Trust Company of Illinois ("First Bank") to

2

deteriorate significantly (including any significant decrease in the regulatory capital ratios of First Bank);

d.  support and consent to the release, discharge, exculpation, and injunction provisions contained in the Plan;

e.  enter into and comply with the terms of the escrow agreement that will govern the Plan Funding Escrow, the form of which is attached hereto as **Exhibit D** (the "Escrow Agreement");

f.  not make any material modifications to any exhibits attached hereto without the express written consent of the Supporting TruPS Holders holding a majority of all TruPS Claims held by all Supporting TruPS Holders (collectively, the "Majority Supporting TruPS Holders");

g.  not seek to cancel, terminate, or revoke any TruPS Election that is made by any Holder of TruPS Claims or seek to effect or interpose any TruPS election that any Holder of TruPS Claims fails to make;

h.  not enter into or seek Bankruptcy Court approval of any post-petition employment, retention, engagement, or other agreements with any third parties other than with Kirkland & Ellis, LLP, without the prior written consent of the Majority Supporting TruPS Holders;

i.  not directly or indirectly object to, delay, impede, commence or support any proceeding in opposition to, or take any other action that is inconsistent with or is intended to frustrate or interfere with the acceptance, Confirmation, implementation, or consummation of the Plan and the Restructuring Transactions;

j.  subject to Section 13.c, not directly or indirectly commence a chapter 11 case for the Debtor (other than the Chapter 11 Case to pursue Confirmation and consummation of the Plan) or propose, file, support, or vote for or in favor of any restructuring, workout, plan of arrangement, plan of reorganization, or sale process other than the Plan (each an "Alternative Transaction"), or directly or indirectly market any assets of the Debtor in any way in connection with an Alternative Transaction;

k.  not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede Confirmation of the Plan and consummation of the Restructuring Transactions;

l.  to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay Confirmation of the Plan or consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; and

KE 35583175

m.  comply with all of its obligations under this Agreement and the exhibits annexed hereto (which exhibits are incorporated herein by reference) unless compliance is waived in writing by each of the other Parties.

4.  **Covenants of Supporting Shareholders.**  Upon and only during the continued effectiveness of the Stock Purchase Agreement and for so long as this Agreement has not been validly terminated, each Supporting Shareholder hereby agrees and covenants to:

a.  use commercially reasonable efforts in good faith to support the Plan and entry of the Confirmation Order by the Bankruptcy Court;

b.  not, directly or indirectly, submit an election to terminate the Debtor's current tax treatment as an "S Corporation" in accordance with section 1362(d) of title 26 of the Internal Revenue Code prior to the Effective Date of the Plan;

c.  not take any action prior to the closing of the Recapitalization Right to Purchase that may have negative tax consequences on the Debtor;

d.  not assert any claims of any kind or priority against the Debtor in the Chapter 11 Case;

e.  support and consent to the release, discharge, exculpation, and injunction provisions contained in the Plan;

f.  not object to, delay, impede, commence or support any proceeding in opposition to, or take any other action that is inconsistent with or is intended to frustrate or interfere with the acceptance, Confirmation, implementation, or consummation of the Plan and the Restructuring Transactions;

g.  not hypothecate, pledge, encumber, assign, sell or otherwise transfer, offer or contract to hypothecate, pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Debtor.

h.  not commence a chapter 11 case for the Debtor (other than the Chapter 11 Case to pursue Confirmation and consummation of the Plan); and

i.  comply with all of its obligations under this Agreement and the exhibits annexed hereto (which exhibits are incorporated herein by reference) unless compliance is waived in writing by each of the other Parties.

5.  **Covenants of the Supporting TruPS Holders.**  For so long as this Agreement has not been validly terminated, each Supporting TruPS Holder (solely on its own behalf and not on behalf of any other Holder of TruPS Claims) hereby agrees and covenants severally (but not jointly) to:

a.  subject to the receipt of the Disclosure Statement and a ballot to vote on the Plan (the form of which is attached hereto as **Exhibit E**), vote each of its TruPS Claims

4

to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis and not change or withdraw such vote (or cause such vote to be changed or withdrawn);

b. use reasonable best efforts in good faith to take all actions necessary or appropriate to support the Plan and entry of the Confirmation Order by the Bankruptcy Court (including, without limitation, filing with the Bankruptcy Court documents in support of the Plan and Confirmation and appearing in the Bankruptcy Court in support of the Plan and Confirmation);

c. subject to the receipt of the Disclosure Statement and a ballot to vote on the Plan, make the TruPS Election such that it becomes an Electing TruPS Holder;

d. on demand by the Debtor after making the TruPS Election, promptly pay into the Plan Funding Escrow its Pro Rata portion (based on the amount of the respective TruPS Claims relative to the TruPS Claims of all Electing TruPS Holders) of the Plan Funding TruPS Contribution, which payment and any application thereof shall be governed by the applicable provisions of the Plan; provided that each Supporting TruPS Holder agrees and acknowledges that if such Supporting TruPS Holder does not pay its Pro Rata Portion of the Plan Funding TruPS Contribution into the Plan Funding Escrow within two (2) business days of such demand, then it will not under any circumstance be or be deemed an Electing TruPS Holder under the Plan and will be forever barred from seeking to make or reinstate the TruPS Election (including by seeking any relief of the Bankruptcy Court or any other court to permit it to be or be deemed an Electing TruPS Holder);

e. on demand by the Debtor after making the TruPS Election, execute and enter into the Manager Loan Documents (as defined below) and fund the loans contemplated thereunder within two (2) business days of such demand;

f. support and consent to (and not opt out of) the release, discharge, exculpation, and injunction provisions contained in the Plan;

g. not directly or indirectly object to, delay, impede, commence or support any proceeding in opposition to, or take any other action that is inconsistent with or is intended to frustrate or interfere with the acceptance, Confirmation, implementation, or consummation of the Plan and the Restructuring Transactions;

h. not directly or indirectly commence a chapter 11 case for the Debtor (other than the Chapter 11 Case to pursue Confirmation and consummation of the Plan) or propose, file, support, or vote for or in favor of any Alternative Transaction, or directly or indirectly market any assets of the Debtor in any way in connection with an Alternative Transaction;

i. to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the Parties, the timing of the

5

Closing Date and other material terms of this Agreement are preserved in any such provisions; and

j.   comply with all of its obligations under this Agreement and the exhibits annexed hereto (which exhibits are incorporated herein by reference) unless compliance is waived in writing by each of the other Parties.

**6.**   **Covenants of Management Parties.**   For so long as this Agreement has not been validly terminated in accordance with its terms, each Management Party (solely on its own behalf and not on behalf of any other Management Party) hereby agrees and covenants severally (but not jointly) to:

a.   use reasonable best efforts in good faith to take all actions necessary or appropriate to support the Plan and entry of the Confirmation Order by the Bankruptcy Court (including, without limitation, filing with the Bankruptcy Court documents in support of the Plan and Confirmation and appearing in the Bankruptcy Court in support of the Plan and Confirmation);

b.   through FB Investment Group, LLC (which shall be controlled by the Management Parties), execute loan agreement(s), promissory notes, and pledge agreements substantially in the form attached hereto as **Exhibit F** (collectively, the "Manager Loan Documents") with the Supporting TruPS Holders and any other Holder of TruPS Claims that makes the TruPS Election (as such terms are defined in the Plan) and, within two (2) business days of signing this Agreement, fund $120,000.00 into the Plan Funding Escrow (it being understood that the Manager Loan Documents will be held in escrow pending countersignature by the counterparties thereto, and that the counterparties thereto will countersign the Manager Loan Documents and provide the loan amounts thereunder in accordance with the covenant set forth in Section 5.e hereof);

c.   use reasonable best efforts to effect and consummate the Sale Transaction contemplated by the Stock Purchase Agreement and satisfy its respective obligations under the Stock Purchase Agreement;

d.   not directly or indirectly assert any claims of any kind or priority against the Debtor in the Chapter 11 Case;

e.   support and consent to the release, discharge, exculpation, and injunction provisions contained in the Plan;

f.   not directly or indirectly object to, delay, impede, commence or support any proceeding in opposition to, or take any other action that is inconsistent with or is intended to frustrate or interfere with the acceptance, Confirmation, implementation, or consummation of the Plan and the Restructuring Transactions;

g.   not directly or indirectly commence a chapter 11 case for the Debtor (other than the Chapter 11 Case to pursue Confirmation and consummation of the Plan) or propose, file, support, or vote for or in favor of any Alternative Transaction, or

directly or indirectly market any assets of the Debtor in any way in connection with an Alternative Transaction;

h. to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the Parties, the timing of the Closing Date and other material terms of this Agreement are preserved in any such provisions; and

i. comply with all of its obligations under this Agreement and the exhibits annexed hereto (which exhibits are incorporated herein by reference) unless compliance is waived in writing by each of the other Parties.

**7.**     **Representations and Warranties by the Debtor.**   The Debtor represents and warrants to each of the other Parties that, as of the date hereof:

a. it has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement, and the execution, delivery, and performance by it of this Agreement will not (i) contravene any applicable provision of any law, statute, rule or regulation, or any order writ, injunction, or decree of any court or governmental instrumentality or violate any provision of its organizational documents or (ii) conflict with, or result in a breach or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party;

b. the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part;

c. this Agreement is the legally valid and binding obligation of the Debtor and is enforceable against the Debtor in accordance with its terms, except as enforcement may be limited in or by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally;

d. the Debtor's engagement agreement with River Branch Capital, LLC or any affiliates thereof (collectively, "River Branch") has been, or will be, amended such that any and all fees payable by the Debtor to River Branch are only paid after the Effective Date of the Plan and are contingent on a successful capital raise for First Bank;

e. it has no knowledge of the occurrence of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement; and

f.   except as expressly provided in this Agreement, the execution, delivery, and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body other than the Bankruptcy Court and (solely in relation to regulatory matters related to the exercise of the Recapitalization Right to Purchase) the Federal Deposit Insurance Corporation.

**8.    Representations and Warranties by the Supporting Shareholders.**   Each Supporting Shareholder (solely on its own behalf and not on behalf of any other Holder of Interests) represents and warrants on a several (but not joint) basis to each of the other Parties that, as of the date hereof:

a.   such Supporting Shareholder either is the sole beneficial owner of or has sole investment or voting discretion (and the power and authority to bind the beneficial owner(s)) with respect to outstanding shares of common stock in the Debtor that, together with any such shares held or controlled by any other Supporting Shareholders, constitute a majority of the issued or outstanding shares of common stock of the Debtor, and such Supporting Shareholder has made no hypothecation, pledge, encumbrance, assignment, sale, or other transfer, or offered or contracted to hypothecate, pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Debtor;

b.   such Supporting Shareholder has full power and authority to act on behalf of, vote, and consent to matters concerning such shares of common stock in the Debtor and to dispose of, exchange, assign, and transfer such shares, including the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

c.   the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part; and

d.   this Agreement is the legally valid and binding obligation of such Supporting Shareholder and is enforceable against such Supporting Shareholder in accordance with its terms.

**9.    Representations and Warranties by the Supporting TruPS Holders.**   Each Supporting TruPS Holder (solely on its own behalf and not on behalf of any other Holder of TruPS Claims) represents and warrants on a several (but not joint) basis to each of the other Parties that, as of the date hereof:

a.   such Supporting TruPS Holder (A) either (1) is the sole beneficial owner of the principal amount of Trust Junior Subordinated Debentures set forth on such Supporting TruPS Holder's signature page to this Agreement, or (2) has sole investment or voting discretion with respect to the principal amount of claims

8

under such Trust Junior Subordinated Debentures set forth on such signature page and has the power and authority to bind the beneficial owner(s) of such TruPS Claims to the terms of this Agreement, and (B) has full power and authority to act on behalf of, vote, and consent to matters concerning such TruPS Claims and to dispose of, exchange, assign, and transfer such TruPS Claims, including the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

b.   such Supporting TruPS Holder has made no assignment, sale, participation, grant, conveyance, pledge, or other transfer of, and has not entered into any other agreement to assign, sell, use, participate, grant, convey, pledge, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any TruPS Claims that are subject to this Agreement that conflict with the representations and warranties of such Supporting TruPS Holder herein or would render such Supporting TruPS Holder otherwise unable to comply with this Agreement and perform its obligations hereunder;

c.   this Agreement constitutes the legally valid and binding obligation of such Supporting TruPS Holder, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

d.   such Supporting TruPS Holder is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended); and

e.   such Supporting TruPS Holder does not have actual knowledge of the occurrence of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement.

**10.    <u>Representations and Warranties by Management Parties</u>.** Each Management Party (solely on its own behalf and not on behalf of any other Management Party) represents and warrants on a several (but not joint) basis to each of the other Parties that, as of the date hereof:

a.   it has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement and the execution, delivery, and performance by it of this Agreement will not (i) contravene any applicable provision of any law, statute, rule or regulation, or any order writ, injunction, or decree of any court or governmental instrumentality or violate any provision of its organizational documents or (ii) conflict with, or result in a breach or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party;

b.   the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part;

9

c.  this Agreement is the legally valid and binding obligation of such Management Party and is enforceable against such Management Party in accordance with its terms; and

d.  except as expressly provided in this Agreement, the execution, delivery, and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body other than (solely in relation to regulatory matters related to any exercise by such Management Party of the Recapitalization Right to Purchase) the Federal Deposit Insurance Corporation.

**11.**    **Survival**.  The foregoing representations and warranties of the Parties shall not survive the Closing Date (as defined in the Stock Purchase Agreement) of the Recapitalization Right to Purchase.  After the Closing Date, there will be no liability for breach of any covenants contained in this Agreement that were to be performed prior to such closing.

**12.**    **Transfer Restrictions**.  Each Supporting TruPS Holder agrees that, so long as either (i) this Agreement has not been validly terminated in accordance with its terms or (ii) the Effective Date of the Plan has not occurred, it shall not directly or indirectly (a) grant any proxies to any person in connection with its TruPS Claims, or other claims against or interests in the Debtor, to vote on the Plan or any other plan in the Chapter 11 Case or (b) sell, loan, issue, pledge, hypothecate, assign, transfer, or otherwise dispose of or grant, issue, or sell any option, right to acquire, voting, participation, or other interest in any TruPS Claims or other claims or interests, in whole or in part, any TruPS Claim, or any option thereon or any right or interest therein (each of (a) and (b), a "<u>Transfer</u>"), unless (x) the transferee is a Party to this Agreement or (y) if the transferee is not a Party to this Agreement prior to the effectiveness of the Transfer, such transferee delivers to the other Parties an executed signature page for, and agrees to be bound by, this Agreement, in which event the transferee shall be deemed to be a Supporting TruPS Holder hereunder solely with respect to the TruPS Claims purchased from a Supporting TruPS Holder (the "<u>Purchased TruPS Claims</u>") and shall be subject to all obligations and covenants of the Supporting TruPS Holders hereunder, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the Purchased TruPS Claims.  Each Supporting TruPS Holder agrees that any Transfer or purported Transfer that does not comply with this Agreement shall be deemed void *ab initio* and of no effect.  For the avoidance of doubt, this Agreement shall in no way be construed to preclude any holder of TruPS Claims from acquiring additional Trust Junior Subordinated Debentures or TruPS Claims or any other claims against or interests in the Debtor; <u>provided</u> that any additional Trust Junior Subordinated Debentures or TruPS Claims or any other claims against or interests in the Debtor acquired shall, upon acquisition, automatically be deemed to be subject to all the terms of this Agreement.  For the avoidance of doubt, following valid termination of this Agreement in accordance with its terms or the Effective Date of the Plan, the restrictions contained in this Section 12 shall be null and void and of no force or effect. shall, upon acquisition, automatically be deemed to be subject to all the terms of this Agreement.

**13.**    **Termination of Obligations.**  This Agreement shall terminate, and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

10

a.  by the mutual written consent of the Debtor, the Supporting TruPS Holders, and the Management Parties;

b.  on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "Termination Event"), unless such Termination Event is waived by the Debtor, the Majority Supporting TruPS Holders, and the Management Parties within such five (5) business day period:

   i.   the Petition Date shall not have occurred on or before April 30, 2015, or such later date as may be agreed in writing by the Debtor, the Supporting TruPS Holders, and the Management Parties;

   ii.  the Stock Purchase Agreement shall not have been executed by all parties thereto on or before the date hereof, or such later date as may be agreed in writing by the Debtor, the Supporting TruPS Holders, and the Management Parties;

   iii. the Manager Loan Documents shall not have been executed by all parties thereto on or before the date hereof, or such later date as may be agreed in writing by the Debtor, the Supporting TruPS Holders, and the Management Parties;

   iv.  the Escrow Agreement shall not have been executed by all parties thereto on or before the date hereof, or such later date as may be agreed in writing by the Debtor, the Supporting TruPS Holders, and the Management Parties;

   v.   the Confirmation Order shall not have been entered by the Bankruptcy Court on or before July 14, 2015, or such later date as may be agreed in writing by the Debtors, the Supporting TruPS Holders and the Management Parties;

   vi.  Section 14 of this Agreement shall not have been satisfied on or before the date of entry of the Confirmation Order;

   vii. the Effective Date shall not have occurred on or before August 13, 2015, or such later date as may be agreed in writing by the Debtors, the Supporting TruPS Holders, and the Management Parties;

   viii. the Debtor shall (A) publicly announce its intention not to pursue Confirmation or consummation of the Plan or (B) publicly propose, accept, or file any documents with the Bankruptcy Court seeking approval of an Alternative Transaction;

   ix.  (A) an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Case, or (B) the Chapter 11 Case shall have been converted to a case under Chapter 7;

11

        x.      the Stock Purchase agreement is validly terminated by any party for any reason.

c.    by the Debtor, if the board of directors of the Debtor reasonably determines in good faith that Confirmation or consummation of the Plan cannot reasonably be achieved or that the continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law;

d.    by any Supporting Shareholder, if the Stock Purchase Agreement is validly terminated;

e.    by any Supporting Shareholder, if after the date hereof and before the Effective Date any Supporting Shareholder or any member of the board of directors of the Debtor or First Bank receives any instruction or direction from the Federal Deposit Insurance Corporation, the Illinois Department of Financial and Professional Regulation, the Federal Reserve Bank of Chicago or the Board of Governors of the Federal Reserve System that any of the Supporting Shareholders, the Debtor or the directors of the Debtor or First Bank should act to cause First Bank to be recapitalized prior to the consummation of the transactions contemplated in the Stock Purchase Agreement or the Plan;

f.    by the Majority Supporting TruPS Holders, if (i) the Effective Date shall not have occurred on or before the date that is 45 days after the date of entry of the Confirmation Order <u>and</u> (ii) the amount of the Estimated Plan Funding Amount (including any adjustment, modification, or supplement thereto) has increased based on any change to the date by which the Debtor reasonably projects the Effective Date will have occurred, <u>but only if</u> (iii) after engaging in good-faith discussions with the Debtor regarding the accuracy of the Estimated Plan Funding Amount (including any adjustment, modification, or supplement thereto), the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders certify to the Debtor in writing that they are not reasonably satisfied that the amount of the Estimated Plan Funding Required Amount (<u>excluding</u> the amount of any Claim to the extent that such Claim is: (i) disallowed or expunged by a Final Order; and/or (ii) not payable in Cash (as provided by any documents giving rise to or governing such Claim or otherwise agreed by the Debtor and the Holder(s) of such Claim)) shall be less than or equal to the aggregate amount of all Plan Funding Contributions;

g.    by the Majority Supporting TruPS Holders, if the Debtor makes any material modifications to any exhibits hereto without the express written consent of the Majority Supporting TruPS Holders; or

h.    by the Majority Supporting TruPS Holders, if the ballot for the Holders of TruPS Claims to vote on the Plan is modified from the form attached hereto as **<u>Exhibit E</u>**, unless the Majority Supporting TruPS Holders agree in writing to such modifications.

KE 35583175

**14.** **Estimated Plan Funding Required Amount.** This Section 14 shall be satisfied upon the occurrence of each of the following:

    a.   upon the reasonable request of any Supporting TruPS Holder, the Debtor shall have provided to the Supporting TruPS Holders all reasonably available information and diligence materials regarding Claims and potential Claims that may be asserted or assertable against the Debtor;

    b.   the Debtor shall have provided to the Supporting TruPS Holders a good-faith and reasonable estimate (the "Estimated Plan Funding Required Amount"), together with reasonably detailed supporting data, based on all Claims asserted in the Chapter 11 Case and all other reasonably available information, of the aggregate total amount of all asserted or assertable Claims that are:  (i) Administrative Claims (through a date by which the Debtor reasonably projects the Effective Date will have occurred); (ii) Cure Claims (iii) Priority Tax Claims; (iv) Other Priority Claims; (v) Secured Claims; and (vi) General Unsecured Claims; and

    c.   After engaging in good-faith discussions with the Debtor regarding the accuracy of the Estimated Plan Funding Amount and prior to Confirmation, the Electing TruPS Holders holding a majority of all TruPS Claims held by all Electing TruPS Holders notified the Debtor in writing that in their sole discretion they are satisfied that the amount of the Estimated Plan Funding Required Amount (excluding the amount of any Claim to the extent that such Claim is: (i) disallowed or expunged by a Final Order; and/or (ii) not payable in Cash (as provided by any documents giving rise to or governing such Claim or otherwise agreed by the Debtor and the Holder(s) of such Claim)) shall be less than or equal to the aggregate amount of all Plan Funding Contributions.

**15.** **Remedies Under this Agreement.** Without limiting the rights or remedies of the Debtor against any other Party with respect to monetary damages, the Debtor shall not be liable to any other Party for money damages of any kind for a breach of this Agreement, whether direct, special, indirect, consequential, incidental, or punitive.  Without limiting the rights or remedies of the Debtor against any other Party with respect to monetary damages, any non-breaching Party shall be entitled to specific performance of this Agreement and injunctive or other equitable relief for any breach of this Agreement, without having to establish the inadequacy of damages as a remedy or any requirement to post a bond.

**16.** **Counterparts.** This Agreement and any amendments, waivers, consents, or supplements hereto or in connection herewith may be executed in multiple counterparts (including by means of telecopied or electronically transmitted signature pages), all of which taken together shall constitute one and the same Agreement.

**17.** **No Solicitation.** Notwithstanding anything to the contrary, this Agreement is not and shall not be deemed to be (a) a solicitation of consents to the Plan or any chapter 11 plan or (b) an offer for the issuance, purchase, sale exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934, each as amended.

KE 35583175

**18.**     __Time Is of the Essence.__  The Parties acknowledge and agree that time is of the essence, and that they must each use best efforts to effectuate and consummate the Restructuring as soon as reasonably practicable.

**19.**     __Relationship Among the Parties__.  Nothing herein shall be deemed or construed to create a partnership, joint venture, or other association between or among any of the Parties. Each Party agrees and understands that neither this Agreement, the Plan, nor the transactions contemplated hereby or thereby, creates or otherwise gives rise to any fiduciary duty or other duty of trust or confidence not otherwise existing.

**20.**     __GOVERNING LAW; CONSENT TO JURISDICTION.__  THIS AGREEMENT (AND ANY CLAIMS, CAUSES OF ACTION, ACTIONS, CONTROVERSIES OR DISPUTES THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE HERETO OR THERETO, TO THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, TO THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF OR THEREOF, OR TO THE INDUCEMENT OF ANY PARTY TO ENTER HEREIN AND THEREIN, WHETHER FOR BREACH OF CONTRACT, TORTIOUS CONDUCT OR OTHERWISE AND WHETHER PREDICATED ON COMMON LAW, STATUTE OR OTHERWISE) SHALL BE CONSTRUED AND INTERPRETED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE, EXCEPT TO THE EXTENT THAT THE FEDERAL LAWS OF THE UNITED STATES APPLY.   FOR SO LONG AS THE DEBTOR IS OR MAY BE SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THE PARTIES HERETO IRREVOCABLY ELECT AS THE SOLE JUDICIAL FORUM FOR THE ADJUDICATION OF ANY MATTERS ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT (AND ANY CLAIMS, CAUSES OF ACTION, ACTIONS, CONTROVERSIES OR DISPUTES THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE HERETO OR THERETO, TO THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, TO THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF OR THEREOF, OR TO THE INDUCEMENT OF ANY PARTY TO ENTER HEREIN AND THEREIN, WHETHER FOR BREACH OF CONTRACT, TORTIOUS CONDUCT OR OTHERWISE AND WHETHER PREDICATED ON COMMON LAW, STATUTE OR OTHERWISE), AND CONSENT TO THE EXCLUSIVE JURISDICTION OF, THE BANKRUPTCY COURT.   ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE SUBMITTED TO THE BANKRUPTCY COURT AS LONG AS THE DEBTOR IS OR MAY BE SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT.   IN THAT CONTEXT, EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY: (1) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY ACTION RELATING TO THIS AGREEMENT OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION SHALL BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT; (2) CONSENTS THAT ANY SUCH ACTION MAY AND SHALL BE BROUGHT IN SUCH COURT AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OF ANY SUCH ACTION IN ANY SUCH COURT OR THAT SUCH ACTION WAS BROUGHT IN AN INCONVENIENT COURT OR FORUM AND AGREES NOT TO PLEAD OR CLAIM THE SAME; (3) AGREES THAT SERVICE OF

14

PROCESS IN ANY SUCH ACTION MAY BE EFFECTED BY MAILING A COPY OF SUCH PROCESS BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY OR ANY RECOGNIZED SERVICE AGENT ON BEHALF THEREOF; AND (4) AGREES THAT NOTHING IN THIS AGREEMENT SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY THE LAWS OF THE STATE OF DELAWARE.

**21.** **Independent Analysis.** Each Party hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

**22.** **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

**23.** **Mutual Drafting.** This Agreement is the result of the Parties' joint efforts, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation, and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

**24.** **Headings.** The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize, or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no headings had been used in this Agreement.

**25.** **Amendments.** Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without prior written agreement signed by the Majority Supporting TruPS Holders and all of the other Parties hereto.

*[Signature Pages Follow]*

## Exhibit A

**Stock Purchase Agreement**

*[Exhibit included elsewhere and omitted in this instance.]*

## Exhibit B

**Plan**

*[Exhibit included elsewhere and omitted in this instance.]*

## <u>Exhibit C</u>

**Disclosure Statement**

*[Exhibit included elsewhere and omitted in this instance.]*

## Exhibit D

**Escrow Agreement**

KE 35583175

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (as the same may be amended or modified from time to time pursuant hereto, this "Escrow Agreement") is made and entered into as of March 31, 2015, by and among Northwest Bancorporation of Illinois, Inc. ("Depositor"), the Supporting TruPS Holders (as defined herein), the Supporting Management Parties (as defined herein), and Citibank, NA, as escrow agent (the "Escrow Agent").

WHEREAS, the Depositor (the "Debtor") will file a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Illinois on or before April 30, 2015 (the "Chapter 11 Case");

WHEREAS, pursuant to that certain plan support agreement dated March 31, 2015 (the "Plan Support Agreement"), the Depositor and Supporting TruPS Holders shall establish an escrow account (the "Escrow") for obligations under the payments made during the Debtor's Chapter 11 Case and in accordance with the Debtor's prepackaged chapter 11 plan (as may be amended, supplemented or revised from time to time in accordance with its terms, the "Plan");

WHEREAS, pursuant to the Plan Support Agreement those supporting holders of trust preferred securities signing onto the Plan Support Agreement (the "Supporting TruPS Holders") shall deposit $880,000.00 into the Escrow on or before April 28, 2015;

WHEREAS, Alan Reasoner and Emad Murrar (collectively, the "Supporting Management Parties") shall each deposit $60,000.00 into the Escrow on or before March 31, 2015;

WHEREAS, the Plan provides for a successor in interest to the Debtor pursuant to and under the Plan (the "Reorganized Debtor");

WHEREAS, only (1) the Debtor or the Reorganized Debtor, as the case may be, each through their representative counsel, Kirkland & Ellis LLP ("K&E") (who are listed in Schedule A-1 attached hereto), (2) any of the Supporting TruPS Holders (who are listed in Schedule A-2 attached hereto), and (3) the Supporting Management Parties (who are listed in Schedule A-3 hereto), jointly (collectively with the Debtor, K&E, and the Supporting TruPS Holders, the "Directing Parties") can issue joint directions to release the funds to the Depositor;

WHEREAS, the Escrow Funds (as defined below) shall only be released from the Escrow as directed in accordance with Section 3 of this Escrow Agreement and neither the Depositor, nor the Reorganized Debtor, nor K&E has or shall have any interest of any kind in the Escrow Funds unless and until such funds are released from the Escrow Account (as defined below) to such parties in accordance with the Plan and Plan Support Agreement;

WHEREAS, Depositor receives and holds certain funds; and

WHEREAS, Depositor, the Supporting TruPS Holders, and the Supporting Management Parties are desirous of appointing the Escrow Agent as its agent to hold these funds subject to the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.      **Appointment; Purpose of Escrow Arrangement**.  Depositor, Supporting TruPS Holders, and Supporting Management Parties hereby appoint Escrow Agent as their Escrow Agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.  Depositor hereby

represents, warrants and covenants that (a) the purpose of this escrow arrangement is as follows: to fund obligations under the Chapter 11 Case and distribute such funds in accordance with the Plan (the "Purpose"), (b) an Escrow Agreement and dedicated Escrow Account (as hereafter defined) is necessary and appropriate for the Purpose and the use of a general operating account would be appropriate for the Purpose, and (c) the deposit of funds hereunder, each transaction in the Escrow Account and each document, notice, instruction or request provided to Escrow Agent hereunder shall comply with all applicable laws and regulations.

2.    **Funds.**  The Supporting TruPS Holders agree to deposit with Escrow Agent the sum of $880,000.00 and the Supporting Management Parties agree to deposit with Escrow Agent the sum of $120,000.00, for an aggregate deposit of $1,000,000.00 ("Escrow Deposit").  Unless otherwise instructed in writing, the Escrow Agent shall invest and reinvest the Escrow Deposit, together with all products and proceeds thereof, including all interest, dividends, gains, and other income earned with respect thereto (collectively, the "Escrow Funds") in a "noninterest-bearing transaction account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits.  The Escrowed Funds shall at all times remain available for distribution.  The Escrow Agent is authorized to establish a noninterest-bearing transaction account for the Escrowed Funds and to transfer cash balances between the Escrow Account and its respective noninterest-bearing transaction account as necessary to facilitate transactions as contemplated by this Escrow Agreement.  The parties hereto acknowledge that a monthly account statement will be issued for the noninterest-bearing transaction account in addition to the monthly account statement for the Escrow Account.  All interest or other income earned under this Escrow Agreement shall be retained in the Escrow Account as part of the Escrow Funds and reported by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form), as income earned from the Escrow Deposit by the Depositor, whether or not said income has been distributed during such year.  Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, and shall remit such taxes to the appropriate authorities. Depositor hereby represents to Escrow Agent that no other tax reporting of any kind is required given the underlying transaction giving rise to this Escrow Agreement.

3.    **Disposition and Termination.**  (a) Escrow Agent shall deliver the Escrow Funds only upon and pursuant to the written instructions executed by the Directing Parties.  Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of the Escrow Funds must be in writing or set forth in a Portable Document Format ("PDF"), executed by the Directing Parties and delivered to Escrow Agent only by confirmed facsimile or attached to an email on a Business Day only at the fax number or email address set forth in Section 8 below.  No instruction for or related to the transfer or distribution of the Escrow Funds shall be deemed delivered and effective unless Escrow Agent actually shall have received it on a Business Day by facsimile or as a PDF attached to an email only at the fax number or email address set forth in Section 8 and as evidenced by a confirmed transmittal to the transmitting fax number or email address and Escrow Agent has been able to satisfy any applicable security procedures as may be required hereunder.  Escrow Agent shall not be liable to Depositor, Supporting TruPS Holders, Supporting Management Parties, or any other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Escrow Funds if delivered to any other fax number or email address, including but not limited to a valid email address of any employee of Escrow Agent.  Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds to the following parties without a verifying call-back as set forth in Section 3(b) below:

|  |  |  |
|---|---|---|
| Reorganized Debtor: | Bank name: | Northwest Bancorporation of Illinois, Inc. |
|  | ABA number: | 071923336 |
|  | Account name: | Northwest Bancorporation of Illinois, Inc. |
|  | Account number: | 333067 |
|  |  |  |
| HoldCo Asset Management, L.P.: | Bank name: | TD Bank |
|  | ABA number: | 026013673 |
|  | Account name: | HoldCo Opportunities Fund, L.P. |
|  | Account number: | 4290326672 |

| OSK, LLC: | Bank name: | Wells Fargo Bank, N.A. |
| | ABA number: | 121000248 |
| | Account name: | OSK Asset Holdings, LLC |
| | Account number: | 2179160854 |
| | | |
| Alan Reasoner: | Bank name: | JPMorgan Chase Bank, N.A. |
| | ABA number: | 071000013 |
| | Account name: | Alan Reasoner |
| | Account number: | 765130083 |
| | | |
| Emad Murrar: | Bank name: | PNC Bank, NA |
| | ABA number: | 071921891 |
| | Account name: | Emad Murrar |
| | Account number: | 4606661266 |

Upon notice from the Directing Parties this Escrow Agreement shall terminate, and any residual Escrow Funds shall be promptly released to the Supporting TruPS Holders and the Supporting Management Parties, subject to the provisions of Section 6.  Unless and until such notice is given by the Directing Parties, neither the Debtor nor the Reorganized Debtor shall have no interest in, control of, or right to any of the Escrow Funds.

(b) In the event any other funds transfer instructions are set forth in an instruction from the Directing Parties in accordance with Section 3(a), Escrow Agent is authorized to seek confirmation of such funds transfer instructions by a single telephone call-back to one of the Directing Parties, and Escrow Agent may rely upon the confirmation of anyone purporting to be that Directing Party.  The persons and telephone numbers designated for call-backs may be changed only in a writing executed by a Directing Party and actually received by Escrow Agent via facsimile or as a PDF attached to an email.  Except as set forth in Section 3(a) above, no funds will be disbursed until a Directing Party is able to confirm such instructions by telephone callback.  Escrow Agent, any intermediary bank and the beneficiary's bank in any funds transfer may rely upon the identifying number of the beneficiary's bank or any intermediary bank included in a funds transfer instruction provided by Depositor and confirmed by a Directing Party.  Further, the beneficiary's bank in the funds transfer instruction may make payment on the basis of the account number provided in Depositor's instruction and confirmed by a Directing Party even though it identifies a person different from the named beneficiary.

The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any transfer instructions furnished to it hereunder and believed by it to be genuine and to have been signed and presented by the proper Directing Parties.  Concurrent with the execution of this Agreement, the Directing Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Schedule A-1, Schedule A-2, and Schedule A-3 attached hereto.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.

(c)  Depositor and Supporting TruPS Holders acknowledge that there are certain security, corruption, transmission error, and access availability risks associated with using open networks such as the internet and Depositor hereby expressly assumes such risks.

(d)  As used in this Section 3, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which Escrow Agent located at the notice address set forth below is authorized or required by law or executive order to remain closed.  Depositor, Supporting TruPS Holders, and Supporting Management Parties acknowledge that the security procedures set forth in this Section 3 are commercially reasonable.

4.    **Escrow Agent**.  Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duty, shall be implied.  Escrow Agent has no knowledge of, nor any obligation to comply with, the terms and conditions of any other agreement.  Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by any Directing Party believed by it to be genuine and to have been signed by such Directing Party(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and

3

Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to Depositor, Supporting TruPS Holders, and Supporting Management Parties. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds, including, without limitation, the Deposit nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

5.      **Resignation; Succession.**  Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing specifying a date when such resignation shall take effect. Escrow Agent shall deliver the Escrow Funds as directed by the Directing Parties to any appointed successor Escrow Agent, at which time Escrow Agent's obligations under this Escrow Agreement shall cease and terminate. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all of the escrow business may be transferred, shall be the Escrow Agent under this Escrow Agreement without further act, provided that such entity effectively assumed all obligations of the Escrow Agent under this Escrow Agreement.

6.      **Compensation.**  Depositor agrees to pay Escrow Agent upon execution of this Escrow Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing, shall be as described in Schedule 2. Depositor further agrees to the disclosures set forth in Schedule 2.

7.      **Indemnification and Reimbursement.**  Depositor, Supporting TruPS Holders, and Supporting Management Parties, jointly and severally, agree to indemnify, defend, hold harmless, pay or reimburse Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the fees and expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Losses"), arising out of or in connection with (a) Escrow Agent's performance of this Escrow Agreement, except to the extent that such Losses are determined by a court of competent jurisdiction to have been caused by the gross negligence or willful misconduct of such Indemnitee; (b) Escrow Agent's following any instructions or directions from the Directing Parties received in accordance with this Escrow Agreement; and (c) a breach of any representation or warranty made by Depositor under this Escrow Agreement.  Depositor, Supporting TruPS Holders, and Supporting Management Parties hereby grant Escrow Agent a lien on, right of set-off against and security interest in the Escrow Funds for the payment of any claim for indemnification, fees, expenses and amounts due to Escrow Agent or an Indemnitee. In furtherance of the foregoing, Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Escrow Funds for its own account or for the account of an Indemnitee any amounts due to Escrow Agent or to an Indemnitee under Section 6 or 7. The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Escrow Agreement.

8.      **Notices.**  All notices, requests, demands and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if set forth in a PDF sent by electronic mail ("e-mail") to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five business days after the date such notice is deposited in the United States Mail. If notice is given to a party, it shall be given at the address for such party set forth below. It shall be the responsibility of the parties to notify the Escrow Agent and the other party in writing of any name or address changes.

If to Depositor:                Northwest Bancorporation of Illinois, Inc.
300 East Northwest Highway
Palatine, Illinois 60067
Attention:  Alan Reasoner
Tel No.:  (847) 654-4420
Fax No.:  (847) 705-3903
Email Address:  alan.reasoner@firstbankillinois.com

With copies to:              Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  David R. Seligman, P.C. and Brad Weiland
Tel No.:  (312) 862-2000
Fax No.:  (312) 862-2200
Email Addresses:  david.seligman@kirkland.com
                                  brad.weiland@kirkland.com

If to the
Reorganized Debtor:       Northwest Bancorporation of Illinois, Inc.
300 East Northwest Highway
Palatine, Illinois 60067
Attention:  Alan Reasoner
Tel No.:  (847) 654-4420
Fax No.:  (847) 705-3903
Email Address:  alan.reasoner@firstbankillinois.com

With copies to:              Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  David R. Seligman, P.C. and Brad Weiland
Tel No.:  (312) 862-2000
Fax No.:  (312) 862-2200
Email Addresses:  david.seligman@kirkland.com
                                  brad.weiland@kirkland.com

If to HoldCo Asset
Management, L.P.:         HoldCo Asset Management, L.P.
32 Broadway, Suite 1201
New York, New York 10004
Attn:  Vik Ghei
Tel No.:  (917) 740-8450
Fax No.:  (607) 216-3312
Email Address:  vik@holdcoadvisors.com

| | |
|---|---|
| If to OSK, LLC: | OSK, LLC<br>3948 W. 49½ Street, Box 24794<br>Edina, Minnesota 55424<br>Attn:  Stephen Hodges<br>Tel No.:  (502) 439-0491<br>Fax No.:  (763) 592-7850<br>Email Address:  stephen.hodges@osp-group.com |
| If to Supporting<br>Management Parties: | 300 East Northwest Highway<br>Palatine, Illinois 60067<br>Attention:  Alan Reasoner and Emad Murrar<br>Tel No.:  (847) 654-4420 and (708) 205-7209<br>Fax No.:  (847) 705-3903 and (312) 278-0161<br>Email Address:    alan.reasoner@firstbankillinois.com<br>                   emad.murrar@firstbankillinois.com |
| If to Escrow Agent: | Citi Private Bank<br>Citibank, N.A.<br>One Sansome Street, 23rd Floor<br>San Francisco, CA 94105<br>Attention:  Raafat A. Sarkis<br>Tel No:  (415) 627-6327<br>Fax No.:  (415) 592-5584<br>Email Address:  raafat.sarkis@citi.com |

9.      **Compliance with Court Orders.**  In the event that a legal garnishment, attachment, levy restraining notice or court order is served with respect to any of the Escrow Funds, or the delivery thereof shall be stayed or enjoined by an order of a court, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to Depositor, the Supporting TruPS Holders, the Supporting Management Parties, or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

10.     **Miscellaneous.**    The provisions of this Escrow Agreement may be waived, altered, amended, or supplemented only by a writing signed by the Escrow Agent and the Directing Parties.  Neither this Escrow Agreement nor any right or interest hereunder may be assigned by Depositor, Supporting TruPS Holders, or Supporting Management Parties without the prior consent of Escrow Agent.  This Escrow Agreement shall be governed by and construed under the laws of the State of New York.  Depositor, Supporting TruPS Holders, Supporting Management Parties, and Escrow Agent irrevocably waive any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York. To the extent that in any jurisdiction Depositor, Supporting TruPS Holders, or Supporting Management Parties may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, Depositor, Supporting TruPS Holders, and Supporting Management Parties shall not claim, and hereby irrevocably waive, such immunity.   Escrow Agent, Depositor, Supporting TruPS Holders, and Supporting Management Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Escrow Agreement.  No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.  This Escrow Agreement may be executed in one or more

6

counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable.  This Escrow Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns, including, with respect to the Depositor, the Reorganized Debtor, Supporting TruPS Holders, and Supporting Management Parties.  All signatures of the parties to this Escrow Agreement may be transmitted by facsimile or as a PDF attached to an email, and such facsimile or PDF will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.  If any provision of this Escrow Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  Except as expressly provided in Section 7 above, nothing in this Escrow Agreement, whether express or implied, shall be construed to give to any person or entity other than Escrow Agent, Depositor, Supporting TruPS Holders, and Supporting Management Parties any legal or equitable right, remedy, interest or claim under or in respect of the Escrow Funds or this Escrow Agreement.

11.    **Force Majeure.**  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss of malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances. Or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

12.    **Use of Citibank Name.**  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

*[signature page follows]*

## SCHEDULE 2

## ESCROW AGENT FEE SCHEDULE
### Citibank, N.A., Escrow Agent

**Acceptance Fee**
To cover the acceptance of the Escrow Agency appointment, the study of the Escrow Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee: Waived**

**Administration Fee**
To cover maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Escrow Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Escrow Agreement.

**Fee: $4,000.00**

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

**Fee: Waived**

**Transaction Fees**
To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Escrow Agreement:

**Fee: Waived**

**Other Fees**

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment

**<u>Exhibit E</u>**

**Form Class 3 - TruPS Claims Ballot**

**BALLOT FOR ACCEPTING OR REJECTING
THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**

**CLASS 3—TRUPS CLAIMS**

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR
COMPLETING BALLOTS CAREFULLY BEFORE COMPLETING THE BALLOT**

**THIS BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE DEBTOR BY 5:00 P.M.,
PREVAILING CENTRAL TIME, ON APRIL 28, 2015 (THE "<u>VOTING DEADLINE</u>")**

Northwest Bancorporation of Illinois, Inc. (the "Company") has sent this Ballot to you because our records indicate that, as of March 30, 2015 (the "Voting Record Date"), you are a Holder of a Class 3 TruPS Claim and, accordingly, you have a right to vote to accept or reject the *Debtor's Chapter 11 Plan of Reorganization* (as may be further amended or supplemented from time to time and including all exhibits or supplements thereto, the "Plan"), which is subject to Bankruptcy Court approval and which provides for a comprehensive restructuring of the Company's pre-bankruptcy obligations and maximizes recoveries available to all constituents.[1]

Your rights are described in the *Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization*, dated March 31, 2015 (as may be further amended or supplemented from time to time and including all exhibits or supplements thereto, the "Disclosure Statement"). The Disclosure Statement and the Plan are contained in the packet you are receiving with this Ballot. If you have any questions regarding any of the solicitation materials you have received or need to obtain additional solicitation materials, you may contact proposed counsel to the Debtor, Kirkland & Ellis LLP (the "K&E") by (a) writing to K&E at Northwest Bancorporation of Illinois, Inc., c/o Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: David R. Seligman, P.C. and Brad Weiland, or (b) calling K&E at (312) 862-2000 within the U.S. or Canada.

This Ballot may not be used for any purpose other than to vote to accept or reject the Plan. If you believe you have received this Ballot in error, please contact K&E at the address or telephone number set forth above.

*You should carefully review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been classified as a Class 3 TruPS Claim under the Plan.*

Please note that <u>only</u> those Holders of Claims in Class 3 TruPS Claims that are considered an accredited investor, as that term is defined by the Securities and Exchange

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and the Disclosure Statement (as such terms are defined in this Ballot), as applicable.

**Commission for the purposes of rule 506 of Regulation D promulgated under the United States Securities Act of 1933 are entitled to vote on the Plan.**

If K&E does not receive your Ballot on or before the Voting Deadline, which is 5:00 p.m., prevailing Central Time, on April 28, 2015, then unless the Company determines (such determination subject to the reasonable consent of the Required Consenting Secured Parties), your vote will not count.  **If the Court confirms the Plan and the Plan becomes effective, it will bind you regardless of whether you vote.**

<u>**Item 1**</u>**. Amount of Class 3 TruPS Claim**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 3 TruPS Claim for the following amount:

$\$\underline{\hspace{5cm}}$

<u>**OR**</u>

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 3 TruPS Claim (including any accrued and unpaid interest thereon) in the principal amount of:

$\$\underline{\hspace{5cm}}$

<u>**Item 2**</u>**.  Vote on Plan**

The Holder of the Class 3 TruPS Claim set forth in Item 1 votes to (*please check one*):

| <u>**ACCEPT THE PLAN**</u> | <u>**REJECT THE PLAN**</u> |
|:---:|:---:|
| ☐ | ☐ |

Any Ballot that is executed by the Holder of a Class 3 TruPS Claim, but that indicates both an acceptance and a rejection of the Plan or does not indicate either an acceptance or rejection of the Plan, will not be counted.

2

<u>Item 3</u>.  **TruPS Election**

As a Holder of Class 3 TruPS Claims you have the option to make the TruPS Election.[2] In order to make the TruPS Election you must check the box below:

<div style="border:1px solid">

**<u>TRUPS ELECTION</u>**

☐

</div>

By checking the box above and making the TruPS Election, you are ***irrevocably choosing to***:

***forego any rights to a portion of the Non-Electing TruPS Distribution*** and agree that any distribution to you under the Plan will be expressly subordinated to the distributions to Holders of TruPS Claims that do ***not*** make the TruPS Election; ***and***

***receive, in full and final satisfaction, settlement, release, and discharge*** of and in exchange for all but not less than all of your Allowed TruPS Claims, your Pro Rata share (based on the amount of your Allowed TruPS Claim relative to the Allowed TruPS Claim of any other Holder that makes the above TruPS Election) of the Electing TruPS Distribution; ***and***

***fund in Cash*** your Pro Rata share (based on the amount of your Allowed TruPS Claims relative to the Allowed TruPS Claims of any other Holder of TruPS Claims that makes the above TruPS Election) of the Plan Funding TruPS Contribution.[3]

**THE TRUPS ELECTION MADE PURSUANT TO THIS BALLOT SHALL BE BINDING ON THE UNDERSIGNED HOLDER OF THE CLASS 3 TRUPS CLAIMS SET FORTH IN ITEM 1 OR ANY SUBSEQUENT TRANSFEREE THEREOF.**

---

[2]   The TruPS Election or failure to make the TruPS Election shall be irrevocable by any Entity, including the Debtor and the Holder of the TruPS Claim making or failing to make such election.

[3]   Each Electing TruPS Holder shall be required to place its Pro Rata portion of the Plan Funding TruPS Contribution in the Plan Funding Escrow on or before April 28, 2015.  Failure to make the payment on or before April 28, 2015 will invalidate any TruPS Election.  Any Holder of TruPS Claims that makes the TruPS Election by checking the box above but fails to make the payment into the Plan Funding Escrow by April 28, 2015 shall irrevocably result in such Holder of TruPS Claim to be deemed to have elected to not make the TruPS Election.

3

## IMPORTANT INFORMATION REGARDING
## <u>THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS</u>

If you (a) vote to <u>accept</u> the Plan or (b) <u>abstain</u> from voting on the Plan and <u>do not opt-out</u> of the releases provided by the Plan, you are automatically deemed to consent to the Plan's release by Holders of Claims and Interests described in item 4, below.

If you (a) vote to <u>reject</u> the Plan or (b) <u>abstain</u> from voting and <u>opt-out</u> of the releases provided by the Plan, you are not bound by the Plan's release by Holders of Claims and Interests described in item 4, below.

<u>Item 4</u>.  Article VIII.D of the Plan provides for the following release by Holders of Claims and Interests.

> **Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Third Party Releasees from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtor, First Bank, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Stock Purchase Agreement, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

> **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:**

**(1) in exchange for the good and valuable consideration provided by the Third Party Releasees; (2) a good faith settlement and compromise of the Claims released by this** Error! Reference source not found.**; (3) in the best interests of the Debtor, its Estate, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity granting a Third Party Release from asserting any claim or Cause of Action released pursuant to the Third Party Release.**

**IF YOU HAVE ABSTAINED FROM VOTING BUT WISH TO OPT-OUT OF THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS, YOU <u>MUST</u> CHECK THE BOX BELOW:**

☐     <u>REJECT</u> **THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS**

<u>Item 5</u>. **Certifications**

By signing this Ballot, the undersigned certifies that:

1. as of the Voting Record Date, the undersigned is either (a) the Holder of the Class 3 (s) being voted or (ii) an authorized signatory for the Holder of the Class 3 (s) being voted;

2. the Holder has received a copy of the Disclosure Statement and the Plan and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

3. the Holder has cast the same vote with respect to all Class 3 TruPS Claims;

4. the Holder is an accredited investor, as that term is defined by the Securities and Exchange Commission for the purposes of Rule 506 of Regulation D promulgated under the United States Securities Act of 1933;

5. no other Ballots with respect to the amount of the Class 3 TruPS Claims (s) identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims(s), then any such Ballots dated earlier are hereby revoked;

6. the Holder acknowledges that a vote to accept the Plan constitutes an acceptance of the treatment of such Holder's Class 3 TruPS Claims (s);

7. the Holder understands and, if accepting the Plan, agrees with the treatment provided for its Claims(s) under the Plan; and

8. the Holder acknowledges and agrees that the Company may make conforming changes to the Plan to the extent provided by Bankruptcy Rule 3019 as may be reasonably necessary; *provided*, that the Company will not re-solicit acceptances or rejections of the Plan in the event of such conforming changes.

*[Signature Page Follows]*

KE 35297794

Name of Holder: _____
(Please print or type)

Social Security Number or Federal Tax
Identification Number _____

Signature: _____

Name of Signatory: _____
(If other than Holder)[1]

Title: _____

Address: _____

_____

_____

Date Completed: _____

**PLEASE COMPLETE, SIGN, AND DATE THE BALLOT
AND RETURN IT PROMPTLY.**

---

**BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY K&E BY THE VOTING
DEADLINE, WHICH IS 5:00 P.M. PREVAILING
CENTRAL TIME, ON APRIL 28, 2015, USING
THE FOLLOWING DELIVERY METHODS:**

**If by Mail to:**

**Northwest Bancorporation of Illinois, Inc.
c/o Kirkland & Ellis LLP
Attn: Brad Weiland
300 North LaSalle Street
Chicago, IL 60654**

**If by E-Mail to:**

**brad.weiland@kirkland.com**

**If by Fax:**

**(312) 862-2200**

---

[1] If you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing. You may be required to provide additional information or documentation with respect to such relationship.

3

## INSTRUCTIONS FOR COMPLETING BALLOTS

1.   The Company is soliciting the votes of Holders of Claims with respect to the Plan. Capitalized terms used in the Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan or the Disclosure Statement, as applicable.

2.   The Court may confirm the Plan and thereby bind you by the terms of the Plan.  Please review the Disclosure Statement for more information.

3.   To ensure that your vote is counted, you must:  (a) complete the Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) sign and deliver your Ballot to K&E in accordance with these Ballot Instructions. The Voting Deadline for the receipt of Ballots by K&E is 5:00 p.m., prevailing Central Time, on April 28, 2015.  Your completed Ballot must be **ACTUALLY RECEIVED** by K&E on or before the Voting Deadline.

4.   You have the option to select either the default TruPS Claims treatment or make the TruPS Election, and subject to the terms and conditions of the Plan.  Unless you check the box in **Item 3**, you will be deemed to have selected the default TruPS Claims treatment.  Refer to **Item 3** for more details on the consequences of making the TruPS Election.

5.   You must vote all of your Claims within a particular Class either to accept or reject the Plan and may not split your vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, if a Holder has multiple Claims within the same Class, the Company may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

6.   If you choose to abstain from voting your Claims but wish to opt-out of the release by Holders of Claims and Interests provided by the Plan, you may not vote to accept or reject the plan, must indicate your intent to opt-out of the third party release on the Ballot, and return the Ballot to K&E in accordance with these instructions by the Voting Deadline.

7.   If a Ballot is received after the Voting Deadline, it will not be counted unless the Company determines otherwise (such determination subject to the reasonable consent of the Required Consenting Secured Parties).  The method of delivery of Ballots to K&E is at the election and risk of each Holder of a Claim or Interest.  Except as otherwise provided herein, such delivery will be deemed made only when K&E actually receives the originally executed Ballot.  Instead of effecting delivery by mail, overnight courier, hand delivery, or facsimile, it is recommended, though not required, that Holders effect delivery by electronic mail to bweiland@kirkland.com.  Ballots delivered by electronic mail must be electronic scans formatted in portable document format (PDF).  In all cases, Holders should allow sufficient time to assure timely delivery.  Delivery of a Ballot to K&E by any other electronic means (other than electronic mail to bweiland@kirkland.com) shall not be valid.  No Ballot should be sent to the Company,

4

the Company's agents (other than K&E), or any other entity, and if so sent will not be counted unless the Company determines otherwise in its sole discretion.

8. If multiple Ballots are received from the same Holder of Claims with respect to the same Claims prior to the Voting Deadline, the last dated valid Ballot timely received will supersede and revoke any earlier dated Ballots.

9. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan or to abstain from voting and opt-out of the release by Holders of Claims and Interests provided by the Plan.

10. This Ballot does not constitute, and shall not be deemed to be:  (a) a Proof of a Claim or Interest; or (b) an assertion or admission of a Claim or Interest.

11. Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if requested by K&E or the Company, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and electronic mail address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

12. If you hold Claims more than one Class, you may receive more than one Ballot coded for each different Class.  Each Ballot votes only your Claims indicated on that Ballot.  Please complete and return each Ballot you received.

13. The following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claims; (b) any Ballot not actually received by K&E by the Voting Deadline, unless otherwise determined by the Company (such determination subject to the reasonable consent of the Required Consenting Secured Parties); (c) any unsigned Ballot; (d) any Ballot that does not contain an original or authenticated signature; (e) any Ballot that partially rejects and partially accepts the Plan; (f) any Ballot not marked to accept, reject, or abstain from voting on the Plan or marked to both accept and reject the Plan; and (g) any Ballot superseded by a later, timely submitted valid Ballot.

14. If you believe you have received the wrong Ballot, you should contact K&E immediately at (312) 862-2000 within the U.S. or Canada.

## PLEASE DELIVER YOUR BALLOT PROMPTLY!

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT KIRKLAND & ELLIS LLP AT (312) 862-2000.**

KE 35297794

## Exhibit F

### Manager Loan Documents

## COMMERCIAL LOAN AGREEMENT

This Commercial Loan Agreement (this "Agreement") is dated as of April 1, 2015 (the "Effective Date") and entered into by **FB Investment Group, LLC**, as borrower ("Borrower"), and _____, as lender ("Lender").

WHEREAS, Northwest Bancorporation of Illinois, Inc., an Illinois bank holding company corporation ("NBI"), has filed or will soon file a voluntary chapter 11 bankruptcy case (the "Bankruptcy Case") and will seek to confirm a chapter 11 plan of reorganization that has been reviewed and approved by Borrower and Lender (such plan of reorganization, the "Plan"); and

WHEREAS, in connection with the Plan, Borrower and Lender will each make a cash contribution (the "Plan Contribution") to an escrow account (the "Plan Escrow Account"), which will be used to fund certain of NBI's expenses in connection with the Bankruptcy Case in accordance with the terms of the Plan; and

WHEREAS, Borrower's portion of the Plan Contribution will be $300,000; and

WHEREAS, Borrower desires that Lender extend credit to Borrower to enable Borrower to fund its portion of the Plan Contribution; and

WHEREAS, to secure Borrower's obligations made in connection with this Agreement, Borrowers are granting to Lender a first-priority security interest in, lien upon, and pledge of the Collateral, as defined and evidenced in that certain Commercial Pledge Agreement by and between Lender and Borrower, the form of which is attached hereto as <u>Exhibit A</u> (the "Pledge Agreement"); and

WHEREAS, Lender has agreed to extend credit to Borrower under the terms and subject to the conditions hereof.

NOW, THEREFORE, in consideration of the premises aforesaid and the agreements, provisions and covenants herein contained, Borrower and Lender agree as follows:

## SECTION 1.  LOAN AND COLLATERAL

### 1.1 Loan.

(A) Term Loan.  Subject to the terms and conditions of this Agreement, Lenders hereby agrees to extend credit to Borrower (the "Loan") in the principal amount equal to the Lender's pro rata portion of One Hundred Eighty Thousand and 00/100 Dollars ($180,000.00), as determined by the amount of the Allowed TruPS Claims (as such term is defined in the Plan) held by Lender compared to the total amount of Allowed TruPS Claims of all Electing TruPS Holders (as such term is defined in the Plan (such amount, the "Loan Amount"). Borrower's obligation to repay the Loan shall be evidenced by that certain Commercial Promissory Note made by Borrower in favor of Lender (the "Promissory Note"), the form of which is attached hereto as <u>Exhibit B</u>, and

the terms of which are incorporated herein by this reference. This Agreement, the Promissory Note, and the Pledge Agreement are collectively referred to herein as the "Loan Documents".

(B) Maturity Date.  All principal and interest on the Loan, shall be due and payable in full on the Maturity Date, as defined in the Promissory Note (the "Maturity Date").

(C) Non-Recourse. Notwithstanding anything to the contrary in this Agreement, all obligations hereunder and under the other Loan Documents shall be non-recourse against the Borrower. Lender shall only have recourse to the Collateral (as defined in the Pledge Agreement).  Section 5 of the Promissory Note is incorporated herein.

## 1.2 Interest and Payments.

The Loan shall bear interest in accordance with the terms of the Promissory Note.  Payments shall be made in accordance with the terms of the Promissory Note, including the interest deferral provisions thereunder.

## 1.3 Term of this Agreement.

Except as otherwise expressly provided hereunder, this Agreement shall remain in full force and effect between Borrower until all the obligations of Borrower under the Loan Documents have been fully paid and satisfied.

## 1.4 Grant of Security Interest.

Borrower shall grant to Lender a first-priority security interest, lien upon, and pledge of the Collateral, in accordance with the terms of the Pledge Agreement.

## SECTION 2. PLAN ESCROW ACCOUNT

## 2.1 Establishment of the Plan Escrow Account.

Prior to the Funding Date (as defined below), Borrower, Lender, and NBI shall enter into an escrow agreement (the "Plan Escrow Agreement") that will establish and set for the terms of the Plan Escrow Account.  The Plan Escrow Agreement shall conform in all respects to the terms and conditions of the Plan.  The escrow agent for the Plan Escrow Account (the "Escrow Agent") shall be an institution mutually agreed upon by Lender, Borrower and NBI.

## 2.2 Mechanics of Plan Escrow Account; Loan Documents Held in Escrow; Distribution of Loan Amount.

(A) On or before April 28, 2015 (the "Lender Funding Date"), Lender shall deliver (i) the Loan Amount to the Escrow Agent and (ii) two (2) originals of the Pledge Agreement executed by Lender to Brown Legal Advisors, LLC (the "Document Escrow Agent"). Lender's failure to deliver the Loan Amount to the Escrow Agent on or prior to the Lender Funding Date shall

relieve Borrower from any and all obligations set forth in the Loan Documents, and the Loan Documents shall be deemed null and void in all respects.

(B) Within one (1) business day after the date hereof, (the "Borrower Funding Date"), Borrower shall deliver to the Escrow Agent One Hundred Twenty Thousand and 00/100 Dollars ($120,000.00) (the "Borrower Plan Contribution").

(C) Subject to Section 2.2(G), the Escrow Agent shall not release the Loan Amount or Borrower Plan Contribution to any party unless and until the Effective Date of the Plan (as defined under the Plan) has occurred.

(D) On the Borrower Funding Date, Borrower shall deliver the Document Escrow Agent (i) one (1) original of the Promissory Note executed by Borrower and (ii) two (2) originals of the Pledge Agreement executed by Borrower.
(E) Subject to Section 2.2(G), on or after the Effective Date of the Plan, the Escrow Agent shall distribute the Loan Amount and the Borrower Plan Contribution to the bankruptcy estate of NBI for the payment of certain expenses as set forth in the Plan.

(F) Subject to Section 2.2(G), on or after the Effective Date of the Plan, and following written instructions to the Document Escrow Agent from both Borrower and Lender, the Document Escrow Agent shall (i) add the Loan Amount to the Promissory Note and the Pledge Agreement and (ii) distribute one (1) original of the fully executed Pledge Agreement to each of Borrower and Lender and one (1) original of the executed Promissory Note to Lender.

 (G) In the event that the Effective Date of the Plan does not occur on or prior to the date written in Article IX.A.7 of the Plan (as such date may be extended as permitted by the Plan, the "Outside Date"), the Document Escrow Agent shall destroy all copies the Promissory Note and Pledge Agreement deposited therewith, and the Escrow Agent shall (i) return the full Loan Amount to Lender and (ii) return the full amount of the Borrower Plan Contribution to Borrower.

## SECTION 3.  TERMINATION; NULL AND VOID

If the Effective Date of the Plan has not occurred on or before the Outside Date, all obligations of Lender and Borrower hereunder and under each of the Loan Documents shall be irrevocably null and void in all respects.

## SECTION 4. [INTENTIONALLY OMITTED]

## SECTION 5. FURTHER ASSURANCES

Borrower shall, from time to time, upon the reasonable request of Lender execute such financing or continuation statements, documents, security agreements, or deliver to Lender such instruments or other documents that may be reasonably necessary or advisable in the reasonable opinion of Lender, perfect or otherwise implement the guaranties and security for repayment of the obligations provided for in the Loan Documents.

## SECTION 6. DEFAULT, RIGHTS AND REMEDIES

3

**6.1 Events of Default.**

"Event of Default" shall mean (i) any default or event of default set forth in the Pledge Agreement or the Promissory Note and (ii) the occurrence or existence of any one or more of the following (for each subsection a different grace or cure period may be specified, if no grace or cure period is specified, such occurrence or existence constitutes an immediate Event of Default):

(A) Payment. Failure to make payment of principal or interest when due; or

(B) Breach of Covenants. Failure of Borrower to perform or comply with the affirmative covenants contained in Sections 5 of this Agreement or any affirmative or negative covenants contained in the Pledge Agreement or Promissory Note; or

(C) Breach of Warranty. Any representation, warranty or certification made by Borrower in any Loan Document or in any statement or certificate at any time given by such Person in writing pursuant or in connection with any Loan Document is false in any material respect on the date made; or

(D) Involuntary Bankruptcy; Appointment of Receiver, etc. (1) A court enters a decree or order for relief with respect to Borrower in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed or other similar relief is not granted under any applicable federal or state law; or (2) the continuance of any of the following events for sixty (60) days unless dismissed, bonded or discharged: (a) an involuntary case is commenced against Borrower, under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or (b) a receiver, liquidator, sequestrator, trustee, custodian or other fiduciary having similar powers over Borrower or over all or a substantial part of Borrower's property, is appointed; or

(E) Voluntary Bankruptcy; Appointment of Receiver, etc. (1) Borrower commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case under any such law or consents to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of Borrower's property; or (2) Borrower makes any assignment for the benefit of creditors; or

(F) Liens. Any lien, levy or assessment is filed or recorded with respect to or otherwise imposed upon all or any part of the Collateral, and such lien, levy or assessment is not stayed, vacated, paid or discharged within thirty (30) days after Borrower receives actual or constructive notice of the same; or

(G) Solvency. Borrower is unable to pay its debts as they become due in the usual course of business, or admits in writing the present or prospective inability to pay its debts as they become due; or

4

(H) Invalidity of Loan Documents. Any of the Loan Documents for any reason, other than a partial or full release in accordance with the terms thereof, ceases to be in full force and effect or is declared to be null and void, or Borrower denies that it has any further liability under any Loan Documents to which it is a party, or gives written notice to such effect; or

(I) Failure of Security. Lender does not have or ceases to have a valid and perfected first priority security interest in the Collateral for any reason, and such default is not cured within thirty (30) days' after written notice thereof from Lender to Borrower; or

(J) The death or disability of Borrower.

## 6.2 Acceleration.

Upon the occurrence of any Event of Default described in the foregoing subsections 6.2(D) or 6.2(E), all obligations hereunder and under the Promissory Note shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower.

Upon the occurrence and during the continuance of any other Event of Default, Lender may, by written notice to Borrower, declare all principle and interest outstanding under the Promissory Note to be, and the same shall forthwith become, immediately due and payable.  The foregoing acceleration shall become effective upon sending such notice, regardless of when received by Borrower.

## 6.3 Remedies.

If any Event of Default shall have occurred and be continuing, Lender may exercise all remedies for defaults or events of default under the Pledge Agreement or the Promissory Note, in addition to any and all remedies available or at law or in equity.

## 6.4 Limitation on Duty of Lender with Respect to Collateral.

Beyond the safe custody thereof, Lender shall have no duty with respect to any Collateral in its possession (or in the possession of any agent or bailee) or with respect to any income thereon or the preservation of rights against prior parties or any other rights pertaining thereto. Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such collateral is accorded treatment substantially equal to that which Lender accords its own property to preserve its value. Lender shall not be liable or responsible for any loss or damage to any of the Collateral or for any diminution in the value thereof, by reason of the act or omission of any agent or bailee selected by Lender in good faith.

## 6.5 Waivers; Non-Exclusive Remedies.

No failure on the part of Lender to exercise, and no delay in exercising and no course of dealing with respect to, any right under this Agreement or the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise by Lender of any right under this

Agreement or any other Loan Document preclude any other or further exercise thereof or the exercise of any other right. Subject to Section 1.1(C), the rights in this Agreement and the other Loan Documents are cumulative and shall in no way limit any other remedies provided by law.

## SECTION 7. MISCELLANEOUS

### 7.1 Expenses and Attorneys' Fees.

Borrower agrees to promptly pay all fees, costs, expenses (including reasonable attorneys' fees) of Lender and costs of settlement incurred in collecting upon or enforcing rights against the Collateral or incurred in any action to enforce this Agreement or the other Loan Documents or to collect any payments due from Borrowers under this Agreement or any other Loan.  All such fees, costs and expenses shall be added to the principal amount of the Promissory Note, shall be payable on demand, and shall be secured by the Collateral.

### 7.2 Notices.

Unless otherwise specifically provided herein, all notices shall be in writing addressed to the respective party as set forth below and may be personally served or sent by overnight courier service or United States mail and shall be deemed to have been given: (a) if delivered in person, when delivered; (b) if delivered by overnight courier, the next business day after delivery to such courier properly addressed; or (c) if by U.S. Mail, four (4) business days after depositing in the United States mail, with postage prepaid and properly addressed.

If to Borrower:
**FB Investment Group, LLC**
_____
_____
_____
Attention: Emad Murrar

If to Lender:
_____
_____
_____

### 7.3 Survival of Representations and Warranties and Certain Agreements.

All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the making of the Loan hereunder. Notwithstanding anything in this Agreement or implied by law to the contrary, but subject to Sections 1.1(C) and 3 hereof, the agreements of Borrower and Lender set forth in Section 7 hereof shall survive termination of this Agreement.

### 7.4 No Waiver.

No failure or delay on the part of Lender in the exercise of any power, right or privilege hereunder or under any of the Loan Documents shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

**7.5 Entire Agreement.**

This Agreement and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.

**7.6 Severability.**

The invalidity, illegality or unenforceability in any jurisdiction of any provision in or obligation under this Agreement or the other Loan Documents shall not affect or impair the validity, legality or enforceability of the remaining provisions or obligations under this Agreement, or the other Loan Documents.

**7.8 Headings.**

Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**7.9 Applicable Law.**

THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

**7.10 Successors and Assigns.**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, Borrower may not assign its rights or obligations hereunder without the written consent of Lender.

**7.11 No Fiduciary Relationship; No Duty; Limitation of Liabilities.**

(A) No Fiduciary Relationship. No provision in this Agreement or in any of the other Loan Documents and no course of dealing between the parties shall be deemed to create any fiduciary duty by Lender to Borrower.

(B) No Duty. All attorneys, accountants, appraisers, and other professional persons and consultants retained by Lender shall have the right to act exclusively in the interest of Lender and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to Borrower.

(C) Limitation of Liabilities. Neither Lender nor any affiliate, officer, director, shareholder, employee, attorney, or agent of Lender shall have any liability with respect to, and Borrower hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Borrower in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents. Borrower hereby waives, releases, and agrees not to sue Lender or any of Lender's affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the transactions contemplated hereby.

**7.12 Waiver Of Jury Trial.**

EACH OF BORROWER AND LENDER HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. EACH OF BORROWER AND LENDER ACKNOWLEDGES THAT THIS WAIVES A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT IT HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT IT WILL CONTINUE TO RELY ON THE WAIVER IN ITS RELATED FUTURE DEALINGS. EACH OF BORROWER AND LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

**7.13 Construction.**

Borrower and Lender acknowledge that each has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement and the other Loan Documents with its legal counsel. This Agreement and the other Loan Documents shall be construed as if jointly drafted by each Loan Party and Lender, with no negative inference to be drawn against the party that drafted the Loan Documents.

**7.14 Amendment.**

No alteration of or amendment to this Agreement or the other Loan Documents shall be effective unless given in writing and signed by both Borrower and Lender.

**7.15 Counterparts; Effectiveness.**

This Agreement and any amendments, waivers, consents, or supplements may be executed via electronic or facsimile transmission in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute one and the same instrument. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

**7.16 Rights and Obligations Freely Assignable.**

Lender shall have the absolute right to sell or assign any of its rights hereunder, including rights to payment on the Promissory Note and the security interests and liens granted under the Pledge Agreement, to any party without notice or consent of any Loan Party.

[signature page follows]

## EXHIBIT A

**PLEDGE AGREEMENT**

## COMMERCIAL PLEDGE AGREEMENT

**STATE OF ILLINOIS**                                        **Date:  April 1, 2015**
**COUNTY OF COOK**

**Grantor:  FB Investment Group, LLC**      **Lender:** _____

**THIS COMMERCIAL PLEDGE AGREEMENT** (the "Agreement") dated April 1, 2015, is made and executed between **FB Investment Group, LLC** ("Grantor") and _____("Lender").

     1.    **Definitions**.  The following capitalized terms shall have the meanings when used in this Agreement.  Unless specifically stated to the contrary, all references to dollar amounts shall moan amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise define in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

    a.  **Agreement**.  The word "Agreement" means this Commercial Pledge Agreement, as the Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Agreement from time to time.

    b.  **Borrower**.  The word "Borrower" means FB Investment Group, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

    c.  **Collateral**.  The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

    d.  **Event of Default**.  The phrase "Event of Default" means the Event of Default set forth in this Agreement in the section titled "Default."

    e.  **Income and Proceeds**.  The words "Income and Proceeds" mean all present and future income, proceeds, earnings, increases and substitutions  form or for the Collateral of every kind and nature, including without limitation all payments, interest, profits, distributions, benefits, rights, options, warrants, dividends, stock dividends, stock splits, stock rights, regulatory dividends, subscriptions, monies, claims for money due and to become due, proceeds of any insurance on the Collateral, shares of stock of different par value or no par value issued in substitution or exchange for shares included in the Collateral,

and all other property Grantor is entitled to receive on account of such Collateral, including accounts, documents, instruments, chattel paper and general intangibles.

f. **Indebtedness**.  The word "Indebtedness" means the indebtedness evidence by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

g. **Loan Agreement**.  The words "Loan Agreement" means that certain Commercial Loan Agreement dated as of April 1, 2015 executed by Borrower and Lender.

h. **Loan Amount**.  The words "Loan Amount" shall have the same meaning as ascribed to such words in the Loan Agreement.

i. **Note**.  The word "Note" means the Commercial Promissory Note of even date herewith executed by Borrower in an original principal amount equal to the Loan Amount, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or other credit agreement.

j. **Obligor**.  The word "Obligor" means without limitation any and all persons obligated to pay money or to perform some other act under or in connection with the Collateral.

k. **Property**.  The word "Property" means all of Grantor's right, title and interest in and to all the Property described in the "Collateral Description" section of this Agreement.

l. **Related Documents**.  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, along with any and all amendments and modifications thereto, executed in connection with the Indebtedness.

2. **Grant of Security Interest**.  For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law; subject, however, to the limitations in Section 11.

3. **Collateral Description**.  The word "Collateral" as used in this Agreement means Grantor's present and future rights, title and interest in and to, together with any and all present and future additions thereto, substitutions therefore, and replacements thereof, together with any

and all present and future certificates and/or instruments evidencing any trust preferred securities and further together with all Income and Proceeds as described herein:

> Those certain Amended Trust Preferred Securities sponsored by Northwestern Bancorporation of Illinois, Inc. ("NBI"), issued to the Borrower pursuant NBI's plan of reorganization confirmed in the chapter 11 case styled *In re Northwest Bancorporation of Illinois, Inc.* (the "Plan"), in an original principal amount equal to (i) the Management TruPS Amount multiplied by (ii) a number equal to (x) the amount of Allowed TruPS Claims (as defined in the Plan) held by the Lender divided by (y) the total amount of Allowed TruPS Claims held by the Electing TruPS Holders (as defined in the Plan).

4.    **Representations and Warranties With Respect to the Collateral**.   Grantor represents and warrants to Lender that:

a.    **Ownership**.  Grantor is the lawful owner of the Collateral free and clear of all security interests, liens, encumbrances and claims of others except as disclosed to and accepted by Lender in writing prior to execution of this Agreement.

b.    **Right to Pledge**.  Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral.

c.    **Authority; Binding Effect**. Grantor has the full right, power and authority to enter into this Agreement and to grant a security interest in the Collateral to Lender.   This Agreement is binding upon Grantor as well as Grantor's successors and assigns, and is legally enforceable in accordance with its terms.   The foregoing representations and warranties, and all other representations and warranties, and all other representations and warranties contained in this Agreement are and shall be continuing in nature and shall remain in full force and effect until such time as this Agreement is terminated or cancelled as provided herein.

d.    **No Further Assignment**.  Grantor has not, and shall not, sell, assign, transfer, encumber or otherwise dispose of any of Grantor's rights in the Collateral except as provided in this Agreement.

e.    **No Violation**.  The execution and deliver of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party.

f.    **Financing Statements**.  Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest.  At Lender's request, Grantor additionally agrees to sign all other documents that are reasonably necessary to perfect, protect, and

continue Lender's security interest in the Collateral, including, but not limited to an account control agreement with the Collateral custodian.  Grantor will pay all filing fees, title transfer fees and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs.  Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is an Event of Default.  Lender may file a copy of this Agreement as a financing statement.  If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

5.       **Lender's Rights and Obligations With Respect to the Collateral**.  Lender may hold and otherwise maintain rights in the Collateral until all Indebtedness has been paid and satisfied.  Thereafter Lender shall immediately deliver the Collateral to Grantor or to any other owner of the Collateral.  Lender shall have the following rights in addition to all other rights to Lender may have by law (subject, however, to the limitations in Section 11):

a.   **Maintenance and Protection of Collateral**.  Lender may, but shall not be obligated to, take such steps as it deems necessary or desirable to protect, maintain, insure, store or care for the Collateral, including paying of any liens or claims against the Collateral.  This may include such things as hiring other people, such as attorneys, appraisers or other experts.  Lender may charge Grantor for any cost incurred in so doing.  When applicable law provides more than one method of perfection of Lender's security interest, Lender may choose the method(s) to be used.  If the Collateral consists of stock, bonds or other investment property for which no certificate has been issued, Grantor agrees, at Lender's request, either to request issuance of any appropriate certificate or to give instructions on Lender's forms to the issuer, transfer agent, mutual fund company, or broker, as the case may be, to record on its books or records Lender's security interest in the Collateral.  Grantor also agrees to execute any additional documents, including, but not limited to, a control agreement, necessary to perfect Lender's security interest as Lender may reasonably desire.

b.   **Income and Proceeds from the Collateral**.  Lender may receive all Income and Proceeds and add it to the Collateral.  Grantor agrees to deliver to Lender immediately upon receipt, in the exact form received and without commingling with other property, all Income and Proceeds from the Collateral which may be received by, paid or delivered to Grantor's account, whether as an addition to, in discharge of, in substitution of, or in exchange for any of the Collateral.

c.   **Application of Cash**.  At Lender's option, Lender may apply any cash, whether included in the Collateral or receiver as Income and Proceeds or through liquidation, sale, or retirement, of the Collateral, to the satisfaction of

the Indebtedness or such portion thereof as Lender shall choose, whether or not matured.

    d.   **Collection of Collateral**.   Lender at Lender's option may, but need not, collect the Income and Proceeds directly from the Obligor.  Grantor authorizes and directs the Obligors, if Lender decides to collect the Income and Proceeds, to pay and deliver to Lender all Income and Proceeds from the Collateral and to accept Lender's receipt of the payments. Grantor irrevocably appoints Lender as Grantor's attorney-in-fact, with full power of substitution, for the purposes of taking any and all actions on Grantor's behalf to allow payments of Income or Proceeds from the Obligor directly to Lender in accordance with this Section 5.d.

    e.   **Perfection of Security Interest**.  Upon Lender's request, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral.  When applicable law provides more than one method of perfection of Lender's security interest, Lender may choose the method(s) to be used. For the avoidance of doubt, this may include (i) physical possession of certificates evidencing the Collateral, along with a bond power for such certificates executed in blank and "medallion stamped" by the appropriate financial institution and (ii) execution of an account control agreement reasonably acceptable to Lender in connection with a custodial or other account in which the Collateral is maintained or accounted for. Upon Lender's request, Grantor will sign and deliver any writings Lender reasonably deems necessary to perfect Lender's security interest.   If any of the Collateral consists of securities for which no certificate has been issued.  Grantor agrees, at Lender's option, either to request issuance of an appropriate certificate or to execute appropriate instructions on Lender's forms instructing the issuer, transfer agent, mutual fund company, or broker, as the case may be, to record on its books and records, by book-entry or otherwise, Lender's security interest in the Collateral.   Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties.

    6.    **Lender's Expenditures**.   If any action or proceeding is commenced that would material affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of their Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amount Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor.  All such expenses will become a party of the

Indebtedness and, at Lender's option, will (a) be payable on demand; (b) be added to the balance of the Note and be apportioned among and be payable with an installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (c) be treated as a balloon payment which will be due and payable at the Note's maturity.  The Agreement also will secure payment of these amounts.  Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

7.      **Limitations On Obligations of Lender**.  Lender shall use ordinary reasonable care in the physical preservation and custody of the Collateral in Lender's possession, but shall have no other obligation to protect the Collateral or its value.  In particular, but without limitation, Lender shall have no responsibility for (a) any depreciation in value of the Collateral or for the collection or protection of any Income and Proceeds from the Collateral, (b) preservation of rights against parties to the Collateral or against third person, (c) ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the Collateral, or (d) informing Grantor about any of the above, whether or not Lender has or is deemed to have knowledge of such matters.   Except as provided above, Lender shall have no liability for depreciation or deterioration of the Collateral.

8.      **Default**.  Each of the following shall constitute an event of default ("Event of Default") under this Agreement:

a.    **Payment Default**.  Grantor fails to make any payment when due under the Indebtedness, subject to the interest deferral provision contained in paragraph 2 of the Note.

b.    **Other Defaults**.  Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition in any other agreement between Lender and Grantor.

c.    **Default in Favor of Third Parties**.  Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or perform Grantor's obligations under this Note or any of the Related Documents.

d.    **False Statements**.  Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

e.    **Defective Collateralization**.  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any

collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

f. **Death or Insolvency**.  The death of Grantor, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

g. **Creditor of Forfeiture Proceedings**.  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the loan.  This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

9.    **Cure Provisions**.  If any Event of Default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of this same provision of this Note within the preceding twelve (12) months, it may be cured if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

10.    **Rights and Remedies On Default**.  If an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

a. **Accelerate Indebtedness**.    Declare the Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

b. **Collect the Collateral**.  Collect any of the Collateral and, at Lender's option and to the extent permitted by applicable law, retain possession of the Collateral while suing on the Indebtedness.

c. **Sell the Collateral**.  Sell the Collateral, at Lender's discretion, as a unit or in parcels, at one or more public or private sales.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily

sold on a recognized market, Lender shall give or mail to Grantor, and other persons as required by law, notice at least ten (10) days in advance of the time and place of any public sale, or of the time after which any private sale may be made.  However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person' right to notification of sale.  Grantor agrees that any requirement of reasonable notice as to Grantor is satisfied if Lender mails notice by ordinary mail addressed to Grantor at the last address Grantor has given Lender in writing.  If a public sale is held, there shall be sufficient compliance with all requirements of notice to the public by a single publication in any newspaper of general circulation in the country where the Collateral is located, setting forth in the time and place of sale and a brief description of the property to be sold.  Lender may be purchaser at any public sale.

d. **Sell Securities**.   Sell any securities including the Collateral in a manner consistent with applicable federal and state securities law.  If, because of restriction under such law, Lender is unable, or believes Lender is unable, to sell the securities in an open market transaction, Grantor agrees that Lender will have no obligation to delay sale until the securities can be registered.  Then Lender may make a private sale to one or more persons or to a restricted group of persons, even though such sale may result in a price that is less favorable than might be obtained in an open market transaction.  Such sale will be considered commercially reasonable.  If any securities held as Collateral are "restricted securities" as defined in the Rules of the Securities Exchange Commission (such as Regulation D or Rule 144) or the rules of the state securities departments under state "Blue Sky" laws, or if Grantor or any other owner of the Collateral is an affiliate of the issuer of the securities, Grantor agrees that neither Grantor, nor any member of Grantor's family, nor any other person signing this Agreement will sell or dispose of any securities of such issuer without obtaining Lender's prior written consent.

e. **Rights and Remedies with Respect to Investment Property Financial Assets and Related Collateral**.   In addition to other rights and remedies granted under this Agreement and under applicable law, Lender may exercise any or all of the following rights and remedies: (1) register with any issuer or broker or their securities intermediary any of the Collateral consisting of investment property or financial assets (collectively herein "investment property").  In Lender's sole name or in the name of Lender's broker, agent or nominee; (2) cause any issuer, broker or other securities intermediary to deliver to Lender any of the Collateral consisting of securities, or investment property capable of being delivered; (3) enter into a control agreement or power of attorney with any issuer or securities intermediary with respect to any Collateral consisting of investment property, on such terms as Lender may deem appropriate, in its sole discretion, including without limitation, an agreement granting to Lender any of the rights provided hereunder without further notice to or consent by Grantor; (4) execute any such control

agreement on Grantor's behalf and in Grantor' name, and hereby irrevocably appoint Lender as agent and attorney-in-fact, coupled with an interest, for the purpose of executing such control agreement on Grantor's behalf; (5) exercise any and all rights of Lender under any such control agreement or power of attorney; (6) exercise any voting, conversion, registration, purchase, option, or other rights with respect to any Collateral; (7) collect, with or without legal action, and issue receipts concerning any notes, checks, drafts, remittances or distributions that are paid or payable with respect to any Collateral consisting of investment property.  Any control agreement entered with respect to any investment property shall contain the following provisions, at Lender's discretion.  Lender shall be authorized to instruct the issuer, broker, or other securities intermediary to take or to refrain from taking such actions with respect to the investment property as Lender may instruct, without further notice to or consent by Grantor.   Such actions may include without limitation the issuance of entitlement orders, account instruction, general trading or buy or sell orders, transfer and redemption orders, and stop loss orders.  Lender shall be further entitled to instruct the issuer, broker or securities intermediary to sell or to liquidate any investment property, or to pay the cash surrender or account termination value with respect to any and all investment property, and to necessary to place Lender in "control" of such investment collateral, as contemplated under the provisions of the Uniform Commercial Code, and shall fully authorize Lender to issue "entitlement orders" concerning the transfer, redemption, liquidation or disposition of investment collateral, in conformance with the provisions of the Uniform Commercial Code.

    f.  **Foreclosure.**  Maintain a judicial suit for foreclosure and sale of the Collateral.

    g.  **Transfer Title**.   Effect transfer of title upon sale of all or part of the Collateral.  For this purpose, Grantor irrevocably appoints Lender as Grantor's attorney-in-fact to execute endorsements, assignments and instruments in the name of Grantor and each of them (if more than one) as shall be necessary or reasonable.

    h.  **Other Rights and Remedies**.  Have an exercise any or all of the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, at law, in equity, or otherwise.

    11.  **Application of Proceeds; Non-Recourse**.  Apply any cash which is part of the Collateral, or which is received from the collection or sale of the Collateral, to reimbursement of any expenses, including any costs for registration of securities, commissions incurred in connection with a sale, attorneys' fees and court costs, whether or not there is a lawsuit and including any fees on appeal, incurred by Lender in connection with the collection and sale of such Collateral and to the payment of the Indebtedness of Grantor to Lender, with any excess funds to be paid to Grantor as the interests of Grantor may appear.  Notwithstanding anything to the contrary in this Agreement, Lender agrees that the Indebtedness is non-recourse, and Section

5 of the Note is incorporated herein.  Lender agrees that Grantor will not be liable to pay any deficiency after application of the proceeds of the Collateral to the Indebtedness.

12.     **Election of Remedies**.  Subject to Section 11, except as may be prohibited by applicable law, all of Lenders' rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercise singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare an Event of Default and exercise its remedies.

13.     **Miscellaneous Provisions**.  The following miscellaneous provisions are a part of this Agreement:

a.  **Amendments**.   This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

b.  **Attorneys' Fees and Expenses**.  Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.   Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Grantor also shall pay all curt costs and such additional fees as may be directed by the Court.

c.  **Caption Headings**.  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

d.  **Governing Law**.  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to conflicts of law provisions.  This Agreement has been accepted by Lender in the State of Illinois.

e.  **Choice of Venue**.  If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the Federal or state courts located in Cook County, Illinois.

f. **No Waiver by Lender**.  Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.  No delay or omission on the party of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instance where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

g. **Notices**. Any notice require to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown at the beginning of this Agreement. Any party may change its address for notice under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.   Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice give to all Grantors.

h. **Severability**.  If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid or unenforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

i. **Successor and Assigns**.  Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.  If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor' successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

j.   **Time is of the Essence**.  Time is of the essence in the performance of this Agreement.

k.   **Counterparts.**  This Agreement may be executed in counterparts.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL PLEDGE AGREEMENT AND AGREES TO ITS TERMS.   THIS AGREEMENT IS DATED APRIL 1, 2015.**

[signature page follows]

# **EXHIBIT B**

## **PROMISSORY NOTE**

# COMMERCIAL PROMISSORY NOTE

**STATE OF ILLINOIS**
**COUNTY OF COOK**

**Date:  April 1, 2015**                                   **AMOUNT: $**_____

---

**Borrower:  FB Investment Group, LLC**         **Lender:** _____

      1.     **Promise to Pay**.  Pursuant to this Commercial Promissory Note (the "Note"), FB Investment Group, LLC ("Borrower") promises to pay to _____ ("Lender"), or order, in lawful money of the United States of America, the principal amount of the "Loan Amount" as defined in the CLA (as defined below), which is equal to _____, together with interest on the unpaid principal balance from the Effective Date (as defined in the Stock Purchase Agreement dated on or about the date hereof between Alan Reasoner and Emad Murrar, as purchasers, and the sellers therein (the "SPA")), until paid in full, under the terms and subject to the conditions hereof.

      2.     **Payment**.  Borrower will pay regular quarterly accrued, unpaid interest due as of each payment date, beginning on the date that is three (3) months after the Effective Date (the "Initial Payment Date"), with all subsequent payments to be due on the same day of each quarter after the Initial Payment Date; provided, however, that so long as no Event of Default (as defined herein) has occurred and is continuing, Borrower shall have the right to defer any and all interest payments until the Maturity Date (as defined herein).  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any unpaid collection costs.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

      3.     **Interest Rate and Calculation Method**.  The interest rate on this promissory note (the "Note") will be charged on the unpaid principal balance until the full amount of the principal has been paid at a rate of 8% per annum.  Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (366 during leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.

      4.     **Maturity**.  The principal amount of this Note and all accrued, unpaid interest thereon, including deferred interest, shall be due and payable in full on the date that is 30 months after the Effective Date (the "Maturity Date").

      5.     **Non-Recourse**.  Notwithstanding anything to the contrary in this Note, all obligations under this Note shall be non-recourse against the Borrower.  Lender shall only have recourse to the Collateral (as defined in the Collateral Pledge Agreement of even date herewith between Borrower and Lender (the "CPA")).  The liability of Borrower under this Note, the CPA, the Commercial Loan Agreement of even date herewith between Borrower and Lender (the

"CLA"), and any other Related Document (as defined in the CPA; collectively, the "Loan Documents"), shall be limited to and enforceable solely against the Collateral and not any other assets of Borrower.  No directors, officers, employees, agents, managers, members, or owners of Borrower or any entity affiliated with Borrower shall have any personal liability under or in connection with the Indebtedness (as defined in the CPA) or any Loan Document.  Without limiting anything in this Section 5, if Borrower is a partnership or limited liability company, then none of the following shall be considered to be assets of Borrower: (a) the assets of the partners or members of Borrower; (b) any negative capital account of a partner or member of Borrower; or (c) any obligation of a partner or member of Borrower to contribute capital to Borrower.

6.   **Prepayment**.  Borrower may pay without penalty all or a portion of the amount owed prior to its due date or the Maturity Date.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amount, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to Borrower at the address indicated above.

7.   **Interest After Default**.   Upon an Event of Default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note.  However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

8.   **Default**.  Each of the following shall constitute an event of default ("Event of Default") under this Note:

a.   **Payment Default**.  Borrower fails to make any payment when due under this Note.

b.   **Other Defaults**.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition in any other agreement between Lender or Borrower.

c.   **Default in Favor of Third Parties**.  Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

2

d. **False Statements**.   Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

e. **Death or Insolvency**.   The death of Borrower, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

f. **Creditor of Forfeiture Proceedings**.   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

g. **Cure Provisions**.   If any Event of Default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of this same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

9.     **Lender's Rights**.   Upon an Event of Default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable.

10.     **Attorneys' Fees and Expenses**.   Subject to any limits under applicable law, upon an Event of Default, Lender's reasonable attorneys' fees and all of Lender's other reasonable collection expenses, whether or not there is a lawsuit, including without limitation reasonable legal expenses for bankruptcy proceedings against Borrower, shall be included in the principal amount of the obligations hereunder.

11.     **Governing Law**.  This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to conflicts of law provisions.  This Note has been accepted by Lender in the State of Illinois.

12.     **Choice of Venue**.  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Federal or state courts located in Cook County, Illinois.

13.     **Collateral**.  Borrower acknowledges this Note is secured by $300,000 in original principal amount of those certain Amended Trust Preferred Securities sponsored by Northwestern Bancorporation of Illinois, Inc. ("NBI"), issued to the Borrower pursuant NBI's plan of reorganization confirmed in the chapter 11 case styled *In re Northwest Bancorporation of Illinois, Inc.*, all as more particularly described in the CPA.

14.     **Successor Interests**.  The terms of this Note shall be binding upon Borrower, and upon Borrower's successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

15.     **General Provisions**.  This Note is payable in full on the Maturity Date.  The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on the Maturity Date.  If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.  Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Illinois (as applicable).  Any such excess interest or unauthorized fee shall, instead of anything state to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to the Borrower.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly state in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorse, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  This Note may be executed in counterparts.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE INTEREST RATE AND DEFAULT PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

[signature page follows]