**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| NORTHWEST BANCORPORATION | ) |
| OF ILLINOIS, INC.,[1] | ) Case No. 15-15245 (CAD) |
|  | ) |
| Debtor. | ) |
|  | ) |

**DECLARATION OF ALAN REASONER, PRESIDENT**
**OF NORTHWEST BANCORPORATION OF ILLINOIS, INC., IN SUPPORT**
**OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

---

[1] The Debtor in this chapter 11 case is Northwest Bancorporation of Illinois, Inc.; the last four digits of the Debtor's federal tax identification number are: 0422. The location of the Debtor's headquarters and the service address for the Debtor is: 300 East Northwest Highway, Palatine, Illinois 60067.

KE 33055262

**Table of Contents**

| | | Page |
|---|---|---|
| I. | Overview of the Debtor's History and Operations | 3 |
| | A. The Debtor's Business and Operations | 3 |
| | B. The Debtor's Prepetition Capital Structure | 4 |
| |    1. Trust Preferred Securities | 4 |
| |    2. Equity Ownership | 5 |
| II. | Events Leading to the Debtor's Financial Difficulties | 5 |
| | A. Global Financial Downturn | 5 |
| | B. 2011 FDIC Consent Order and Federal Reserve Written Agreement | 6 |
| | C. Prepetition Negotiations Among Certain TruPS Holders, Shareholders, and Management Parties | 7 |
| | D. The Plan Support Agreement | 8 |
| | E. The Debtor's Solicitation Process and Proposed Confirmation Timeline | 11 |
| III. | First-Day Pleadings | 12 |
| | A. The Combined Hearing Motion | 12 |
| | B. The Bank Account Motion | 14 |
| | C. The Bar Date Motion | 16 |
| | D. The K&E Retention Application | 16 |
| | E. The River Branch Retention Application | 17 |

KE 33055262

I, Alan Reasoner, hereby declare under penalty of perjury:

1. I am the President of Northwest Bancorporation of Illinois, Inc. (the "Debtor"), the debtor and debtor in possession in this chapter 11 case. I also serve as a director of the Debtor, and I am familiar with the Debtor's day-to-day operations, financial affairs, and books and records.

2. The Debtor is a bank holding company headquartered in Palatine, Illinois. The Debtor's primary asset is 100 percent of the outstanding equity in First Bank and Trust Company of Illinois ("First Bank"), a single-branch community bank also located in Palatine, Illinois. First Bank, which has retail and commercial banking operations, is not a debtor in this chapter 11 case and continues to operate in the ordinary course of business. In addition to my position at the Debtor, I am also First Bank's President and Chief Executive Officer and serve as a director of First Bank.

3. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtor continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. As discussed in more detail herein, the Debtor has filed this chapter 11 case to effectuate a prepackaged, consensual balance-sheet restructuring negotiated by the Debtor, with the assistance of its advisors, and certain of its key stakeholders—all as set forth in a prepetition plan support agreement (the "Plan Support Agreement") among the parties. To that end, at the same time it commenced this case, the Debtor filed the *Debtor's Prepackaged Chapter 11 Plan of Reorganization* (the "Plan"), a related disclosure statement (the "Disclosure Statement"), and a

motion seeking to schedule a combined hearing to approve the Disclosure Statement and to confirm the Plan.

5. The proposed restructuring set forth in the Plan will:

- reduce the Debtor's obligations under its junior subordinated debentures (the "Debentures") and related trust common and preferred securities (together with the Debentures, the "TruPS") from over $51 million to approximately $11.5 million of principal only (a reduction of almost 80 percent);

- extend the Debtor's right to defer interest payments and distributions on the TruPS;

- provide for *full payment in cash* of all claims other than the trust preferred securities claims;

- lay the foundation for a successful sale transaction and recapitalization of the Debtor and First Bank following the successful deleveraging of the Debtor's balance sheet through the post-bankruptcy exercise of a right to purchase established by the Plan and the related (and pre-negotiated) purchase agreement;

- provide for the consensual and collaborative funding of this chapter 11 case (and the Plan) by certain electing holder of TruPS claims and members of the Debtor's management (including myself).

6. I submit this declaration (this "Declaration") to provide an overview of the Debtor, its business, and this chapter 11 case and to support the Debtor's chapter 11 petition and "first-day" pleadings (collectively, the "First-Day Pleadings"). Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management team or the Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

2

KE 33055262

I.  **OVERVIEW OF THE DEBTOR'S HISTORY AND OPERATIONS**

   A.  **The Debtor's Business and Operations**

   7.  The Debtor is a bank holding company headquartered in Palatine, Illinois. The Debtor was incorporated on May 27, 1977, for the purpose of enabling First Bank, an Illinois banking corporation located in Palatine, Illinois, to operate within a bank holding capital structure. The Debtor's assets consist of (a) the equity in First Bank and interests in certain statutory trusts related to the Debtor's outstanding TruPS obligations, as described below, and (b) approximately $10,000 in cash and cash equivalents. The Debtor does not have any significant operations of its own and has only two officers. I serve as President, and Ken Eiserman serves as Chief Financial Officer. Both positions are unpaid, but a portion of the salary paid by First Bank to each officer is allocated to the Debtor as required by applicable banking regulations.

   8.  The Debtor, through First Bank, provides full-service retail and commercial banking, which primarily includes deposit gathering, safekeeping, and distribution; lending for commercial, agricultural, real estate, and consumer purposes; and assisting borrowers with refinancing, acquisition, and bridge lending opportunities. First Bank is a community bank with a single branch and so focuses on the greater Chicagoland area for its retail banking business. In addition, it provides commercial banking services across the country. First Bank has approximately 26 employees at its Palatine headquarters. As of December 31, 2014 First Bank had assets of $243.5 million, with regulatory Leverage and Total Risk Based capital ratios of 8.10 percent and 11.96 percent, respectively.

   9.  As a bank holding company, the Debtor is subject to oversight and regulation by the Board of Governors of the Federal Reserve System and, in certain instances, various federal and state banking authorities. As described in detail below, the Debtor has operated under a

3

written agreement with the Federal Reserve, which establishes or confirms certain regulatory obligations of the Debtor, since May 2011. As an Illinois state-chartered non-member bank, First Bank is also subject to regulation, examination, and supervision by the Federal Deposit Insurance Corporation ("FDIC") and the State of Illinois Department of Financial and Professional Regulation, Division of Banking (the "Division"). As described in detail below, First Bank has operated under a consent order with the FDIC, which establishes certain additional regulatory requirements of First Bank, since January 2011.

### B. The Debtor's Prepetition Capital Structure

#### 1. Trust Preferred Securities

10. As of the Petition Date, the Debtor has outstanding unsecured obligations totaling over $51 million, consisting of principal, interest, distributions, and liquidation amounts owing under the TruPS. Under the Plan, the TruPS will be amended to reduce the outstanding obligations to approximately $11.5 million of principal only, and the amendments will extinguish the Debtor's obligation to pay accrued interest and distributions (a reduction of almost 80 percent).

11. The instruments providing for the Debtor's TruPS obligations include a customary series of issuances. Specifically, an issuer issues notes or debentures to a specially formed trust entity, which in turn issues common stock and preferred stock or capital securities to investors or other holders. Historically, the structure has been commonly used to take advantage of favorable regulatory, tax, and accounting treatment.

12. In July 2001, the Debtor coordinated the issuance of the outstanding TruPS capital securities by three trusts in the aggregate principal amount of $35 million. The Debtor guaranteed certain obligations of the three trusts under their trust agreements, and the preferred securities that are part of the TruPS issuances were sold to third-party investors.

4

13.     Each of the Debentures and each of the related indentures permit the Debtor, in certain circumstances, to defer the payment of interest thereon for a period up to 20 calendar quarters, which in turn also permits the trusts to defer any corresponding distributions under the TruPS for the same period. At the end of the deferral period, if the Debtor fails to make a deferred payment, the indenture trustee or, in some cases, the holders of a requisite amount of TruPS, have the right (after the expiration of any applicable grace period), to declare an event of default and exercise various remedies.

14.     Beginning in April and July 2010, the Debtor elected to defer interest payments on the TruPS. The Debtor has deferred interest for the maximum period of 20 calendar quarters. As a result, as of the Petition Date, there is accrued and unpaid interest outstanding on the Debentures of approximately $16 million. The deferral periods for all three of these issuances has come to an end.

### 2.     Equity Ownership

15.     Approximately 90 percent of the equity interest in the Debtor is owned by Robert Hershenhorn and his family. Under the Plan, minority equity interests (i.e., interests held by any shareholder who has not executed the prepetition Plan Support Agreement) will be cancelled; majority equity interests (i.e., interests subject to the prepetition Plan Support Agreement) will be reinstated and remain in place until the purchase right established by the Plan is exercised and applicable regulatory requirements are satisfied. There will be no distribution to any holder of equity interests in the Debtor.

## II.    EVENTS LEADING TO THE DEBTOR'S FINANCIAL DIFFICULTIES

### A.     Global Financial Downturn

16.     The global economic downturn that began in 2007 adversely impacted the Debtor's sole operating asset, First Bank. First Bank is a community banking institution with a

5

loan portfolio primarily made up of real estate loans, with a majority consisting of construction and development, commercial real estate, and multifamily loans. First Bank's lending footprint historically was primarily located in areas that saw rapid growth over the past two decades, and real estate construction and development loans were a significant part of First Bank's business prior to the onset of the financial crisis in 2007.

17. Since first incurring losses in the downturn, First Bank has acted to solve problem credits and proactively manage its businesses for a return to profitability. These efforts have focused on achieving improved loan quality, returning to a state of positive net earnings, and stabilizing its loan portfolio.

### B.    2011 FDIC Consent Order and Federal Reserve Written Agreement

18. On January 5, 2011, the FDIC, together with the Division, and First Bank entered into a consent order regarding First Bank's overall condition and the implementation or revision of policies and procedures to cure certain deficiencies noted by the FDIC and the Division during their joint safety and soundness examination of First Bank conducted as of March 31, 2010. Under the terms of the consent order, First Bank is, among other things, required to maintain a Tier 1 Leverage Ratio of at least 9.5 percent and a Total Risk Based Capital Ratio of at least 13.5 percent. At December 31, 2014, First Bank's Tier 1 Leverage Ratio and Total Risk Based Capital Ratio were 8.10 percent and 10.90 percent, respectively. In addition, First Bank is restricted from declaring or paying any dividend to the Debtor or any other party without prior written consent from the FDIC and the Division.

19. On May 31, 2011, the Federal Reserve Bank of Chicago and the Debtor mutually agreed to enter into a written agreement (which made reference to the consent order). Under the terms of the written agreement, the Debtor and its board of directors agreed to, among other things, take appropriate steps to ensure First Bank complies with the consent order, not to

6

directly or indirectly incur or increase any indebtedness, and not to declare or pay any dividends without prior written approval from the Federal Reserve.

20. The Debtor's only revenue comes from dividends paid by First Bank. Since First Bank has been restricted in paying any dividends to the Debtor, the Debtor has had (and currently has) no revenue or sufficient funds to pay the interest under the TruPS. Accordingly, the Debtor and First Bank have been working diligently since 2011 to identify a solution that would maximize value and recoveries for all stakeholders of the Debtor and implement a recapitalization of the Debtor and First Bank.

### C. Prepetition Negotiations Among Certain TruPS Holders, Shareholders, and Management Parties

21. Recognizing that its current and projected TruPS repayment schedules were not sustainable given First Bank's weakened business performance brought on by the global economic recession, the Debtor determined that a restructuring of the balance sheet or a potential sales transaction involving the Debtor and/or First Bank was necessary to ensure that the Debtor could satisfy its financial obligations going forward.

22. In early-to-mid-2014, the Debtor retained professionals to provide guidance and advice, including advice regarding the Debtor's obligations to creditors and other stakeholders. The Debtor prepared tax, financial, and other information intended to facilitate discussions and development of a restructuring solution that would optimize value and recoveries to all constituents.

23. In an effort to forge a consensual resolution, the Debtor, its shareholders, various creditors, and members of management engaged in discussions regarding potential reorganization or sale alternatives (including discussions with multiple potential third-party investors).

24. Over the course of these discussions, it became clear that no third-party investor or group of investors could present a viable proposal for the comprehensive restructuring of the Debtor's balance sheet and recapitalization of the Debtor and First Bank. The Debtor and its key stakeholders turned their focus to negotiating and implementing a successful deleveraging as a first step toward better positioning the Debtor to effectuate the capital raise needed to recapitalize the Debtor and First Bank.

25. These extensive, arm's-length discussions, which took place over the course of several months, were productive and ultimately resulted in the negotiated terms of the Plan Support Agreement. The Plan Support Agreement—by which parties commit to support the transactions contemplated by the Plan—serves as the foundation for this chapter 11 case and the Debtor's proposed restructuring.

**D.     The Plan Support Agreement**

26. The Plan Support Agreement provides that the parties thereto will support the Plan.[2] Specifically, the Plan provides for, among other things, two complementary transactions: (a) a restructuring of the Debtor's balance sheet through amendments to the TruPS; and (b) a sale of the equity interests in the Debtor in connection with an ultimate recapitalization of the Debtor and First Bank (all subject to regulatory approval).

27. The general terms of the Debtor's comprehensive balance-sheet restructuring are as follows:

- *Treatment of TruPS Claims (Class 3).*
  - Non-Electing TruPS Claims Treatment: Holders of allowed TruPS Claims who do not make the TruPS Election (the "Non-Electing TruPS Holders") shall receive a pro rata share (based on the amount of their allowed TruPS

---

[2] This Declaration is intended only to provide a summary of certain key terms provided under the Plan and is qualified in its entirety by reference to the Plan and all exhibits related thereto.

Claims relative to the allowed TruPS Claims of any other holder of TruPS Claims that does not make the TruPS Election) of Senior Amended TruPS (as defined in the Plan) in the amount of $800,000.00 and any accrued and unpaid interest under the applicable TruPS indentures and the applicable Trust Junior Subordinated Debentures (as defined in the Plan) will be irrevocably waived and excused; <u>provided</u> that, if all holders of TruPS Claims make the TruPS Election, there shall be no Non-Electing TruPS Distribution (as defined in the Plan), and the principal face amount of all Junior Amended TruPS (as defined in the Plan) shall be $11,500,000.00 in the aggregate.

- Electing TruPS Holders Treatment: Holders of allowed TruPS Claims who do make the TruPS Election shall (a) forego any rights to a portion of the Non-Electing TruPS Distribution (as defined in the Plan) and agree that any distributions to the Electing TruPS Holders under the Plan will be expressly subordinated to the distributions to Non-Electing TruPS Holders; (b) receive such Holder's pro rata share (based on the amount of such holder's TruPS Claim relative to the allowed TruPS Claim of any other holder that makes the TruPS Election) of the Electing TruPS Distribution (as defined in the Plan); and (c) fund in cash such holder's pro rata share (based on the amount of such holder's allowed TruPS Claims relative to the allowed TruPS Claims of any other holder of TruPS Claims that makes the TruPS Election) of the Plan Funding TruPS Contribution.

- *Treatment of Interests.* Holders of Interests (as defined in the Plan) will receive no distribution and the Non-Majority Interests will be terminated upon effectiveness of the Plan. The Majority Interests will be reinstated subject to the Sale Transaction.

- *Treatment of Other Claims.* Although Section 510(b) Claims (as defined in the Plan) shall be cancelled without distribution under the Plan, all other non-TruPS Claims and non-Section 510(b) Claims, including general unsecured claims, are unimpaired and will receive payment ***in full in cash*** from the Reorganized Debtor.

- *Plan Financing.* Those holders of TruPS Claims that made the TruPS funding election (the "<u>TruPS Election</u>") (collectively, the "<u>Electing TruPS Holders</u>") funded $700,000.00 (the "<u>Plan Funding TruPS Contribution</u>") into an escrow on April 28, 2015, with such amount to be used to fund the Reorganization Transaction. In exchange for funding the Plan Funding TruPS Contribution, the Electing TruPS Holders will receive, upon effectiveness of the Plan, their Pro Rata portion of the Junior Amended TruPS (as defined in the Plan). In addition, the Management Plan Support Parties funded $300,000.00 (a portion of which in an amount of $180,000.00 is financed by the Electing TruPS Holders through loans by the Electing TruPS Holders to the Management Plan Support Parties) (the "<u>Plan Funding Management</u>

9

Contribution") into an escrow no later than April 28, 2015, with such amount to be used to fund the Reorganization Transaction. In exchange for the Plan Funding Management Contribution, the Management Plan Support Parties will receive their Pro Rata portion of $300,000.00 of the Junior Amended TruPS.

28.     The general terms of First Bank's sale transaction and recapitalization (the "Sale Transaction") are as follows:

- ***Sale and Recapitalization.*** The Management Plan Support Parties and the Majority Interests entered into that certain Stock Purchase Agreement dated March 31, 2015 (the "Stock Purchase Agreement"), whereby the Management Plan Support Parties have the right to purchase all of the Majority Interests on or after the Plan's effective date (the "Recapitalization Right to Purchase"). The Recapitalization Right to Purchase is freely transferrable by the Management Plan Support Parties. Any entity holding the Recapitalization Right to Purchase and seeking to consummate the purchase of the Majority Interests must (immediately upon such purchase) a capital contribution to the Debtor for the purpose of recapitalizing First Bank in an amount sufficient to receive regulatory approval for First Bank's recapitalization and ownership change. The Sale Transaction has been structured to comply with applicable regulations.

29.     It is important to note that the Debtor has virtually no cash on hand with which to pay claims of any priority, and, standing alone, the Debtor likely could not fund a chapter 11 reorganization.

30.     Instead, the money necessary to fund the Plan is being provided solely by (a) the Electing TruPS Holders, who, by making the TruPS Election, will be agreeing to fund a maximum of $880,000.00 (including making a $180,000.00 loan to the Management Plan Support Parties) and (b) the Management Plan Support Parties, who are agreeing to fund $120,000.00, plus take a $180,000.00 loan from the Electing TruPS Holders. Moreover, under the Plan Support Agreement certain holders of TruPS Claims and the Management Plan Support Parties have already agreed and committed to fund this $1 million aggregate Plan funding amount, subject to the terms and conditions of the Plan and the Plan Support Agreement. Without the funding provided by these parties, and in particular the $880,000 funded by the

10

Electing TruPS Holders, the Debtor would likely be forced into a "free fall" bankruptcy with no plan, no stalking horse bidder for its primary asset (First Bank), and no readily available source of funding for even administrative claims. As such, the funding provided by the Electing TruPS Holders and the Management Plan Support Parties is critical to the Debtor's ability to reorganize and preserve value for its creditors.

### E.    The Debtor's Solicitation Process and Proposed Confirmation Timeline

31.    The Plan Support Agreement contemplates a prepackaged chapter 11 process. Following the execution of the Plan Sponsor Agreement, the Debtors commenced a prepackaged solicitation of the Plan on March 31, 2015, by delivering a copy of the Plan and the Disclosure Statement (including Ballots) to Holders of Claims entitled to vote to accept or reject the Plan. The Debtors established April 28, 2015, at 5:00 p.m., prevailing Central Time, as the deadline for the receipt of votes to accept or reject the Plan (the "Voting Deadline"). The Debtors will seek Bankruptcy Court approval of the Voting Deadline at the Confirmation Hearing. On the Petition Date, the Debtor will file a voting report (the "Voting Report") setting forth the voting results for Class 3 Claims. I believe that the Voting Report will show that Holders of Claims entitled to vote have overwhelmingly (or unanimously) voted to accept the Plan. Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement and schedule the Confirmation Hearing to consider approval of this Disclosure Statement and confirmation of the Plan.

| Event | Date |
|---|---|
| Voting Record Date[3] | March 30, 2015 |
| Distribution of Solicitation | April 1, 2015 |

---

[3]    The "Voting Record Date" is the date on which it was determined which Holders of Claims in Class 3 were entitled to vote to accept or reject the Plan and whether Claims had been properly assigned or transferred such that an assignee could vote as the Holder of a Claim.

KE 33055262

| Event | Date |
|---|---|
| Package | |
| Voting Deadline[4] | April 28, 2015, at 5:00 p.m., prevailing Central Time |
| Distribution of Combined Hearing Notice | No later than two Business Days after entry of the Order, or such other date as the Court may direct |
| Objection Deadline | May 11, 2015, at 4:00 p.m., prevailing Central Time, or such other date as the Court may direct |
| Cure Objection Deadline | On or before the later of the commencement of the Combined Hearing and 10 Business Days following receipt of the Cure Notice, or such other date as the Court may direct |
| Deadline to File the Reply Brief | 12:00 p.m., prevailing Central Time, on the date that is two Business Days before the Combined Hearing |
| Combined Hearing | May 18, 2015 or such date as the Court may direct |

### III.   FIRST-DAY PLEADINGS

32. The Debtor has filed the First-Day Pleadings seeking relief intended to allow the Debtor to streamline the administration of this chapter 11 case, proceed to efficient confirmation and consummation of the Plan, and preserve value for all stakeholders. The First-Day Pleadings include the motions set forth below.

### A.   The Combined Hearing Motion

33. At the same time the Debtor commenced this prepackaged chapter 11 case, it filed the *Debtor's Motion for Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Combined Hearing Notice and the Cure Notice, and (E) Directing that a Meeting of Creditors Not Be Convened* (the "Combined Hearing Motion").

---

[4]   The "Voting Deadline" is the date and time on or before which all Ballots (as defined in this Motion) must have been properly executed, completed, delivered, and actually received by the Debtor.

12

34. This motions seeks entry of an order: (a) scheduling a combined hearing (the "Confirmation Hearing") on the adequacy of the Disclosure Statement and confirmation of the Plan; (b) establishing a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline"); (c) approving the Solicitation Procedures; (d) approving the form and manner of distributing the Combined Hearing Notice and the Cure Notice; and (e) directing that the U.S. Trustee not convene a meeting of creditors if the Plan is confirmed within 40 days of the Petition Date.

35. Specifically, I understand that, in connection with the foregoing, the Debtor respectfully requests that the Court approve the following dates and deadlines:

| Event | Date |
|---|---|
| Voting Record Date[5] | March 30, 2015 |
| Distribution of Solicitation Package | April 1, 2015 |
| Voting Deadline[6] | April 28, 2015, at 5:00 p.m., prevailing Central Time |
| Distribution of Combined Hearing Notice | No later than two Business Days after entry of the Order, or such other date as the Court may direct |
| Objection Deadline | May 11, 2015, at 4:00 p.m., prevailing Central Time, or such other date as the Court may direct |
| Cure Objection Deadline | On or before the later of the commencement of the Combined Hearing and 10 Business Days following receipt of the Cure Notice, or such other date as the Court may direct |
| Deadline to File the Reply Brief | 12:00 p.m., prevailing Central Time, on the date that is two Business Days before the Combined Hearing |
| Combined Hearing | May 18, 2015 or such date as the Court may direct |

---

[5] The "Voting Record Date" is the date on which it was determined which Holders of Claims in Class 3 were entitled to vote to accept or reject the Plan and whether Claims had been properly assigned or transferred such that an assignee could vote as the Holder of a Claim.

[6] The "Voting Deadline" is the date and time on or before which all Ballots (as defined in this Motion) must have been properly executed, completed, delivered, and actually received by the Debtor.

13

36. I believe cause exits to approve the requested dates in the Combined Hearing Motion, which will allow the Debtor to expeditiously effectuate its restructuring and preserve value. Even prior to commencing the solicitation of the Plan, the Debtor, in conjunction with its advisors, had already engaged in discussions with its principal stakeholders regarding implementing a restructuring of the Debtor's debt obligations and recapitalization of the Debtor and First Bank. Further, a combined hearing on the Debtor's Disclosure Statement and Plan will reduce the time the Debtor remains in bankruptcy, better positioning the Debtor to implement the Sale Transaction and ultimate recapitalization of the Debtor and First Bank and cutting the cost of administering and funding this chapter 11 case. Accordingly, I believe that the requested dates and deadlines in the Combined Hearing Motion provide sufficient time for parties to make an informed decision regarding the Plan.

37. I believe that the relief requested in the Combined Hearing Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and will enable the Debtor to meet its restructuring milestones under the Plan and Plan Support Agreement, thereby providing for a more efficient chapter 11 process. Accordingly, I respectfully submit that the Combined Hearing Motion should be granted.

### B. The Bank Account Motion

38. The Debtor also filed the *Debtor's Motion for Entry of an Order (A) Authorizing the Debtor to Maintain Its Existing Bank Account and Business Forms, (B) Waiving Deposit and Investment Requirements of Section 345(b) of the Bankruptcy Code, and (C) Authorizing Financial Institutions to Honor Checks and Electronic Payment Requests* (the "Bank Account Motion").

39. By the Bank Account Motion, the Debtor seeks entry of an order (a) authorizing the Debtor to maintain its existing bank account and business forms; (b) waiving the deposit and

14

investment requirements of section 345(b) of the Bankruptcy Code; and (c) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests; and (d) granting related relief.

40. The Debtor maintains one bank account (the "Bank Account") at First Bank. As the Debtor only has two officers, no employees on payroll, and conducts minimal operational activities, there is little activity associated with the Bank Account. Funds are transferred from the Bank Account to pay corporate expenses as needed, but primarily on a quarterly basis. As of the Petition Date, the Bank Account holds approximately $10,000 in funds.

41. Although First Bank is not an authorized depository institution under the U.S. Trustee's Operating Guidelines and Financial Reporting Requirements for Debtors-in-Possession and Trustees (the "U.S. Trustee Guidelines"), it is insured by the Federal Deposit Insurance Corporation (the "FDIC"). The Debtor's balance of funds in the Bank Account falls well below the amounts insured by the FDIC for depositors. I believe it would be unnecessarily burdensome and cost-ineffective for the Debtor to be compelled to replace the the Bank Account with a new banking account (considering that the Bank Account only holds approximately $10,000) and that a waiver of the requirements to comply with the U.S. Trustee Guidelines is appropriate in this chapter 11 case.

42. The Debtor maintains the cash in the Bank Account in conservative investments that satisfy certain prudent investor guidelines, which have a primary goal of protecting principal and a secondary goal of maximizing yield and liquidity. As of the Petition Date, all of the Debtor's excess funds are held in the Bank Account, which, as a money market account, invests only in assets, securities, or other instruments insured, guaranteed, or collateralized by the United

15

States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States.

43. I believe that the relief requested in the Bank Account Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interests and will enable the Debtor to continue to operate in the ordinary course without disruption. Accordingly, I respectfully submit that the Bank Account Motion should be granted.

### C. The Bar Date Motion

44. In addition, by the *Debtor's Motion for Entry of an Order (A) Setting Bar Dates for Filing Proofs of Claim and (B) Approving the Form and Manner of Notice Thereof* (the "Bar Date Motion"), the Debtor seeks entry of an order establishing deadlines for filing proofs of claim (and approving the form and manner of related notices).

45. The Bar Dates (as defined in the Bar Date Motion) are designed to provide the Debtor and other parties in interest with certainty regarding the size of the claims pool. The Debtor does not anticipate that there will be many general unsecured claims in this chapter 11 case. Nonetheless, an expedited bar date process is an important part of implementing a streamlined restructuring pursuant to the Plan and exiting chapter 11 as soon as possible.

46. I believe that the relief requested in the Bar Date Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate in the ordinary course without disruption. Accordingly, I respectfully submit that the Bar Date Motion should be granted.

### D. The K&E Retention Application

47. In addition, shortly after the Petition Date, the Debtor intends to file the *Debtor's Application to Employ Kirkland & Ellis LLP as Attorneys for the Debtor and Debtor in Possession Effective* Nunc Pro Tunc *to the Petition Date* (the "K&E Retention Application").

By the K&E Retention Application, the Debtor will seek to employ and retain Kirkland & Ellis LLP ("K&E") as attorney for the Debtor in this chapter 11 case. I believe that the Debtor's estate will benefit from K&E's services, primarily in representing and advising the Debtor through its chapter 11 case. K&E is a full-service law firm that has extensive experience in representing debtors in a wide variety of chapter 11 cases and other restructurings. It is my understanding that K&E is extremely well suited to represent the Debtor in this chapter 11 case. Accordingly, I respectfully submit that the K&E Retention Application should be granted.

E.  **The River Branch Retention Application**

48.    In addition, shortly after the Petition Date, the Debtor intends to file the *Debtor's Application to Employ River Branch Capital LLC as Financial Advisor for the Debtor and Debtor in Possession, Effective* Nunc Pro Tunc *to the Petition Date, and Waiving Certain Information Requirements Imposed by Local Bankruptcy Rule 5082-1(c)* (the "River Branch Retention Application"), by which it will seek to retain River Branch Capital LLC as financial advisor in this chapter 11 case. I believe that the Debtor's estate will benefit from River Branch's services, primarily in marketing the recapitalization of First Bank. River Branch specializes in providing financial advisory and investment banking services to financial institutions and bank holding companies, like the Debtor. It is my understanding that River Branch is fully equipped to assist the Debtor in marketing and negotiating a potential transaction resulting with the recapitalization of First Bank. Accordingly, I respectfully submit that the River Branch Retention Application should be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 29, 2015
Chicago, Illinois

*/s/ Alan Reasoner*
Alan Reasoner
President
Northwest Bancorporation of Illinois, Inc.
300 East Northwest Highway
Palatine, Illinois 60067